IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

GERALD BUSHMAKER,

|                          | FINAL PRETRIAL ORDER |

                          Plaintiffs,

          v.                                         09-cv-726-slc

A. W. CHESTERTON COMPANY and
RAPID AMERICAN CORPORATION,

                          Defendants.

---

At the pretrial conference on February 21, 2013, the court discussed a wide spectrum of legal, evidentiary and trial practice issues with the parties.  The court's rulings at the final pretrial conference speak for themselves and will not be repeated in this order.   As part of the relatively long, freewheeling discussion, the court also permitted and directed the parties to submit additional briefing on several motions in limine, as well as a few minor issues concerning the voir dire and jury instructions.  Having received and reviewed the parties' supplements, the court rules as follows:

I.      **Rapid's Motion in Limine #4:   Motion to Exclude Deposition and Trial Testimony of Louis Pechstein, John T. Cantlon, Thomas F. Mancuso, M.D., John Humphrey, Karl Krieg, Robert Merrill, Michael Prus and Robert Bockstahler Given in Earlier Actions**

Plaintiff seeks to introduce the deposition testimony of deceased witnesses Louis Pechstein, John Humphrey and John T. Cantlon, who testified in prior asbestos litigation involving Celotex Corporation.   (The testimony of Prus and Bockstahler has been ruled inadmissible by the court; Merrill and Krieg are not listed on plaintiff's latest witness list; and

Rapid American appeared in the deposition of Mancuso.)  Fed. R. Civ. P. 32(a)(8) provides that

a deposition may be used in a later action involving the same subject matter between the same

parties, their representatives or successors in interest to the same extent as if taken in the later

action.  Similarly, Fed. R. Evid. 804(b)(1) provides for an exception to the hearsay rule if the

declarant is unavailable as a witness and gave testimony

> (A)  . . . as a witness at a trial, hearing, or lawful deposition,
> whether given during the current proceeding or a different one;
> and
>
> (B) [that testimony] is now offered against a party who had—or,
> in a civil case, whose predecessor in interest had—an opportunity
> and similar motive to develop it by direct, cross-, or redirect
> examination.

"There need only be a 'substantial identity of issues, and the presence of an adversary with the

same motive to crossexamine the deponent.'"  *Kmart Corp. v. Footstar, Inc.*, 2012 WL 5389727,

*4 (N.D. Ill. Nov. 2, 2012) (quoting *Acme Printing Ink Co. v. Menard, Inc.*, 812 F. Supp. 1498,

1523 (E.D. Wis.1992)).  "The similar motive inquiry is essentially a hypothetical one:  is the

motive to develop the testimony at the prior time similar to the motive that would exist if the

declarant were produced (which of course he is not) at the current trial or hearing."  *Schimpf v.

Gerald, Inc.*, 52 F. Supp. 2d 976, 982 (E.D. Wis. 1999).

Plaintiff has presented evidence showing that Celotex, like Rapid, also had successor

liability for Philip Carey's conduct and appeared at depositions representing the interests of

Philip Carey in its defense of 65,000 asbestos claims that arose from its acquisition of Philip

Carey's liabilities.  Defendant argues that it did not have the same opportunity and motive as

Celotex because although it shares a common corporate predecessor with Celotex—the Philip

Carey Manufacturing Company as it existed prior to June 1, 1967—Celotex, unlike defendant,

also is responsible for Philip Carey as it existed after June 1, 1967.  However, as plaintiff points

out, the fact that Celotex may have had additional interests (avoiding post-1967 liability as well

as pre-1967 liability), those interests were the same as defendant's—conducting a thorough and

complete defense to Carey-related asbestos claims.

Defendant also argues that Celotex did not examine the former Philip Carey employees

regarding their lack of knowledge of the potential harmful effects of asbestos, actions they took

to promote safety in the workplace and the absence of claims against Philip Carey during the

time period relevant to this action—all things defendant would have asked if it had been present

at the depositions.  However, the test is whether Celotex had the motive and opportunity to

examine the witnesses, not whether Celotex acted as defendant would have acted.  *See Kmart*,

2012 WL 5389727 at *4 (finding similarly where defendant argued that it would have directed

deposition questions differently and pinned down the witnesses).  Nothing in the record

indicates that Celotex was prevented from or did not have the incentive to thoroughly cross

examine Pechstein, Humphrey and Cantlon.  *See Schimpf*, 52 F. Supp. 2d at 983 (citing *United

States v. Feldman*, 761 F.2d 380, 385 (7th Cir. 1985)) (noting mere naked opportunity to cross

examine is not enough; there also must be real need or incentive).  Accordingly, the prior

deposition testimony of those witnesses is admissible.


II.     **Rapid's Motion in Limine #15(B) and ©:  Motion to Exclude Evidence that Rapid
        (aka Philip Carey) was Involved in Other Claims or Lawsuits and Any Evidence
        of Occupational Accidents Involving Asbestos that Were Not under Same or
        Similar Conditions as Plaintiff's Working Conditions**

Rapid has moved to exclude plaintiff from making:

3

B.  Any reference to the effect that the Defendant has or may have been involved in any other type of claim or lawsuits of any kind;  and

C.  Any reference to any industrial or occupational accidents, tragedies, or epidemics involving asbestos or any other substance, which were not under the same or similar conditions as Plaintiff's working conditions.

Plaintiff opposes the motion, asserting that he wants to introduce evidence of eight workers compensation claims against Philip Carey by plant workers dating back to 1949 for the purpose of showing Philip Carey had notice of the potential dangers of asbestos.

As an initial matter, I note that defendant objects to several of the claims on the ground that they post-date the sale of the products at issue in this case.  As discussed in the next section of this order, I am reserving ruling on Rapid's motion to exclude post-sale evidence.  (I agree with Rapid, however, that any claims filed after the liability cut-off date of June 1, 1967 are not relevant.)  To the extent that *that* motion is granted, then any post-sale worker's compensation claims are irrelevant.

In products liability cases, evidence of other accidents is relevant to show notice to the defendant of the danger, to show existence of the danger and to show the cause of the accident, but only where the accidents occurred under substantially similar circumstances. *Weir v. Crown Equipment Corp.*, 217 F.3d 453, 457 (7th Cir. 2000).  Defendant argues that the workers compensation claims do not meet this requirement because they involved plant workers, who worked in conditions much different than that of Bushmaker. However, where, as here, the plaintiff seeks to introduce the evidence to show notice, "[t]he requirement of similarity is less strict." *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1269 n. 9 (7th Cir. 1988); *see also Dewick v. Maytag Corp.*, 324 F. Supp. 2d 894, 904 (N.D.Ill. 2004) (stating that "foundational requirement of substantial similarity is relaxed ... when prior accidents are introduced only to

4

show that a defendant had notice of a condition and not as substantive evidence that the presence of the condition created liability").

Bushmaker's theory in this suit is that he was injured by inhaling asbestos fibers released when he was working with or near asbestos-containing insulation products, including pipe covering, cement and floor underlayment. Although his level of exposure presumably was a great deal lower than that of the plant workers who filed workers compensation claims, the method by which Bushmaker was harmed–the inhalation of asbestos fibers released into the air–was the same as that of the plant workers. I am satisfied that evidence of workers compensation claims filed by plant workers is relevant to showing that Philip Carey knew or should have known of the dangers posed to someone likely to inhale asbestos fibers, including those who worked with its end products. To the extent that the number of these claims is very small when compared to the thousands of workers who did not file claims, this goes to the weight to accord this evidence, not its admissibility.

The next question is whether the workers compensation claims are unfairly prejudicial when compared to their probative value under Rule 403. Defendant argues that if the court admits the workers compensation claims into evidence, then Rapid will have to present evidence showing the difference between asbestos exposures that can occur during the manufacturing process and the exposures that result from the occasional use of end products, as well as evidence "defending the actions of Philip Carey in responding to the worker's compensation claims," which will result in confusion and delay while the parties litigate these mini-trials. I do not find these arguments persuasive. Evidence showing the difference between plant exposures and end product exposures does not seem overly complicated, and is likely to come in through

other witnesses in any event as part of the state-of-the-art evidence.  Further, it is not clear why a mini-trial would be necessary as to each of the workers compensation claims because *how* the claims were handled by Philip Carey does not appear to be in issue.  The claims are being offered only as to notice, not to show causation, and the court will instruct the jury to that effect when asked to do so.  Under these circumstances, I find that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.


III.    **Rapid's Motion in Limine #23**:  **Bar Any Post-1960 Documents or Testimony Regarding Philip Carey's Knowledge of Potentially Hazardous Nature of its Products**

   A.  **Post-Sale Duty to Warn**

Rapid seeks to exclude this evidence on the ground that the Philip Carey products to which plaintiff claims to have been exposed were sold or supplied to plaintiff's employer, Consolidated Paper, no later than 1960.  Defendant contends that any knowledge that it might have acquired after this date regarding potential hazards from asbestos is irrelevant because any duty that it had to warn of such hazards ended with the sale of the product.  At the pretrial hearing, the court granted the motion conditionally, inviting plaintiff to submit authority in support of his position that a manufacturer has an "ongoing" duty to warn of dangers of which it became aware after it sold the product, and therefore post-sale evidence of knowledge is relevant.  Plaintiff filed a supplement, dkt. 127, to which defendant responded, dkt. 142. Having reviewed those submissions and conducted additional research, I am reversing my conditional ruling and denying Rapid's motion.

6

Various courts have held that manufacturers have a duty to warn of dangers involved in the use of their products if they become aware of those dangers after the product has been sold, although the contours of this duty to warn differ from state to state. *Crowston v. Goodyear Tire & Rubber Co.*, 521 N.W. 2d 401 (N.D. 1994); *Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451 (2d Cir.), cert. denied, 396 U.S. 959 (1969); *Downing v. Overhead Door Corp.*, 707 P.2d 1027 (Colo. App.1985); *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299 (1993); *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992); *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959); *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826 (Minn.1988), *cert. denied*, 492 U.S. 926 (1989); *Cover v. Cohen*, 61 N.Y.2d 261 461 N.E.2d 864 (1984). *See also* 3 American Law of Products Liability 3d, § 32:79 et seq. (1993); Kulbaski, *Statutes of Repose and the Post-Sale Duty to Warn:  Time for a New Interpretation*, 32 Conn. L. Rev. 1027 (2000).

Relying on *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915 (1979) and *Olsen by Olsen v. Ohmeda, Civ. of Boc Group, Inc.*, 863 F. Supp. 870, 874 (E.D. Wis. 1994), *aff'd sub nom.* 77 F.3d 485 (7th Cir. 1996), defendant argues that in Wisconsin, this post-sale duty exists only in limited circumstances that are not present in this case.

In *Kozlowski*, in 1974 a pressurized piston on an industrial sausage stuffer machine broke through a safety ring while Kozlowski was cleaning the machine.  As a result, ammonia spewed out and the fumes asphyxiated Kozlowski.  Decades early, in 1946, the manufacturer of the sausage stuffing machine had developed an optional safety by-pass valve that could have prevented the injury and that was "advertised in trade publications that reached 100% of its customers," but its sales representative did not discuss the safety device with the sausage stuffer's

owner and the owner had no actual knowledge of the existence of the safety device. The question before the court was "whether there is a continuing duty to warn of an alleged defective condition in light of the availability of a 1946 safety device." *Id*. at 901. The trial court had entered a directed verdict in favor of the manufacturer, but the supreme court reversed, finding enough evidence to submit the duty-to-warn question to the jury:

> The sale of the sausage stuffer is to a limited market wherein the manufacturer should know of all companies that own its product. Therefore, whether based upon the theory of strict liability in tort or a common law duty, a jury could find it persuasive that prior to the accident, a Smith's sales representative made only two visits to the Cudahy plant. On each occasion he failed for one reason or another to inform Cudahy of the safety by-pass valve and the hazard it was designed to prevent. The representative's own testimony is that these sales calls were made after 1971 when the safety by-pass valve had become standard equipment on all new machines.
>
> We do not in this decision hold that there is an absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer and the nature of that industry bears no similarity to the realities of manufacturing and marketing household goods such as fans, snowblowers or lawn mowers which have become increasingly hazard proof with each succeeding model. It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards on household items, mass produced and used in every American home, when the product is 6 to 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of the art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period.
>
> As noted, the sausage stuffer machine industry is far more limited in scope. Consequently, a jury in determining a manufacturer's duty in this restricted area must look to the nature of the industry, warnings given, the intended life of the machine, safety improvements, the number of units sold and reasonable marketing practices, combined with the consumer expectations inherent therein.

*Id*. at 900-901.

Although *Kozlowski* was decided more than 30 years ago, I have found no published cases from the Wisconsin appellate courts discussing it in the context of a post-sale duty to warn. However, the case was addressed in detail by the United States District Court for the Eastern District of Wisconsin in *Olsen*.  The plaintiffs in that case argued that the manufacturer of an anesthesia unit was negligent in failing to warn the hospital that the unit lacked certain safety features that were found on newer models.  863 F. Supp. at 876.  Before trial, they took the position that they were proceeding on a *Kozlowski* theory of liability.  *Id*. at 873.  The case went to trial and the jury found for plaintiffs on negligence.  On motions after verdict, however, the court granted defendant's motion for judgment as a matter of law, finding that plaintiffs had not submitted enough evidence to meet the elements required by *Kozlowski*, which the court identified as follows:

> 1.  The duty to warn post sale must arise in a specific context, taking into consideration the nature and scope of the industry.  Factors to be considered include the number of customers, units sold, and customer's expectations;
>
> 2.  The manufacturer knew or should have known of a defect or defective condition in its product after the sale of the product;
>
> 3. The manufacturer developed a safety device in response to the known post sale defect or defective condition; and
>
> 4.  The manufacturer failed to notify its circle of customers of the defect or defective condition and the safety device developed in response thereto.

Defendant in this case argues that plaintiff must establish these same four elements in order to present to the jury his post-sale failure to warn theory.  Defendant argues that plaintiff cannot satisfy the first, third or fourth elements because 1) Philip Carey's products were used in any place where insulation was necessary and therefore the company had no way of knowing who the end users of its products were; 2) there was no safety device developed in response to

9

a known post-sale defect; and 3) Philip Carey could not possibly have notified all of its customers of the defect and any safety device developed in response thereto.

Defendant makes a persuasive case that plaintiff cannot satisfy the *Kozlowski* factors, but I am not convinced that *Kozlowski*'s test was meant to apply–or does apply–to *any* post-sale duty to warn case. Notably, the court indicated that the question before it was the scope of the continuing duty to warn, post-sale, "in light of the availability of a . . . safety device." In limiting the scope of that duty, the court was wary of placing unreasonable burdens upon manufacturers who, each time they re-designed their products to be more safe, would be "required to trace the ownership of each unit sold and warn annually of new safety improvements." In this asbestos exposure case, however, plaintiff is not arguing that defendant had a duty to warn of post-sale safety improvements. He is arguing that once defendant learned that asbestos-containing products were hazardous, it had a duty to recall its products or to provide warnings about the danger.

Given the limited case law and the dissimilar products at issue, it is difficult to discern a clear answer to the parties' dispute, but I conclude that under Wisconsin law, a manufacturer's post-sale duty to warn is not limited to the *Kowalski* situation. Consider *Sharp ex rel. Gordon v. Case Corp.*, 227 Wis. 2d 1, 23 (Wis. 1999), a case cited by plaintiff. In *Sharp,* the plaintiff's arms were amputated when a tractor's power take-off (PTO) shaft engaged without warning as he attempted to clear hay from a baler powered by the PTO. The evidence showed that the Case Corporation, which had manufactured the tractor in 1972, had received complaints that the "off" position on the PTO drive was not really "off" and that the PTO drive would suddenly self-start without warning, and that on at least one prior occasion (in 1985), had received notice of

10

a similar injury sustained by a farmer when the PTO drive shaft had suddenly and without warning become engaged. *Id*. at 26. There also was evidence that Case had issued post-sale warnings about other problems, it was feasible and inexpensive to distribute warnings or decals to dealers, dealers were able to reach about 50 percent of tractor owners and advertisements in national magazines could reach additional owners. *Id*. On one of the answers to special verdict questions, the jury found that after manufacture and sale of the product, Case Corporation learned of a defect posing a serious hazard that originated at and was unforeseeable at the time of manufacture and that Case Corporation did not use due care in warning about the danger. *Id*.

Notably, the case was submitted to the jury on the post-sale failure to warn theory even though there appears to have been no evidence that Case had developed a safety device in response to the problems reported about its tractor's PTO lever. On the other hand the defendant did not challenge the propriety of the special verdict question on appeal, so we don't know whether the viability of a post-sale failure to warn theory was ever in dispute. That said, the court did mention Case's failure to take "adequate remedial procedures such as product recalls or post-sale warnings," as evidence upon which a jury could make a finding of punitive damages. *Id*. at 23. If, as defendant argues here, a defendant cannot be liable at all for a post-sale failure to warn, then it would follow that it would be improper to consider evidence of such conduct in the punitive damages assessment. Accordingly, *Sharp* indicates that *Kozlowski*'s holding is limited to the failure-to-warn-of-safety-improvements scenario and that a manufacturer may in other instances have a post-sale duty to warn.

11

The question troubling this court in this case is: under what specific circumstances that duty exists?  The answer is unclear from the cases cited by the parties.  What is clear, however, is that the elements of a post-sale duty differ from those of a time-of-sale duty, "primarily due to the acknowledgment of extreme practical difficulties–and potential impossibilities– manufacturers or sellers may face in having to identify and notify users about a danger months or even years after they have sold a particular product."  Kulbaski, 32 Conn. L. Rev at 1039. The *Restatement (Third) of Torts:  Products Liability § 10*, explains that a person or entity engaged in the distribution or sale of a product to issue a post-sale warning "if a reasonable person in the seller's position would provide such a warning."  The *Restatement (Third),* then explains that a reasonable person would issue such a warning if:

> (1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

> (2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

> (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

> (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

*See also* V. Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U.L.Rev. 892, 896 (1983) ("[T]he facts of a particular case, such as the gravity and likelihood of harm, the number of persons affected, and the economic cost and practical problems associated with identifying and contacting current product users, should all be relevant in determining whether a manufacturer has satisfactorily discharged a post-sale duty to warn.")

Although Wisconsin has not adopted § 10 of the *Restatement (Third)*, factors (2) and (3) appear to be consistent with the Wisconsin Supreme Court's discussion in *Kozlowski* of the need to evaluate the nature and scope of the industry and the discussion in *Sharp* regarding evidence showing that the provision of a post-sale warning was both feasible and effective.

Accordingly, I am satisfied that in order for a duty to warn, post-sale, to exist, the plaintiff must have some evidence of the sort presented in *Sharp*, namely that it was both practically and economically feasible for the defendant to have provided warnings and that any warnings would have been effective in reaching the users of its products.  See *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23 n. 12, 291 Wis.2d 283, 717 N.W.2d 17 (existence of duty and scope of such duty present questions of law for the courts to decide); *accord* Restatement (Third), § 10 ("courts must make the threshold decisions that, in particular cases, triers of fact could reasonably find that product sellers can practically and effectively discharge such an obligation and that the risks of harm are sufficiently great to justify what is typically a substantial post-sale undertaking").

Here, it is unclear from plaintiff's submissions what, if any, evidence he plans to offer on this subject.  All he says is that: 1) Philip Carey's insulation products were made to be used for many years, and therefore it was foreseeable to Carey that they would continue to be used post-sale; and 2) post-sale warnings have been issued by car sellers and food producers.  This is not enough for the court to allow plaintiff to present this issue to the jury.  Although an argument perhaps could be made that it was up to defendant to have put plaintiff to his proof on this point in the MDL court by filing a motion for summary judgment, it is not entirely clear whether defendant was on notice that plaintiff was going to pursue a post-sale duty-to-warn theory at

13

trial. In any event, notice or not, it would be unfairly prejudicial to defendant to have the post-sale evidence presented to the jury, only to find out that plaintiff has no evidence to offer on the subject of the feasibility and efficacy of a post-sale warning.

Accordingly, not later than noon on Sunday, March 3, 2012, Bushmaker must identify the evidence he intends to present showing that it would have been technically and economically feasible for defendant to have identified and contacted product users after the products were sold or issued a recall of the products and that any warning that defendant could have provided would have been effective in reaching those users. The court will entertain any response that defendant may wish to make at the 8:30 a.m. conference on Monday.[1] If the court is satisfied after considering plaintiff's proffer and defendant's response that plaintiff has enough evidence from which a trier of fact could reasonably find that it was both economically and practically feasible for Rapid's predecessor to have issued a warning or product recall and that such warning would have reached a significant percentage of the users of its products, then plaintiff may proceed at trial on his post-sale failure to warn theory. If plaintiff's proffer is inadequate, then he may not present his post-sale failure to warn evidence to the jury.

I note that defendant makes an alternative argument that, because plaintiff's expert, Dr. Bedrossian, has testified that any exposure to any asbestos-containing product was a contributing cause leading to Bushmaker's injury, and because plaintiff has admitted to having been exposed to asbestos-containing products before 1960, any warning that Philip Carey could

---

[1] Although the parties may not believe this in light of their experiences in this case, this court does not ordinarily set short, weekend deadlines on the eve of trial. This case is the exception because for a variety of reasons, many of the disputes were not fully developed or timely presented by the parties to each other or to this court, so that we are all being more reactive than normally would be the case. It is what it is, so we will all do what we have to do in the time remaining.

14

have provided after 1960 could not have conceivably prevented his injury.  This is a good argument to make during defendant's closing, but I do not find it a sufficient basis to exclude the post-1960 evidence altogether.  If a jury could find that post-1960 exposure to Philip Carey's products contributed to some degree to plaintiff's injury, and there is evidence from which it could find that issuance of a warning was feasible, then it could also find that failure to issue that warning was a cause of Bushmaker's injury.


### B.  Proof of Dangerousness

Alternatively, plaintiff argues that the post-1960 evidence is relevant to show that defendant's asbestos-containing products were unreasonably dangerous at the time of sale. Plaintiff points out that under strict liability, proof of the dangers of a product are admissible regardless of the manufacturer's knowledge of the danger.  *Green v. Smith* & *Nephew AHP, Inc.*, 2001 WI 109, 245 WIs. 2d 772, 629 N.W. 2d 727.  Defendant responds that because it does not matter under strict liability what defendant knew, post-sale evidence related to knowledge is irrelevant.

At the outset, the nature of this dispute is not entirely clear.  Defendant's motion only seeks to include post-1960 evidence offered to show knowledge.  In that respect, I agree that such evidence is irrelevant to plaintiff's strict liability claim.

To the extent that plaintiff has other post-1960 evidence that he seeks to offer solely to show that defendant's products were unreasonably dangerous, such evidence would be admissible.

**IV.  Rapid's MIL #24:  Kaylo-Eagle**

Nothing in plaintiff's submissions, dkt. 129, convince me that I erred in my determination that Bushmaker did not timely disclose to defendant that he would be pursuing liability on a theory of asbestos fiber sales by Old Carey to Owens-Corning and Eagle Picher. The ruling stands.

**V.  Rapid's Motion to Preclude Evidence of Actions of Trade Associations of Which it was Not a Member, dkt. 78**

Rapid moves to exclude actions of trade associations of which it was not a member. Bushmaker intends to introduce such evidence through his experts on what the "state of the art" in the industry was with regard to the dangers of asbestos at the time period relevant to this suit. Bushmaker contends that, so long as information collected by trade or industry groups is deemed by his experts to be reliable sources of the state of the art, then the evidence is admissible whether or not Rapid was a member of such trade groups or aware of their studies.  As Bushmaker points out, a manufacturer can be found liable for failing to warn not only of dangers that it knew, but that it should have known.

Evidence of industry practice or custom is relevant, though not conclusive, evidence on the question whether the defendant reasonably could have done something to prevent the harm. *Morden v. Continental AG*, 235 Wis. 2d 325, 359, 611 N.W. 2d 659 (2000).  "Evidence of 'the custom in the industry (what the industry was doing) and the state of the art (what the industry feasibly could have done) at the time' of the design or manufacture is relevant to the jury's determination of negligence."  *Id*. (quoting *D.L. Friederichs v. Huebner*, 110 Wis.2d 581, 616-17, 329 N.W.2d 890 (1983)).  Rapid cites no case holding that only those reports, studies or other

16

information of which a manufacturer was actually aware may be included in the body of evidence establishing the "state of the art" in the industry.

Instead, defendant's objection appears to be that several of the trade organization reports upon which Bushmaker's experts have relied as a basis for their opinions are unreliable to show the state of the art in Philip Carey's industry because these trade organizations belong to a different industry.  That may be so, but it is an insufficient basis to exclude the evidence altogether.  Notably, Rapid has not raised any *Daubert* challenge to any of plaintiff's state of the art experts.  Insofar as its arguments go to the reliability of those experts' testimony, these arguments go to weight, not admissibility.

## VI.  Bushmaker's MIL #5:  Exclude Bankruptcy Trust Documentation

Bushmaker seeks to prevent Rapid American from introducing bankruptcy trust claim forms as evidence of his exposure to other asbestos products unless it first lays foundation that Bushmaker actually was exposed to asbestos products produced by the company in question. *See* Pl's MIL #5, dkt. 62.  Because the court could not rule definitively on this issue until it reviewed the contents of the claims forms, I asked Rapid American to submit the forms that it intended to introduce into evidence at trial.  In response, Rapid American has submitted several hundred pages of documentation in 26 numbered exhibits.  *See* dkts. 115-118.

After reviewing the bankruptcy trust documents, it appears that they fall within three broad categories: (1) one- to two-page sworn and signed affidavits identifying the products that Bushmaker was exposed to and when and where the exposure occurred; (2) unsigned proof of claim forms asking Bushmaker about his exposure, injuries, prior claims or litigation, smoking

history and employment and economic loss; and (3) sworn and signed release and indemnity agreements.

The affidavits are admissible without any need of further foundation because they are signed admissions by Bushmaker of his periods of exposure to specific products.

The release and indemnity agreements are evidence of settlement offers and negotiations that are generally inadmissible under Fed. R. Evid. 408 unless Rapid American intends to admit them to prove bias or prejudice on the part of a witness.

The claim forms or questionnaires are fair game for Rapid to use in questioning Bushmaker at trial, as long the appropriate foundation is laid. I note that the questions on those forms related to Bushmaker's prior claims and litigation would be inadmissible under Rule 408. Also, some claim forms do not identify a product, exposure amount or exposure site. With respect to those forms, Rapid American will have to lay foundation that Bushmaker actually was exposed to an asbestos-containing product produced by the company in question. Finally, because Exhibit 2708 appears to be a table listing the companies with which Bushmaker has reached a settlement since 1995, it is inadmissible under Rule 408.

Most of the numbered exhibits include more than one type of document and multiple copies of the same document. Therefore, I am instructing Rapid American to sort the potentially admissible documents into separately numbered exhibits. For example, the affidavit relating to Bushmaker's exposure to Armstrong World Industries products in Exhibit 2729 should be numbered separately from the Armstrong World Industries claim form in Exhibit 2729. If redactions are required to an otherwise admissible document, the court will address this matter with the parties at trial.

## VII.  Voir Dire

Defendant has asked that the statement of the case be revised to read that Philip Carey Manufacturing Company is an *alleged* corporate predecessor of defendant because there are two companies by the name of "Philip Carey Manufacturing Company":  one that existed prior to June 1, 1967 and one that existed after June 1, 1967.  Defendant is concerned that the unqualified language is vague and could be construed to its detriment in other litigation. Plaintiff appears to oppose the addition of "alleged" and instead asks that a stipulation be presented to the jury that Rapid is responsible for Philip Carey's liabilities prior to 1967.  Dkts. 136 and 140.

The term "alleged" will not be included in the statement of the case, which only appears in the voir dire and introductory instructions and is intended to briefly introduce the parties and the case to the jurors.  It does not constitute a decision or findings of fact of the court.  For defendant's benefit, I note that the court has not made any findings with respect to its corporate structure or relationship to Philip Carey and none should be inferred from the statement of the case found in the voir dire or introductory instructions.  The parties may advise the court at the conference set for 8:30am on Monday March 4 whether they agree to the stipulation proposed by plaintiff.

At the final pretrial conference, the parties agreed to add a voir dire question related to whether any juror has ever searched the internet to learn about asbestos.  Plaintiff has proposed the following question, which I have added as subpart d to Question No. 3:  Has anyone done research on the internet about asbestos disease?  Dkt. 130.

Question No. 7 asks about manufacturers, distributors and miners of asbestos.  The parties agreed to change the term distributor to seller.  Consolweld also was removed from list of companies in this question because they are not a manufacturer, seller or miner of asbestos and the court already asks about them in Question No. 6.

## VIII.  Introductory Jury Instructions

The parties have asked that the court instruct the jury not to publish the fact that they are on a jury on Twitter or Facebook.  I have added the following statement on page 3 of the introductory instructions: "Do not post on Facebook, Twitter or any other social media site anything about the case or even the fact that you are on a jury."

Defendant asked for a preliminary instruction advising the jury to reach their decision based on the facts and not any emotional proclivities that they may have for either plaintiff or defendant.  The court agreed and has added the following to the introductory instructions:

> Sixth, perform your duties fairly and impartially.  Do not allow sympathy, prejudice, fear or public opinion about either of the parties or the subject of the case to influence you.

As agreed by the parties at the final pre-trial conference, the court has added an instruction about corporate defendants having the same rights as individual defendants.

## IX.  Post-Trial Jury Instructions

As discussed at the final pre-trial conference, the final instructions will be fine tuned to reflect what comes in at trial.  The parties alerted the court that the duty to warn instructions in the post-trial instructions may need to include both manufacturers and sellers.

To avoid the confusion of having a duty to warn instruction for both negligence and strict liability, the court has added the following statement to the strict liability duty to warn instruction:  The failure to give a warning, when required by this instruction, means that the product is "defective" and unreasonably dangerous, even though it is faultlessly made and therefore within the strict liability rule.  *See* Comments, WI JI-Civ 3262; Restatement (Second) of Torts § 402A cmt. j and k.

## X.  Special Verdict

Both parties submitted proposed special verdict forms but only defendant offered objections to plaintiff's proposed verdict form.  Because plaintiff failed to raise any objections to defendant's proposed form, the court adopted defendant's version.  At the final pre-trial conference, however, it became clear that plaintiff opposed the use of the term "substantial occupational exposure" and the combining the apportionment of fault for strict liability and negligence in the same verdict question.  Because plaintiff stated that he did not understand that he had to flag any potential dispute prior to the final pre-trial conference, the court allowed the parties until February 25, 2013 to raise any further objections to the special verdict form. Plaintiff failed to address his objections to the special verdict form in his supplemental materials. As a result, he has waived his objections to the special verdict form.

For completeness sake, I note that at the final pre-trial conference, plaintiff cited the case of *Fuchsgruber v. Custom Accessories, Inc.*, 244 Wis. 2d 758, 628 N.W.2d 833 (Wis. 2001), in support of his position that the apportionment of fault must be divided into separate questions related to negligence and strict liability.  However, as defendant points out, *Fuchsgruber* presented a different situation because it involved one product—a hydraulic jack—and three defendants involved in the chain of distribution (the manufacturer, distributor and retailer).  The state

21

supreme court held that under such circumstances, in strict liability cases, the jury first had to compare the plaintiff's conduct to the product's defectiveness and then, in a separate question, apportion liability among the various defendants involved in the manufacture, distribution and sale of that one product. *Id.*, 244 Wis. 2d at 770-71. Here, there are several possible products that could have contributed to plaintiff's injuries but each of those products involved only one company in the chain of distribution. The combined question related to comparative fault in this case appropriately compares plaintiff's conduct to the alleged defectiveness of each of those products, as well as to the alleged negligence of defendant and possibly other companies.

Because I have not yet made any changes to the special verdict form following the final pretrial conference, I have not attached a copy of it to this order. Copies of the lightly-modified voir dire and jury instructions are attached.

## XI. Trial Practice

At the final pretrial conference, the court explained to the parties how it runs its jury trials. I neglected to mention several points. Although I announced that the court frowns upon technical or tactical objections, I do expect the parties to make the objections that really matter to them. The court allows a brief explanation in support of an objection, but not long speeches. The court is willing to address objections at sidebar if necessary. The court strongly prefers that the opening statements be statements, not arguments. Understanding that lawyers are loathe to object during their opponent's direct presentations to the jury, objections are appropriate if opposing counsel strays too far across the line too often.

Entered this 1st day of March, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

22