UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GERALD BUSHMAKER,

     Plaintiff,

 -vs-                                  Case No. 09-CV-726-SLC

RAPID-AMERICAN CORPORATION,      Madison, Wisconsin
                                 March 7, 2013
        Defendant.            8:35 a.m.

  \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

 STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF JURY TRIAL
HELD BEFORE MAGISTRATE STEPHEN L. CROCKER, and a jury,


APPEARANCES:

For the Plaintiff:  Cascino Vaughan Law Firm
                    BY:  ROBERT MCCOY
                    KEVIN HANBURY
                    JAMES HOEY
                    220 South Ashland Avenue
                    Chicago, Illinois 60607-5308

For the Defendant:  Rasmussen Willis Dickey & Moore
                    BY:  STEVE MOORE
                    9200 Ward Parkway, Ste. 499
                    Kansas City, Missouri  64114

                    Menn Law Firm
                    BY:  MARK FELDMANN
                    2501 East Enterprise Avenue
                    Appleton, Wisconsin  54912-0785


Also present:       Donna Benson - paralegal


Lynette Swenson, RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1                           I-N-D-E-X

2   PLAINTIFF'S WITNESSES          EXAMINATION         PAGES

3   ARTHUR FRANK          Direct by Mr. McCoy        17-97
                          Cross by Mr. Moore         97-135
4                         Redirect by Mr. McCoy      135-146
                          Recross by Mr. Moore       147-150
5

6

7                         E-X-H-I-B-I-T-S

8   PLAINTIFF'S EXHIBITS                 IDENTIFIED/RECEIVED

9   Exhibit 39    Frank CV                   27         ---

10

11

12                          * * * * *

13

14

15       (Call to order)

16          THE CLERK:  Case Number 09-CV-726-SLC.

17  *Bushmaker v. Rapid-American Corporation* is called for a

18  conference and third day of jury trial.  May we have the

19  appearances, please.

20          MR. MCCOY:  Yes.  Robert McCoy and Kevin

21  Hanbury for the plaintiffs.

22          THE COURT:  Good morning.

23          MR. HANBURY:  Good morning, Your Honor.

24          MR. MOORE:  Steve Moore and Mark Feldmann for

25  the defendant.

1          THE COURT:  Good morning to you as well.

2          MR. FELDMANN:  Morning, Judge.

3          THE COURT:  All right, Counsel.  I'll simply

4   acknowledge receipt of the proposed instruction on how

5   to handle the Arthur Mueller testimony that was provided

6   this morning by the defendant, and I've already taken

7   pen to it, but we'll deal with it at the appropriate

8   time.  I don't have anything else on my agenda, but I

9   always call these meetings in abundance of caution.

10      Mr. McCoy, anything that the plaintiff wants to

11   bring to the Court's attention before the jury comes in

12   at nine?

13          MR. MCCOY:  Judge, the two items I want to make

14   sure of were still the stipulation on Rapid's

15   liabilities, which I understand is supposed to be

16   resolved by the end of today.

17          THE COURT:  Okay.  Well, you're right.  But I

18   guess I was expecting you guys to tell me if you had

19   talked, and if so, what the result of that discussion

20   was.

21          MR. MOORE:  We'll work it out over the lunch

22   hour.

23          THE COURT:  Okay.  Yeah, and you're right,

24   Mr. McCoy, you're entitled to that before you rest.  I'd

25   like it done before today.  But if you can do it over

1   lunch, that's great.

2            MR. MCCOY:  Okay.

3            THE COURT:  That's one.

4            MR. MCCOY:  Right.  The other question I had

5   was we had some categories of medical bills that were --

6   the medical bill relationship issue was reserved in the

7   MDL order for future.  It didn't have to be in any

8   expert report.  So I think we've got a category of bills

9   that's been agreed upon, types of bills by categories,

10  and they have that.  And my understanding is those

11  categories are agreed upon and the issue is whether

12  certain bills do really fit in those categories.

13           THE COURT:  Okay.

14           MR. MCCOY:  And that isn't a lot of money.

15           MR. MOORE:  We're about a $5,000 discrepancy,

16  Your Honor.

17           THE COURT:  Well, give me --

18           MR. MCCOY:  If that's all it is, I'm not going

19  to bother Dr. Frank putting on evidence of any of that

20  to the jury.

21           THE COURT:  Sure.  Well, give me an order of

22  magnitude.  $5,000 apart out of a number how big?

23           MR. MOORE:  107.  5,000 out of 107.

24           THE COURT:  Okay.  So about a 5 percent

25  difference.

1          MR. MOORE:  Yes, sir.

2          THE COURT:  Okay.  Fair enough.  Well, and tell

3   me what you want the Court to do.  Are you just letting

4   me know that you've got this difference or is there

5   something I'm going to have to resolve?

6          MR. MCCOY:  I'd just like confirmation that

7   it's not much different than $5,000 in terms of what the

8   difference is.

9          THE COURT:  Well, I think you just heard that.

10         MR. MCCOY:  And if so, if that's confirmed,

11  then Dr. Frank, who is here today, I wouldn't need him

12  to express anything on the specific medical bills.

13         THE COURT:  Sure.  And I think Mr. Moore just

14  committed to that.  But Mr. Moore, let's be more

15  proactive here.  Are you --

16         MR. MOORE:  I commit to that.  My right hand is

17  raised for the record.  I commit to that.

18         THE COURT:  Okay.  Fair enough.  That's it then

19  preliminarily for the plaintiff.

20      Mr. Moore, any preliminary issues on behalf of the

21  defendant today?

22         MR. MOORE:  I do, Your Honor.  But before we

23  discuss it, I'd like Dr. Frank to leave the courtroom

24  because it concerns the scope of his testimony.

25         THE COURT:  Sure.  Doctor, if you'd just make

1   yourself comfortable out in the hallway, that would be

2   wonderful.  Thank you.

3            DR. FRANK:  Yes, Your Honor.

4            THE COURT:  Thank you.

5        (Dr. Frank leaves courtroom at 8:39 a.m.)

6            THE COURT:  All right.  The doctor has left.

7            MR. MOORE:  Thank you, Judge.  I have a couple

8   of concerns.  *Mea culpa* because I know you haven't grown

9   up in the litigation like Mr. McCoy and I have.  In this

10  litigation, historically a lot of times a lot of

11  different experts are identified, and because Mr. McCoy

12  and I are brothers in the Illinois bar, we respect that

13  and try to accommodate each other.  In this instance, I

14  think the Court is going to find that a lot of

15  Dr. Frank's testimony is cumulative of that which was

16  provided yesterday and will be provided later on today

17  in the form of Dr. Bedrossian's deposition.  I just

18  bring that to the Court's attention.  It is -- I didn't

19  make a motion in limine on it, but I have an objection

20  to it being cumulative.  I didn't know until now.  To be

21  honest with you --

22           THE COURT:  No, no, I understand the concern in

23  general, but let's descend into specifics.  Mr. McCoy,

24  we all know it's just a matter of good trial practice

25  and in terms of what judges prefer that cumulation is

1   frowned upon.  How were you planning on handling that

2   with your witnesses hereafter?  Were you planning on

3   skipping over the stuff that the jury has already heard

4   or were you going to revisit it all?

5           MR. MCCOY:  I wasn't going to revisit in any

6   great detail, but I think that is a complex medical case

7   and one doctor alone can't answer all the questions,

8   especially because Arnold Brody is not a medical doctor.

9   He's not.

10          THE COURT:  Sure.

11          MR. MCCOY:  And second of all, Dr. Bedrossian

12  is a pathologist and Dr. Frank is a occupational

13  medicine specialist and his career in asbestos disease

14  goes back to 1968 and that has been the primary part of

15  his career.  So he has information about asbestos

16  disease that certainly Dr. Brody did not convey or I

17  didn't ask him.  I mean there's an indication that

18  Mr. Bushmaker has at least three separate conditions

19  we've identified:  There's an issue about smoking

20  causing it; there's exposures; which exposures caused

21  it.  Dr. Brody can't opine on causation.  He's simply

22  not a medical doctor to do that.

23      So in all of these contexts, there's vast

24  differences in what they're going to be covering and --

25          THE COURT:  Sure.  And I --

1          MR. MCCOY:  Certainly I'm aware of, you know,

2    repeating exactly what was said before, but I'm saying

3    these are three different views and they're not going to

4    be cumulative in the sense that I'm not going to have

5    him go up there and say, you know, how does an asbestos

6    fiber penetrate and all that stuff.

7          THE COURT:  Right.  I get it.  And those are

8    valid points as well.  And if we circle back to high

9    school Venn diagrams, it sounds like we've got three

10   witnesses who may have a little bit of overlap, and

11   perhaps all three will overlap in some small piece, but

12   to the extent that none of those circles overlap, it's

13   all fair game.  And I'm trusting Mr. McCoy not to be too

14   repetitive with his witness, but certainly he's entitled

15   to adduce new evidence.

16       Mr. Moore, if you think that we're hearing too

17   much --

18          MR. MOORE:  I can only say mucociliary

19   escalator so many times.

20          MR. MCCOY:  I don't think -- I don't think

21   that's in here, Your Honor.

22          THE COURT:  Well, sure.  And if you want to

23   just object, cumulative, probably the result you'll get

24   is Mr. McCoy, let's move on as quickly as we can and

25   you'll acknowledge that and then we'll just keep going.

1        MR. MOORE:  I'll keep an eye on the jury and

2   see if they're glossing over on the same testimony.

3        Secondly, and a greater concern is the scope of the

4   testimony.  A report was prepared in this case.  We have

5   a copy of it.  I'm concerned that some issues about an

6   increased risk of cancer reappearing is going to come

7   in.  That's a very technical area I will represent to

8   the Court.  It's not contained in the report here today.

9   And I think it's prejudicial.  I think it's speculative.

10  And --

11       THE COURT:  Sure.  Well, let me interrupt you

12  there to make clear what I think I made clear in one of

13  my rulings at the Final Pretrial Conference.  There is

14  no sandbagging, even if it's unintentional.  We, in this

15  court, are very strict about limiting experts to what's

16  in the reports.  We don't even allow supplementation

17  under 26(e) beyond the scope of that which was contained

18  in the original report.

19       We see this a lot more in patent lawsuits than we

20  do in products liability lawsuits, but the rule is the

21  same and the ruling in this case will be the same.  He

22  may not exceed his report on any substantive matter.

23  Period.  End of story.  And if he does, you can object

24  and I'll strike it.

25       MR. MOORE:  Thank you, Judge.

1        THE COURT:  And Mr. McCoy, I presume you

2    weren't going to go there, but I just wanted to be clear

3    that I don't want you asking about anything that's not

4    in his report.  And if he starts to volunteer it, it

5    might behoove you to stop him so that you don't get an

6    objection that's sustained.  But I'm not going to

7    micromanage and I'm not going to predict what might

8    happen.

9        Again, we don't look for trouble.  We assume

10   everyone is going to do what they are supposed to do.

11       Mr. Moore, was that it for the defendant?

12           MR. MOORE:  Yes, sir.

13           MR. MCCOY:  I don't -- Judge, I would have to

14   talk to Dr. Frank on this, but we have his report that

15   he prepared --

16           THE COURT:  Well --

17           MR. MCCOY:  -- and he's -- he's got in his

18   report --

19           THE COURT:  Let me put it to you --

20           MR. MCCOY:  -- putting --

21           THE COURT:  No, Mr. McCoy.  Stop.  Don't

22   interrupt me.  I haven't read the reports.  That's not

23   my job.  But I've just heard a concern from Mr. Moore on

24   behalf of the defendant that there is a fear that he

25   will exceed the scope of his report in a material way.

1    Again, I don't expect that to happen and what you're

2    telling me now is that you expect him to stick to his

3    report.  Okay.  I accept that as well.  But if there's

4    any doubt about that, then I would suggest that on the

5    matter that is in dispute this morning, you walk him

6    through the report even if you have to read it to him

7    rather than have him freelance.  Okay?

8         Because I haven't read the reports.  I don't know

9    what's in there.  But if I get objections about this, we

10   may end up at side bar with the parties both pointing to

11   the report at that point and saying what's in, what's

12   not, and then I may have to make rulings on the fly

13   based on inferences or implications.  I'd prefer not to

14   have to do that.  But I'll do whatever I have to do.

15        So I'm just going to suggest that because it's been

16   raised as an issue, you make sure that your witness tows

17   the line as best as you can.  But you're right, anything

18   that's in the report is fair game; but anything that is

19   substantively different from his report is not and I

20   don't know where that line is, but the rule is clear.

21             MR. MCCOY:  Well, you know, he talks about all

22   exposures from any and all products contributing.  I'm

23   going to ask him hypotheticals on products that are

24   going into evidence.

25             MR. MOORE:  That's within the scope of the

1   report.

2           THE COURT:  Sure.  And again, I can't predict

3   and I'm not going to ask you to hypothesize to me before

4   he testifies what might happen.  I'm just saying that

5   the rule is clear and the Court will enforce it if asked

6   to.  I'm just saying it might end up being kind of messy

7   and disruptive to get there from here.  So the closer

8   both sides can hue to the line, probably the clearer the

9   presentation will be to the jury.

10      I think that's all we can accomplish at this

11  juncture and let's just see what the testimony is.  I

12  don't have anything else.

13          MR. MCCOY:  I mean let me talk to Dr. Frank

14  about one section of this.

15          THE COURT:  Yeah.  Well, we've got 15 minutes,

16  unless the jury is all here.  We can start early if

17  they're all here.  But if not, we'll just start at nine.

18          MR. MCCOY:  Let me talk to him right now on

19  this one section.

20          THE COURT:  Okay.  Well, unless the parties

21  have anything else for the Court, we'll adjourn and then

22  we'll just reassemble when all eight jurors are here and

23  we'll start at that point.  Okay?

24      With that, we're done.

25          MR. MOORE:  Thanks, Judge.

1      (Recess            8:48-9:00 a.m.)

2            THE COURT:  Do we have a full jury?

3            MR. MCCOY:  Just a minute, Judge.  We're

4      resolving one issue.

5            THE COURT:  All right.  Everyone be seated.

6            MR. MCCOY:  As I understand, we only bring a

7      witness in once.  If there's a point that we know we

8      have to address, it's in the other report, then I think

9      that's what we would do now.

10           THE COURT:  Okay.  So are you addressing that

11     to the Court?  I mean --

12           MR. MCCOY:  Yes.

13           THE COURT:  -- obviously in any trial the

14     plaintiff has the right to rebuttal.  Again, we'd like

15     common sense to be our guide here, but if there's some

16     question as to whether the rebuttal will be necessary

17     and putting it in proactively offends the defendant's

18     sense of what's appropriate and admissible, then perhaps

19     it's best to wait until the defense case and then bring

20     the witness back.

21         On the other hand, you know, I'd like to finish the

22     evidence on Monday at the latest and have you guys close

23     not later than Tuesday, and hopefully Monday afternoon.

24     Does this have to do with this morning's witness --

25           MR. MCCOY:  Yes.

1              THE COURT:  -- with what's in his report?

2              MR. MCCOY:  Specifically the issue is what I

3    think we know in asbestos is the five million particles

4    per cubic foot standard.

5              MR. MOORE:  I talked about it in my opening

6    statement.

7              MR. MCCOY:  Right.

8              MR. MOORE:  But if he wants to say that was a

9    standard adopted in Wisconsin, I guess that's fine.  I

10   mean that's fine.

11             THE COURT:  Okay.  I'm not looking for trouble

12   here.

13             MR. MOORE:  You know, this is an incremental

14   issue.  You know, how much far afield are we going to

15   get from what disclosures have been in this case.

16             THE COURT:  Okay.

17             MR. MCCOY:  It's not something I want, I'm just

18   -- it's just --

19             THE COURT:  Sure.  But let's --

20             MR. MCCOY:  Is it possible to get Dr. Frank

21   past --

22             THE COURT:  -- be clear.  Let's be clear.  And

23   I think we are, but let's revisit where I think we've

24   already been and it has not changed, at least not since

25   yesterday.  The warning issue ends with the last sale;

1   all right?  As the Court ruled before the trial began

2   and has reconfirmed, evidence of knowledge obtained

3   after the last sale in 1960 is relevant only for the

4   purpose of dangerousness, not for what Rapid knew.  That

5   is the import of the new proposed instruction.

6        To the extent that the new proposed instruction has

7   to be supplemented based on any additional testimony, we

8   can do that.  Like I said, we aren't going to be done

9   with the instructions until the evidence is done because

10  we don't know all the evidence that will come in.  But

11  as long as we're all clear on that, then to the extent

12  that Mr. Moore is concerned about what people knew when,

13  we certainly can address that with the instructions to

14  make sure it's clear to the jury what's on one side of

15  the side line temperally and what's on the other side.

16  And Mr. Moore, I don't know if I'm addressing your

17  concern or not.

18        MR. MOORE:  You're not, Your Honor.  I think --

19  here's the point.  The evidence in this case is going to

20  be that the so-called threshold limit value, which was

21  adopted by the ACGIH in 1938, was the standard all the

22  way up until 1971.  So obviously I don't want to jump

23  over that 1960 line, but I think to keep things in

24  perspective, it's important for the jury to know that

25  that was the standard in place all the way up until that

1  time.  I don't think that affects the Court's ruling

2  with regard to the post-1960 --

3          THE COURT:  Okay.  So I misunderstood your

4  complaint.

5          MR. MOORE:  I should -- there's not an issue at

6  this point.

7          THE COURT:  Okay.  Well then I'll stop talking.

8          MR. MOORE:  Me, too.

9          THE COURT:  All right.  Let's bring in the

10  jury.

11          MR. MCCOY:  I will say this, Judge:  We have

12  pretty much narrowed most of his testimony to the

13  pre-period, the pre-sale period.  We've done that.

14          THE COURT:  Okay.

15          MR. MCCOY:  And like you said, a couple

16  references later are only in the sense of the

17  unreasonably dangerous aspect of this.

18          THE COURT:  Understood.  Well, you guys are

19  good attorneys.

20          MR. MCCOY:  Basically --

21          THE COURT:  I think you understand what's

22  allowed and what's not and I anticipate that everyone

23  will stay on the correct side of the line.

24          MR. MCCOY:  Basically that a small exposure

25  will cause asbestos --

1        THE COURT:  Right.  Well, you don't have to

2    proffer to me.  Let's just get the testimony.  Okay?

3    Let's bring in the jury.

4        MR. MCCOY:  Let me get Dr. Frank.

5        (Jury brought courtroom at 9:05 a.m.)

6        THE COURT:  All right.  Everyone please be

7    seated.  Ladies and Gentlemen, welcome back.  I think

8    Mr. McCoy went out to get his first witness.  I have a

9    better sight line than you do.  I think they're coming

10    back through right now.

11      Mr. McCoy, why don't you have your witness come

12    forward, please.

13        MR. MCCOY:  Yes.  Dr. Frank.

14    **ARTHUR FRANK, PLAINTIFF'S WITNESS, SWORN,**

15                    DIRECT EXAMINATION

16    BY MR. MCCOY:

17    Q    All right.  Let's go ahead and begin, Doctor, and

18    I'd like you to give us your -- introduce yourself, give

19    us your full name, and spell your last name for our

20    jurors.

21    A    Good morning.  My name is Arthur Leonard Frank.

22    That's F-r-a-n-k.  I currently serve as a Professor of

23    Public Health and Chair of the Department of

24    Environmental and Occupational Health at the Drexel

25    University, School of Public Health.  I'm also a

                    ARTHUR FRANK - DIRECT

1    Professor of Medicine at the Drexel College of Medicine

2    in the Pulmonary Division of the Department of Internal

3    Medicine.

4    Q    And you have a history of work in asbestos disease;

5    is that correct?

6    A    I do.

7    Q    When did that start?

8    A    It started in December of 1968 when I met

9    Dr. Irving Selikoff.  I had been fortunate enough to be

10   asked to join the first class at the Mount Sinai School

11   of Medicine in New York City when it opened as a medical

12   school.  Dr. Selikoff met with the first year students

13   that year, talked about the work he was doing with

14   asbestos.  I had been doing cancer research actually as

15   a high school student and college student.  I published

16   my first paper in college and was enamored with the kind

17   of work he was doing.  So I started doing asbestos work,

18   I guess it's 45 years ago now, and I'm still doing it

19   today.

20   Q    Have you been to Madison before?

21   A    I have.  I've been here a number of times.  I think

22   the last time was to do a site visit at the University

23   in one of their programs.  It was for a NIOSH Program

24   that they were being funded for or potentially funded

25   for and I was asked to do a site visit here.
                    ARTHUR FRANK - DIRECT

1   Q     NIOSH stands for?

2   A     The National Institute for Occupational Safety and

3   Health.  It trains occupational physicians like myself

4   or nurses who do occupational health nursing,

5   toxicologists, industrial hygienists, those kinds of

6   people.

7   Q     So when you do a site visit here in Madison, what

8   did you have to do?

9   A     We had to go to the University, look at the

10  program, speak to the program director, speak to the

11  residents in the program, and then reach a judgment if

12  we thought the program should be funded or not.

13  Q     Which program?  What kind of program?

14  A     It was the occupational medicine program here.

15  Q     At the University?

16  A     University.

17  Q     Okay.  And you are a medical doctor?

18  A     I am.  As I said, I started at Mount Sinai in 1968.

19  I graduated four years later with my M.D. degree in

20  1972.  The rest of my education was that I stayed on at

21  the Mount Sinai Hospital.  I did my first year of

22  clinical training in internal medicine; that would be

23  general adult medicine.  I left after that first year to

24  become a commissioned officer in the United States

25  Public Health Service.  I served in that capacity, had a

              ARTHUR FRANK - DIRECT

1   commission for 37 years.

2       My active duty in the 1970s for two years was in

3   the lung cancer branch of the National Cancer Institute

4   at the NIH, National Institutes of Health in Bethesda,

5   Maryland, and I looked at the effects of asbestos on

6   respiratory tissue.

7       Two years later, in 1975, I returned to Mount Sinai

8   and I finished two residencies.  I finished my training

9   in internal medicine.  I also did my training in

10  occupational medicine.

11      Also while I was a medical student, I had started

12  studying for a second doctoral degree, a Ph.D. degree,

13  and ended up in 1977 being awarded a Ph.D. degree in

14  biomedical sciences looking at the effects of asbestos

15  on respiratory tissue.  So that would be my formal

16  education.

17  Q    You mentioned something about working with

18  Dr. Selikoff.

19  A    Yes, sir.

20  Q    And when did you start working with him?

21  A    I started working with him, as I said, in December

22  of 1968.  He became the director of my Ph.D. program.

23  He was also head of the Occupational Medicine Program.

24  When I finished all of my training in June of 1977, I

25  stayed on as a member of his unit.  I taught at

                     ARTHUR FRANK – DIRECT

1  Mount Sinai for six years, starting as an instructor,

2  and six years later leaving as an associate professor.

3  But I maintained a relationship with him and interacted

4  with him until the time of his death in 1992.

5  Q    What role has Dr. Selikoff played in the study and

6  research of asbestos diseases, briefly?

7  A    I think it's fair to say Dr. Selikoff did not

8  discover asbestos-related diseases.  Those were known 60

9  or 70 years before I joined him.  But he probably did

10 more to illuminate the problem; study groups that hadn't

11 been studied before such as users.  They had been

12 studied to a certain extent, but he also spread it out

13 into areas such as family exposure, neighborhood

14 exposure, all of which can give you disease, and he

15 brought the world's attention to the problem of asbestos

16 probably more than anybody else.  He was well-known

17 internationally for his work.

18 Q    Were you one of his research assistants?

19 A    I was.  I started as a research assistant that

20 first year in medical school.  It was before I knew any

21 clinical activity, so I would do paperwork, abstract

22 charts, do those kinds of research activities.  As I

23 gained clinical skills, I would be allowed to do

24 physical examinations and talk to the research subjects

25 that we were examining.  And by the time I left in 1984,

                    ARTHUR FRANK - DIRECT

1    I might be in charge of a team of 50 people who would go

2    out in the field and examine the populations that we

3    looked at that.   Could have been asbestos insulators or

4    shipyard workers or other kinds of workers like that.

5    Q    This field of occupational medicine, do you hold a

6    board certification in that area?

7    A    I do.   In medicine there are about, I don't know,

8    34/35 or so specialty certifications as physicians.   So

9    there's pediatricians, there's surgeons, there's

10   different kinds of surgeons.   I actually hold two board

11   certifications and that means I went through an approved

12   residency, passed an exam, and could be called a

13   specialist, both in internal medicine first and then in

14   occupational medicine a year later.

15   Q    The field of occupational medicine, what is that

16   concerned with as far as the aspect of prevention of the

17   disease?

18   A    Well, occupational medicine is one of the three

19   branches of what's called *preventive medicine*.   The

20   other two branches are aerospace medicine and what we

21   call general preventive medicine in public health.   So

22   it's one of the three areas that we call *preventive*

23   *medicine*.

24       The reason -- and the focus is different for two

25   reasons I think than all of the other specialties in

                    ARTHUR FRANK - DIRECT

1  medicine.  For one, we tend to deal with populations of

2  people, not just individual patients.  I've certainly

3  done my share of caring for individual patents.  But we

4  also look at populations and study what kinds of

5  exposures, be they in the workplace or in the general

6  environment might make people sick.

7      We do more than that though.  We look at not only

8  what might make people sick, but once we identify

9  hazards like asbestos or like benzene or arsenic or all

10 the other things, lead, that we've studied over the

11 years, we then try to institute preventive measures to

12 keep people from getting sick in the future once we've

13 identified that there's, in fact, a hazard.

14 Q    And is that applicable then to the asbestos disease

15 concerns?

16 A    Absolutely.  Asbestos disease prevention is an

17 issue that's over 80 years old.  I mean people knew

18 about the hazards and talked about prevention 80 years

19 ago.

20 Q    This has all been part of your research?

21 A    It is.  It is part of my research, part of what

22 I've written about, part of the work that I've been

23 doing these 45 years and teaching about.

24 Q    Have you served on any government panels concerning

25 asbestos disease?
                    ARTHUR FRANK - DIRECT

1  A    I have.  I've served on a number of government

2  boards, both at the federal level, state, and even local

3  level over the years.  I've worked for NIOSH, again the

4  National Institute for Occupational Safety And Health.

5  I was on their Grants Review Panel; that is scientists

6  like myself apply for research monies, and other

7  scientists, a group of us, would determine if we thought

8  the research proposals were appropriate, useful or

9  should be funded.  I chaired that group the last year I

10  was there.

11      A few years later, I was appointed to the highest

12  level advisory body for the director of NIOSH.  It's

13  called the Board of Scientific Counselors.  And the

14  director at that time not only appointed me to that

15  Board, but the subcommittee on asbestos and manmade

16  mineral fibers.  A number of years later, I just

17  finished my term last year, I spent a four-year term on

18  the Board of Scientific Counselors for the National

19  Center for Environmental Health, part of the CDC, the

20  Centers for Disease Control in Atlanta.  And the

21  Environmental Health Institute there also concerned

22  itself, among many other things, with asbestos-related

23  issues.  The situation of living in Montana, for

24  example.  So those are some of the government activities

25  I've done in this country.
                    ARTHUR FRANK - DIRECT

1      I've advised government officials overseas and a
2  number of countries about asbestos hazards as well:
3  Egypt; Israel; India; China.  I could go on.  I've done
4  a lot of work internationally over the last 20 or so
5  years.
6      And at the local level, currently in Pennsylvania,
7  for example, I serve as head of the Environmental
8  Justice Advisory Board for the Department of
9  Environmental Protection and on an environmental health
10 tracking grant for the Department of Health.  And even
11 in the City of Philadelphia, we have what's called the
12 *Air Pollution Control Board*.  We make the rules and
13 regulations for air pollution in the city, and one of
14 areas that we work in is and are concerned about is
15 asbestos.  I serve on that Board as well.
16     So I have done, if you will, sort of government
17 service throughout my career.
18 Q    And Philadelphia is where Drexel University is
19 based?
20 A    Yes.
21 Q    And you have teaching responsibilities --
22 A    I have teaching -- sorry.
23 Q    -- and departmental responsibilities at schools --
24 at the school?
25 A    Yes.  As the Chair of the Department, I spend
                    ARTHUR FRANK - DIRECT

1  probably a quarter of my time as an administrator

2  looking after the faculty, making sure the Department

3  runs right, managing the budgets, all that kind of

4  thing.  Students also bring their problems to me as the

5  Department Chair.  I've been in academic all my career,

6  so it's something I've chosen to do and it's what my

7  life has been about.

8      But I also teach.  I also see a few patients.  I

9  still continue to do research.  Some of my current

10 asbestos-related research is looking at workers who have

11 been exposed to a variety of things includes asbestos at

12 a facility in Amarillo, Texas.  Before I went to Drexel,

13 I was teaching in the University of Texas system, so I

14 started some work down there on a nuclear facility where

15 there's some asbestos exposure.

16     In part of my international activities, I have a

17 colleague from Sri Lanka, a little country just south of

18 India, island nation, where we've been studying the

19 hazards of asbestos cement, manufacturing for housing

20 materials, showing that that population too has hazards

21 to asbestos.

22     And then in addition to the administrative work,

23 the teaching and the research, I do service activities.

24 What I'm doing here today with you is part of what I do,

25 a small portion of my time.  But then I serve on a lot

ARTHUR FRANK - DIRECT

27

1    of committees and organizations around the country and

2    do a fair amount of international travel, generally

3    about four to six trips a year usually to teach and

4    participate in international conferences and such.

5    Q    Doctor, I'm giving you Exhibit No. 39.  Is that a

6    copy of your current curriculum vitae?

7    A    It is.  It's my most recent CV, my curriculum vitae

8    or resume up to date as of this month.

9    Q    Have you worked for companies and unions?

10   A    I have.  Over the years I've done work for both of

11   those sectors; for example, when I taught at the

12   University of Kentucky, that was my next job after

13   New York when I became Professor and Chair of the

14   Department of Preventive Medicine and Environmental

15   Health.

16        I did some work for Ashland Doyle.  They're

17   probably the largest employer in Kentucky at the time.

18   The thing they asked me to do the first time was give

19   them a talk on the hazards of asbestos in their kind of

20   facilities.

21        I also worked with some coal companies and looked

22   after the health and well being of a number of coal

23   miners.  One company hired us and we looked after a

24   thousand miners between underground mines and strip

25   mines.  And then various unions over the years have come

                    ARTHUR FRANK - DIRECT

1    to us for advice and work:  Construction-type unions,

2    the asbestos workers, elevator installers, and such.

3    But also other kinds of unions that were concerned about

4    hazards of asbestos and occasionally some other things.

5    Q    At the request of my law firm, you've reviewed some

6    of the medical records of Gerald Bushmaker; is that

7    right?

8    A    I have.

9    Q    We'll get to that later.  So I think you've talked

10   about a number of -- some of the scientific

11   organizations that you've participated in.  Is there any

12   others that you should include today?

13   A    Well, I've been a member of a number of

14   organizations that have had significant interest in the

15   area of asbestos.  The American Thoracic Society.

16   That's pulmonary physicians in this country.  In May, as

17   it turns out, this year's annual convention happens to

18   be in Philadelphia.  It's about three blocks from my

19   office and they've agreed to let me give a session.

20   It's called *Meet the Professor Lunch*.  It's an informal

21   kind of session and the topic will be asbestos-related

22   disease for the participants who want to learn more

23   about that.  They've let me do that.

24        I belong to the American Public Health Association.

25   The American College of Preventative Medicine.  I've

                 ARTHUR FRANK - DIRECT

1  served as their occupational medicine regent; two terms

2  as secretary/treasurer for this national organization.

3  And I could go on.

4      The only other one probably worth mentioning is a

5  group called the *Collegium Ramazzini*.  Bernardino

6  Ramazzini we consider the father of occupational

7  medicine.  He wrote the first textbook in our field in

8  1700.  He was an Italian physician, Professor of

9  Medicine, and Dr. Selikoff and a colleague in Italy,

10  Professor Maltoni, back in the early 1980s organized the

11  Collegium Ramazzini.  It's limited by its charter to 180

12  physicians and scientists from around the word.  I got

13  elected to that in the mid-1980s and I have attended

14  fairly regularly their meetings and have often spoken

15  about my research on asbestos and been involved in some

16  concept papers and documents regarding the hazards of

17  asbestos that have come out of the Collegium.  So those

18  would be some of the organizations that I belong to.

19  Q    Besides the prevention of diseases, what would be

20  the other primary concerns of occupational medicine as

21  related to asbestos disease?

22  A    Well, I think the primary thing is not only

23  identifying disease in those people that have it, but

24  prevention is really what we're about.  Some of us even

25  work internationally.  There are now over 50 countries

ARTHUR FRANK - DIRECT

1  in the world that have totally banned the use of

2  asbestos.  We are not one of those countries here in the

3  United States, though use is far less than what we used

4  before.  So I am involved in some of these international

5  efforts.

6      I've been asked to testify in front of the

7  Brazilian Supreme Court when they are considering a ban

8  on asbestos for Brazil.  So I think the prevention of

9  disease is really what's primary to those of us that do

10 occupational health.

11 Q    What research are you doing now in the field of

12 asbestos disease?

13 A    Well, as I already mentioned, I'm looking at this

14 population in Texas.  I've got this project in Sri

15 Lanka.  For about 20 years I did research in China.  The

16 factories that we studied there are closed up, so we're

17 looking at some other hazards there.

18     And I do a lot of teaching internationally in

19 talking to my colleagues around the world.  I go to

20 India about twice a year generally to teach, help with

21 organizing some international meetings, and often meet

22 with government officials and talk about the hazards of

23 asbestos there, and have sometimes been asked to -- it's

24 not so much research, but when I'm visiting, they'll

25 bring me some x-rays and ask me to evaluate them.

ARTHUR FRANK - DIRECT

1       The other area they have a big problem with is

2  silicosis, and so I've been involved with silicas and

3  other dust disease of the lung that I've been asked to

4  look at.

5  Q    When you say looking at a population group, can you

6  explain what that means?

7  A    Well, most of us are used to going to our own

8  doctors and being cared for one-by-one.  When we talk

9  about population groups, we either look at geographic

10  groups; people living in a certain area.  I've got a

11  study underway right now that the CDC funded us to look

12  at; a cluster of cancer cases in a three-county area in

13  Pennsylvania, for example.  It's not related to

14  asbestos.

15      So we look at this three-county population trying

16  to determine for this form of cancer if we can

17  identify -- it's a blood-related cancer -- if we can

18  identify causes because there's none known right now for

19  that particular disease.

20      But for example with Dr. Selikoff, we would look at

21  populations.  He put under long-term surveillance 17,800

22  asbestos insulators.  These were unionized insulators.

23  They were all over the United States and Canada.  We

24  would go out into the field and examine them literally

25  all over the country and Canada.  And he would get

               ARTHUR FRANK - DIRECT

1   copies, for example, of everybody's death certificate

2   when they died in the union.  They were entitled to a

3   death benefit, so they had to send in a death

4   certificate.  So it was a very good way to collect a lot

5   of good data.

6       Then he would even go and have his own in-house

7   pathologist look at tissues that were available to make

8   sure the diagnosis was correct.  And so it was from this

9   group of 17,000 and the deaths which are in the many

10  thousands at this point and still being followed.  The

11  same group, even though he passed away in 1992, it's

12  still being followed at Mount Sinai, we could study what

13  the disease patterns were.  And other groups like that

14  have been studied.  Shipyard workers.  Sheet metal

15  workers.  There's been research published on plumbers

16  and pipefitters.  I've studied plumbing workers, for

17  example.  So that's what we mean by looking at

18  populations of people, not just people one-by-one.

19  Q    And when you mentioned those different trades,

20  you're talking about studies about asbestos diseases in

21  those trades?

22  A    Yes.  That's what I took your question to be.

23  Q    Okay.  That's what it was about, yes.  You've

24  published in the field of asbestos disease obviously?

25  A    I have.

                    ARTHUR FRANK - DIRECT

1    Q    Can you give us some examples.

2    A    Sure.  I mean if you look at my CV, I've got

3    somewhere, I don't know, it's 170 or 180 publications

4    over the years now.  About half of them have something

5    to do with asbestos; more than any of the other subjects

6    that I've published on.  So I've published on some of my

7    Ph.D.-related research.

8        So we were looking at what asbestos would do to

9    tissue culture and organ culture, some studies on whole

10   animals, and then some studies on populations of workers

11   such as we've just talked about.

12       There's a paper in there with Dr. Selikoff on

13   shipyard workers.  And then over the years, I've been

14   asked to do either review articles or book chapters.  I

15   have due this month a book chapter on the *Hazards of*

16   *Asbestos, Risk Assessment Regarding Asbestos Disease* for

17   a new toxicology textbook.  So you'll see that about

18   half of my publications have something to do with

19   asbestos.

20   Q    When you testify in court, I'm correct in saying

21   that most always you're working with the plaintiff's

22   counsel?

23   A    Almost always.  I've worked for companies on a

24   number of occasions and testified for defendants, but

25   the vast majority of the work have been for plaintiffs;

ARTHUR FRANK - DIRECT

1  people that have been injured by exposure to asbestos.

2  I will look at their files and if I believe that that's,

3  in fact, the case, will write a report and be prepared

4  to come to court and testify.

5  Q    Are you paid personally for your time in court?

6  A    No.  I've been doing this kind of work, this

7  medical legal work for 35 years now.  I started at

8  Mount Sinai, continued it at Kentucky, and then when I

9  was at the University of Texas, now at Drexel, and I

10 just made it my judgment 35 years ago that I was getting

11 well enough paid as a physician, as an academic doctor,

12 and I didn't need the extra money and so I saw to it

13 that the money was always paid to the University.

14     I personally never kept even a penny of that money

15 over the years.  For 30 years now, I've been a

16 Department head, so I get to use that money.  And so

17 right now, for example, at Drexel, the Dean, with her

18 approval, gives me opportunities to use the monies that

19 I bring in, so I hire extra faculty and extra

20 secretaries and pay for teaching assistants and research

21 assistants for the junior faculty.  And I do a lot of my

22 international work over the years having used these

23 kinds of funds.  That's what allows me to go to India

24 twice a year or do research in China.  But certainly,

25 I've never kept any of the money for the 35 years I've

                    ARTHUR FRANK – DIRECT

1  been testifying.

2  Q    What's the current hourly charge for your time in a

3  lawsuit?

4  A    The University bills at $425 an hour for my time

5  for medical legal work.

6            MR. MCCOY:  Judge, I've got a few questions.  I

7  think that the doctor wanted to use the easel.

8            THE COURT:  Oh, sure.  He's free to move about

9  the courtroom, draw on the boards, whatever he needs to

10  do.

11            THE WITNESS:  Thank you, Your Honor.

12            THE COURT:  I guess the question is, Mr. Moore,

13  you're free to move about if you wish.  Would you rather

14  have it back a little further?

15            MR. MOORE:  I don't know if we're breaking the

16  prom date rule also there.

17            THE COURT:  Right.  You've got to be at least a

18  couple feet away from the edge.  Why don't you come

19  closer to the middle here.

20            MR. MOORE:  I've got an 18-year-old, Your

21  Honor, so I know that rule.  Your Honor, may I?

22            THE COURT:  Of course.

23  BY MR. MCCOY:

24  Q    Doctor, I'm going to let you be the guide on this,

25  and as you -- I've already mentioned to you we heard the

                    ARTHUR FRANK - DIRECT

1    testimony of Dr. Arnold Brody, so we don't want to be

2    too repetitive.  But I know your focus is on

3    occupational medicine and the emphasize in your career

4    has been different, so I think the first question that

5    I've got here in my outline is simply what is asbestos?

6    A    Sure.  Asbestos is a commercial term.  It's not a

7    neurologic or a scientific term.  And it refers to two

8    families of fibers.  There are two groups of fibers.

9    The first group is called the *amphiboles*.  There are

10   five members of this group and there's all together six

11   minerals and they are naturally occurring.  What we mean

12   by that, they're not made by man, they're mined, they're

13   processed out of nature and then put into products.

14        Five of them are amphiboles and they're

15   characterized -- every one is different chemically, but

16   they're fairly straight and needle-like.  And they're,

17   as I said, chemically very different, different colors

18   and so forth.

19        The other type is called the *serpentine form*.

20   There's one member of that group called *chrysotile*.  And

21   the reason it's called serpentine is it looks different.

22   It looks a little bit like a snake or a worm under the

23   microscope.  It has curvatures to it.  So that's what

24   separates these two families within what we call

25   asbestos.

                     ARTHUR FRANK - DIRECT

1  Q    I'm going to just change the angle on this because

2  it's a little hard with you -- kind of step in front of

3  the court and jurors here.  Right here.

4  A    So the first thing is this is what we call

5  asbestos.  That's what we're dealing with.  The second

6  issue is what diseases do we get from exposure to these

7  materials.  And these too are divided into two kinds of

8  disease.  There's the nonmalignant and the malignant.

9  And what we mean of course by malignancy is is it not

10 cancer or is it cancer, and you can get two kinds of

11 disease from asbestos.

12      The major problem you get of the nonmalignant form

13 is asbestosis, and we'll describe that a little bit more

14 in a minute.  There is also something called *asbestos*

15 *warts*; gets into the skin.  These are a wart-like

16 structure.  Not a serious problem.

17      And there's something called *benign asbestotic*

18 *pleural effusion*.  Again, pretty rare.  It's the first

19 finding within about ten years in a few people.  What it

20 does is it irritates the lining of the lung, and we'll

21 talk about that, and causes fluid to build up in the

22 lung.  It actually scares the clinician.  I've had to

23 deal with a few of these because it's a bloody fluid and

24 you really think you're dealing with a cancer.

25      But the biggest problem is asbestosis, and even

                    ARTHUR FRANK - DIRECT

1  though it's not malignant, it can be a cause of death.

2  In the group of insulators that we studied with

3  Dr. Selikoff, roughly 10 percent of them die of

4  asbestosis.  Pulmonary insufficiency.  They just can't

5  move enough oxygen into their body anymore.

6      Then we have the malignant problem, and there are a

7  whole range of cancers that can occur from exposure to

8  asbestos.  The most important one and the most common

9  one is lung cancer.  As I think we'll hear, that's what

10  we're dealing with here today.

11      There's a rare cancer called *mesothelioma*.  This is

12  a cancer of the lining tissues of the lung or the

13  abdomen.  And then there are a whole host of other

14  cancers:  Gastrointestinal tract cancers, kidney cancer,

15  laryngeal cancer, and in women ovarian cancer.  And

16  again, that's not the subject of today's proceedings,

17  but these are the kinds of cancers that you can get from

18  working with asbestos.

19      Some people can get asbestosis and never get

20  cancer.  Some people get cancer, but never get

21  asbestosis.  And some get both.  Why this happens I'll

22  try and describe in just a moment.

23      There is something called the *dose response*

24  *relationship*.  Basically what this tells us is as the

25  amount of exposure goes up, the likelihood of getting a
                    ARTHUR FRANK – DIRECT

1  disease goes up.  Now I've drawn this line here, sort of

2  placed somewhat arbitrarily because no one really knows

3  where this threshold is.  But what we do know and what

4  everybody agrees, it takes a lot of asbestos to produce

5  asbestosis.  So you have to cross some threshold.

6      All of us, everybody in this courtroom today, has

7  some small amount of asbestos in our lungs.  Why is

8  that?  Because it's naturally occurring.  It's out there

9  in nature.  It's been used for many years in products.

10  We all breathe a little bit of asbestos.  So we're way

11  down here somewhere; not at zero, but at very low

12  levels, and at very low levels the likelihood of getting

13  disease is very low.

14      None of us with just background exposure will ever

15  get to the point of having asbestosis.  Cancer, however,

16  is different.  How much asbestos does it take to produce

17  a cancer in a human or in an animal?  The answer is very

18  little.  How little?  We know from animal experiments,

19  groups of animals, one day of exposure in an inhalation

20  chamber was enough to give some animals mesotheliomas or

21  lung cancers.  We know from case reports in humans --

22  again, you can't find a lot of people with just one day

23  of exposure, but there are such people:  A man in

24  England who cut asbestos boards to make a shed in his

25  back yard one day; others who work with material just

ARTHUR FRANK - DIRECT

1  for one day, and they ended up with mesotheliomas.

2      One of the populations that we studied with

3  Dr. Selikoff was a factory where they made asbestos

4  products.  It was during World War II and some people

5  worked for very short periods of time.  Some found it

6  too dusty and dirty, some entered the military, some got

7  better jobs at the shipyards, some people worked a week,

8  two weeks, a month, a couple months.  And we found

9  working one month or less, a month, two weeks, a week,

10 doubled your risk of getting lung cancer.  So a month of

11 work or less was enough to double your risk of lung

12 cancer.

13      We showed in that population by the time you worked

14 for two years, you had a seven-fold excess risk of

15 getting lung cancer.  So we know that it takes very

16 little asbestos to produce the various kinds of cancers.

17      Now asbestos gets into the lungs basically when we

18 breath it in.  The body has efficient mechanisms to keep

19 harmful materials like asbestos out.  It starts up in

20 your nose with hairs, it's in your mouth with saliva

21 that will trap things.  So that will keep some of it

22 from getting into the lungs.  You have little hair-like

23 cells in your upper airway, little mucus globules that

24 will trap foreign materials.  It could be viruses or

25 bacteria or coal dust particles or asbestos particles,

ARTHUR FRANK - DIRECT

1   and the body then pushes it up and out and we swallow

2   it.

3       Nevertheless, some of it will get down into the

4   lungs and it will cause scarring in two places.  It will

5   cause scarring in the lung tissue itself and we call

6   that *parenchymal asbestosis*.

7       And then there's a covering around the lung.  Let

8   me try and explain how we look at the lung.

9       Those of you who have a kitchen sponge at home, you

10  have those little holes in it, and the sponge on your

11  kitchen sink will hold water.  The lung is a collection

12  of air sacs, like your sponge, except they hold air

13  instead of water.  If you took that kitchen sponge and

14  wrapped a piece of Saran Wrap around it, you'd now have

15  a covering around it, and that's exactly what happens

16  with the lung.

17      There's this tissue called the *pleura* and it's a

18  Saran Wrap-like coating around the lungs.  It's normally

19  one to two cells thick.  You need a microscope to see

20  it.  You'd never see it on an x-ray unless it's damaged.

21      So asbestos not only gets into the lung, but it

22  gets out to the pleura and it causes scarring.  So you

23  get scarring in the lung.  What do I mean by scarring?

24  If you've ever cut yourself with a kitchen knife, you

25  get a scab.  It falls off.  You're left with nice normal

ARTHUR FRANK - DIRECT

1  skin.  The same kind of tissue, the scab is what grows

2  in the lung, except it doesn't fall off.  It doesn't go

3  away.  It's permanent.  It will be there forever.  The

4  lungs don't respond like the skin done.

5      Similarly if there's scar tissue in the pleura --

6  Q    Technological failures before.  But this?

7  A    Not a big issue.  We'll clip it in.  I'll be more

8  careful.

9      Sometimes this can become thickened.  It can also

10  become calcified.  And that shows up on x-rays very

11  clearly as big white thick areas.  Calcified pleural

12  plaque.  Not all of them become calcified.  But when you

13  see them, it is a result of scarring which has then

14  become filled up with calcium that the body deposits

15  there.

16      The disease in the lung itself has always been

17  called asbestosis.  Up until relatively recently, this

18  pleural scarring was also called asbestosis, and some of

19  us still call it that.  I was trained by Dr. Selikoff.

20  He called it pleural asbestosis.  Some people use a

21  different term, they call it asbestos-related pleural

22  disease or pleural plaques or pleural thickening.  But

23  whatever you call it, it's a disease.  It's caused by

24  asbestosis or by asbestos and it really is just another

25  manifestation of asbestosis.  Textbooks back in the 30s

                    ARTHUR FRANK - DIRECT

1   all talked about the pleural changes of asbestosis.

2        You also can get lung cancer.  That's the same

3   kinds of lung cancer you get from many other things:

4   From arsenic or isopropyl or cigarettes or radiation,

5   all of which can cause lung cancer.  And you can get a

6   cancer in the pleura called, as I said, a mesothelioma.

7   So these are the diseases that one gets in the lung.

8        The last point I want to make is when do these

9   diseases develop.  If I would throw a whole bunch of

10  asbestos on top of all of you today, would you get sick

11  tomorrow or next week or next year?  No.  There's what

12  we call a latency period.  And the latency period starts

13  for these diseases at ten years and lasts a lifetime;

14  whereas some kinds of cancer-causing materials, the body

15  deals with and gets rid of it.  It metabolizes it.  It

16  puts it in the urine.  It adds it to your bile, in your

17  gallbladder, whatever.  It can get rid of some of these

18  carcinogens.

19       Once asbestos gets in the lungs or out to the

20  pleura, and we know it gets to both of those areas, it

21  will stay there forever.  The body will clear some of it

22  over time, but at the end of somebody's lifetime I've

23  seen these diseases in people in their 90s who hadn't

24  been exposed for 30 years but had been exposed in their

25  20s.  You never outgrow your risk of getting disease
                   ARTHUR FRANK - DIRECT

44

1    from your exposure to asbestos.

2         So this is, from a medical standpoint, what we're

3    concerned about.  The greater the dose, the more likely

4    you are to get disease.  It takes a lot to produce

5    asbestosis that we've talked about.  And why some people

6    get one disease and some get the other we really don't

7    know.  But some can get both.

8         I think that finishes what I would like to do with

9    this.

10   Q    Okay.  One follow-up question I have, Doctor.  In

11   terms of the causation of asbestos disease, if someone

12   has got a one-day exposure and a one-week exposure and a

13   one-hour exposure and on and on, a one-month exposure

14   throughout a number of years or even decades because

15   they're working in that type of a setting where there's

16   asbestos fibers being released, how does that factor

17   into the assessment of causation?

18   A    Well, that goes back to this issue of dose

19   response.  Every one of those, the one hour, the one

20   day, the one week, the ten years, they all cumulatively

21   add to your exposure, putting you at risk for developing

22   cancer, or if you get enough and cross a threshold,

23   enough to get some version of asbestosis.

24        So when you see someone who has been exposed to

25   asbestos who appears to have asbestos-related disease,

                    ARTHUR FRANK - DIRECT

1   you have to say that all of the exposures that they had

2   through their lifetime contributed to the total dose,

3   which contributed to the total response of whatever

4   disease they developed.

5   Q    All right.  I'll let you go ahead and take your

6   seat back.

7   A    Thank you.

8   Q    Based on your review of the medical records of

9   Gerald Bushmaker which had been provided to you by my

10  firm, what asbestos-related diseases did Mr. Bushmaker

11  have?

12  A    In looking at the records that I got regarding

13  Mr. Bushmaker, which included his exposure history and

14  medical records, I believe that he had developed two

15  asbestos-related diseases.  One was a nonmalignant

16  disease, the disease of asbestosis.  The second was a

17  lung cancer that I felt was caused by his exposures to

18  asbestos as well.

19  Q    Now there's also some reference in Mr. Bushmaker's

20  medical records to calcified pleural plaques.

21  A    Yes, sir.

22  Q    Which category does that fit within of the two

23  diseases?

24  A    That's part of asbestosis, and particularly if you

25  would ask me are there other things that will give you

                    ARTHUR FRANK - DIRECT

1  calcified plaques, one-sided individual plaques could

2  come from something else.  I've seen that from people

3  with trauma to their chest, broken ribs and so forth.

4  But when there are multiple and bilateral, both sides,

5  pleural plaques, the only thing that I have ever seen or

6  ever read about that will do this is exposure to

7  asbestos.

8      So when you see bilateral calcified plaques, if I

9  would see that on an x-ray and you wouldn't tell me

10  anything about the exposure history, the first thing I

11  would ask is gee, I wonder if this person had asbestos

12  exposure and could I determine that.

13  Q    How did you go about determining the cause of

14  Mr. Bushmaker's lung cancer?

15  A    I did what I always do with any patient, be it the

16  patient that I examine myself or when I review records,

17  I go through the medical records that are sent to me or

18  get a history; I find out what exposures they had; find

19  out what disease they've -- disease or diseases they've

20  developed, and then make a relationship with that.

21      Now, in the case of Mr. Bushmaker, we had two

22  factors in his history that potentially could have given

23  rise to a lung cancer.  I read early on that there was a

24  history of smoking, and we all know -- I mean we all

25  should know at this point that smoking can lead to the

                    ARTHUR FRANK - DIRECT

1   development of lung cancer.  But it's not all smoking,

2   and it depends on a number of things.  It depends on

3   when you smoked, did you stop smoking, how long ago did

4   you stop, and how much did you smoke.

5        In getting a history, which I had in my report and

6   which I've verified with Mr. Bushmaker directly, he did

7   have a smoking history.  When he was in the Navy, which

8   was in the 40s, he smoked one to two cigarettes a day

9   for about a 16-month period.  Never smoked cigarettes

10  again.

11       He then smoked cigars, which he would do

12  intermittently and occasionally, and his cigar smoking

13  stopped some time it appears in the late 1960s.  It

14  might be as late as 1970, but we think it's the late

15  1960s, and my report reflects that and that's the

16  history that I got in speaking with Mr. Bushmaker and

17  his family.

18       As I said, there are some cancer-causing agents

19  that the body is able to get rid of over time.  One of

20  those is -- and there are many cancer-causing agents in

21  tobacco smoke that the body can get rid of.

22       We also know from studies done by organizations

23  like the American Cancer Society if you can get somebody

24  to give up smoking, their risk of lung cancer reduces

25  over time.  Now the data varies.  The older data showed

ARTHUR FRANK - DIRECT

1  that if you gave up cigarettes for about 25 years or so,
2  your risk of getting lung cancer was about the same as a
3  nonsmoker.  More recent studies show that it's a bit
4  longer than that; that by the time you're -- it takes
5  maybe 35ish or so years before your risk is essentially
6  the same as a nonsmoker.
7      But in the case of Mr. Bushmaker, we have someone
8  who stopped, let us say, in 1970, we'll take that as the
9  latest, and it probably was a bit earlier, and he had
10 his lung cancer in 2006, December.  So it was, what, 36
11 years without any smoking, and at that, it was cigar
12 smoking, which he didn't inhale.
13     So the role of tobacco, if any, was extremely small
14 and was likely essentially noncontributory or a minor
15 contributing factor compared to the overwhelming
16 exposures he had to asbestos with the evidence of his
17 asbestosis and the permanence with which asbestos stays
18 in the lung.
19     So this is what I do when I get a chart.  I think
20 about other exposures.  I ask, you know, as I read
21 through the chart and I looked at the kind of work that
22 he did, I knew that he was a pipefitter.  I've dealt
23 with pipefitters before.  I know the kinds of exposures
24 they have.  Was there anything else that I could say
25 caused his -- the x-ray changes that were diagnosed as
                    ARTHUR FRANK - DIRECT

1  asbestosis, and the answer is no, he had no other

2  exposures that I'm aware of that would do that.

3      And with regard to his lung cancer, he had no other

4  exposures to other materials that I know that cause lung

5  cancer.  I've written about that.  I had no evidence

6  that he had any of those exposures, so I was left with

7  the smoking, which we've just discussed.  But

8  overwhelmingly, I was left with the concept that the

9  asbestos caused his lung cancer.

10 Q    Now, the methodology that you just talked about in

11 terms of how you assess the different exposures and time

12 period and so on, is that the same methodology that was

13 being used back when Dr. Selikoff and you, as one of his

14 assistants, were studying population groups?

15 A    Sure.  I mean this is standard medical methodology.

16 You know, for any of you who have ever been to a doctor

17 and have ever been diagnosed about anything, you've

18 asked well doctor, what caused it, and this is the kind

19 of thinking doctors go through in determining what the

20 cause of disease was.  Not only do we have that with

21 regard to an individual patient, but we have literally

22 decades and decades of scientific writing which address

23 these very issues.  And so we have this concept of what

24 can cause these diseases in general in people, and then

25 we have the specific question what caused it in

ARTHUR FRANK - DIRECT

1  Mr. Bushmaker.  And so that's how I've couched my

2  answer, both in terms of what we know in general about

3  the science and specifically looking at the facts of the

4  case with regard to Mr. Bushmaker.

5  Q    Does the term *marker of asbestosis disease* have a

6  meaning to you in the context of assessing the cause of

7  Mr. Bushmaker's lung cancer?

8  A    Yes.  Again, as I already said, the bilateral

9  calcified plaques pretty much tell me, even if I never

10 read any history and just saw that x-ray, would tell me

11 that there was probably asbestos involved.  And clearly

12 when I got the scientific or the medical records and the

13 history of exposure, it was clear that he had a

14 significant exposure to asbestos and it was a marker for

15 what the changes were on his chest x-ray.

16 Q    How is it that you or science has determined that

17 bilateral calcified pleural plaques are a marker for

18 asbestos?

19 A    Because this has been studied.  There's a study,

20 for example, in Finland.  In one county, there's no

21 asbestos mined and there were roughly 7,000 x-rays

22 taken.

23 Q    No asbestos what?

24 A    No asbestos mined.  A mine.  Where they were taking

25 it out of the ground and processing it.

                    ARTHUR FRANK - DIRECT

1  Q    Okay.

2  A    They looked at 7,000 x-rays in that county and

3  found not a single, not a single pleural plaque or

4  calcified plaque.

5       In the second county where they did have an

6  asbestos mine, which has now been shut down, they don't

7  mine it there anymore, they again took about 6,300

8  x-rays, similar number, thousands and thousands of

9  x-rays, analyzed them and 499 people had calcified

10  plaques.  So it was related to the mining activity.  In

11  the other county, not a single one.

12      So it's that kind of data and the experience that

13  one has in reading x-rays.  For example, one of my

14  studies in China I was looking at three asbestos

15  factories makes asbestos products over there.  I read

16  1,600 sets of x-rays, and not everybody, of course, had

17  pleural plaques, not everybody had asbestosis, but a

18  considerable number of the workers did.  And again, it

19  was related to their exposures to asbestos.

20  Q    So what's the significance of that, calcified

21  pleural plaques as a marker specifically with regard to

22  the causation of Mr. Bushmaker's lung cancer?

23  A    What it tells us is that he has had a significant

24  amount of exposure.  Remember I said you have to pass

25  this threshold to get to having asbestosis manifested by

                    ARTHUR FRANK - DIRECT

1  pleural plaques or parenchymal changes, which tells me

2  and tells people who understand exposure to asbestos

3  that he certainly has had enough exposure to have

4  developed his lung cancer from asbestos.

5  Q    Besides the bilateral calcified pleural plaques, is

6  there -- what other types of indicators would there be

7  that would show up as asbestosis in the diagnosis?

8  A    Well again, if you read some of the CT scan

9  reports, and he's had a lot of CTs over the years,

10 they're following up ever since he had his lung cancer

11 operated on, it's the kind of evaluation you have to

12 keep doing after somebody has had cancer to make sure it

13 doesn't come back.  Occasionally the radiologist will

14 report fibrotic changes in the lung, and then there was

15 an official, what we call a B-read.  There's a certain

16 exam one takes to read x-rays and be certified by NIOSH.

17 And there's a B-reader report that said he had bilateral

18 irregular opacities.  They divide the lung into six

19 zones:  Top, middle and lower and it was the four lower

20 lung zones that had irregular opacities, which are the

21 type that you would see with asbestos, along with the

22 pleural plaquing.

23     So there was evidence not only in the tissue

24 itself, but in the lining around the lung that there

25 were changes consistent with his exposures to asbestos.
          ARTHUR FRANK - DIRECT

1   And nothing in the history, no other cause as I read the

2   medical records that would give him these changes.

3   Q    What about linear areas of scarring at the lung

4   bases?

5   A    Well, that's the irregular opacities at the lung

6   bases that were read by both radiologists in looking at

7   his radiologic tests and by the B-reader.

8   Q    What do those have to do with asbestos?

9   A    They're caused in -- well, there are many things

10  that will cause that appearance -- not that many.

11  There's other dusts that will do it.  There's no

12  evidence that he was exposed to other such dusts.

13       There are other medical conditions that will do it.

14  For example, severe rheumatoid arthritis.  People who

15  have crippling arthritis of their fingers can get

16  changes in their lung.  There's no evidence, nothing in

17  the records that says Mr. Bushmaker had severe

18  rheumatoid arthritis with rheumatoid lung disease.

19       There are certain chemicals that will do it.

20  There's a pesticide called *paraquat* that will give you

21  these changes in the lung.  There's no exposure --

22  there's no evidence he was exposed to paraquat.  So, you

23  go through this differential diagnosis and are left, in

24  his case, saying that the only thing that seems, you

25  know, more likely than not scientifically and medically
                    ARTHUR FRANK - DIRECT

1  to be the cause of his changes are his prior exposures

2  to asbestos.

3  Q    Is there any exposure, besides asbestos, that can

4  cause the calcified pleural plaques?

5  A    Well, as we talked about already, trauma can do it.

6  Unilaterally very, very rarely tuberculosis can do it if

7  you get tuberculosis at the outer edge of the lung.

8  There are a few things, but not bilaterally and not with

9  the intensity that we saw reported in the records of

10 Mr. Bushmaker.

11 Q    I want to talk about some of the scientific

12 literature.  You've mentioned some of it.  But what

13 other scientific literature do you consider as a

14 physician when you are looking at Mr. Bushmaker's

15 situation in assessing the cause of his lung cancer?

16 A    Well, when I'm given a case like his, and I'm given

17 a fair number of cases each year to look at for

18 potential asbestos disease, sometimes I tell the lawyers

19 it's a case that I don't see a relationship because the

20 disease that's in question is not one that I believe is

21 caused by asbestos.

22     But when I'm asked a question like that about what

23 do I draw upon, what literature have I read, I started

24 reading asbestos literature back in 1968.  Dr. Selikoff

25 gave me papers to read and I haven't stopped reading

ARTHUR FRANK - DIRECT

1    them since.  So there's thousands and thousands of

2    articles.  And so if there's a specific question of does

3    it cause lung cancer, what kind of lung cancer, where in

4    the lungs, which fiber type, you know, any kind of

5    scientific question that could be raised, I can answer

6    them.  I draw upon all of that knowledge and experience

7    as I look at these specific cases.

8         It goes back to what I said, there's this general

9    understanding of what asbestos can do and then I take

10   the general understanding and the specific facts of a

11   specific case, in this case Mr. Bushmaker's or anybody

12   else's, and say do they fit in this pattern and can I

13   make the relationship there.

14        For example, one case I remember doing where I

15   didn't make the relationship, we talked about latency

16   before.  Somebody claimed that they were exposed to

17   asbestos and four months later got a lung cancer.  I

18   didn't connect those two.  The science tells me I can't

19   do that.

20        So I draw upon all of that reading and my

21   experience, having looked at thousands of x-rays,

22   thousands of charts, thousands of individuals as either

23   patients or parts of research studies to reach

24   conclusions about any given case.

25   Q    Do you look at literature if it exists specific to
                    ARTHUR FRANK - DIRECT

1  the trade?

2  A    I do, and there are obviously many different trades

3  that have been exposed to asbestos and there are many

4  different products.  One of the book chapters that I

5  wrote for a book a few years ago was on the *History of*

6  *Uses of Asbestos*.  One of things we know that in the

7  past, not so much anymore fortunately, but in the past

8  3- to 4,000 different products had asbestos in them.

9  Now there's not a scientific study on each of those 3-

10  or 4,000 products and there isn't a scientific study on

11  every kind of trade, but there are studies, and

12  specifically on pipefitters, Mr. Bushmaker was a

13  pipefitter for a good part of his working career.  And

14  so we know that pipefitters in general get an excess of

15  asbestos-related disease, and so I bring that to bear as

16  well when I look at the specifics of Mr. Bushmaker's

17  case.

18  Q    What about insulators?

19  A    Insulators are probably the best studied group.

20  That's a group certainly we studied with Dr. Selikoff.

21  I've seen insulators since I left Mount Sinai.

22  Insulators have been looked at in other settings, and so

23  we know a lot about insulators.

24      We even have very good data as to what percentage

25  of them will get certain kinds of disease.  That's why I

                    ARTHUR FRANK - DIRECT

1   was able to tell you that 10 percent die of asbestosis,

2   20 percent of them die of lung cancer.  Another roughly

3   10 percent die of mesotheliomas.

4       About 50 percent of all insulators will die of an

5   asbestos-related disease.  It's not the kind of data you

6   see in the general population, it's enormously more.

7   That's why, you know, others have spoken about the

8   asbestos epidemic in this country.

9   Q    Dr. Frank, change topics here for a moment.  Have

10  you studied literature which reports about the distances

11  that asbestos fibers might travel after they've been

12  released into the air?

13  A    I have.  That's not the kind of --

14          MR. MOORE:  Four corners, Your Honor.

15          THE COURT:  If it's in the report, you can ask

16  about it.  If not, you've got to move on, please.

17          MR. MCCOY:  Judge, can I be heard on this?

18          THE COURT:  You may.  Let's go side bar.

19          MR. MCCOY:  Actually, Judge, I think I have

20  another question.  I'll withdraw that one.

21          THE COURT:  As you wish.

22          MR. MCCOY:  Thank you, Judge.

23  BY MR. MCCOY:

24  Q    Dr. Frank, does the term bystander have a meaning

25  when you assess causation?
                    ARTHUR FRANK - DIRECT

58

1    A    It does.

2    Q    Okay.  Can you explain what a bystander is?

3    A    People can get asbestosis disease who never handle

4    it.  That occurs in many different settings,

5    particularly in the construction trades or in the

6    shipyard.  In the shipyard, about 2 percent of workers

7    do what's called *spraying and lagging*.  They put in

8    place asbestos-containing materials.  And yet because of

9    the enclosed space and the fact that the asbestos will

10   go all over the ship, in fact all over the shipyard,

11   other workers who don't handle it who are bystanders and

12   in shipyards, for example, that would include the naval

13   architects, the security guards and so forth can get

14   asbestos disease because some people are using it and

15   they're nearby.

16       Not only does it work that way in workplaces, but

17   you can bring asbestos home on your clothing, in your

18   beard, in your hair, and contaminate a household.  And

19   we know -- and we give that a different name.  That's

20   not bystander, that's familial or household exposure.

21   And people can get disease, both asbestosis, meaning

22   there's a lot in that household or some people don't get

23   asbestosis, but they end up with excess lung cancers and

24   cases of mesothelioma from exposure.

25       So you don't have to work with it and the material
                    ARTHUR FRANK - DIRECT

1  can spread in a way that others get exposed who aren't

2  handling it.

3  Q    Doctor, I'd like you to assume certain facts here

4  and I'm going to ask you about your opinion if those

5  facts are proved.  I want you to assume that a removal

6  of Philip Carey asbestos cement and block insulation was

7  done by Mr. Bushmaker on a high temperature water system

8  and created so much dust that it looked like snow.

9       Do you have an opinion to a reasonable degree of

10 scientific and medical certainty about whether such

11 exposures caused Mr. Bushmaker's lung cancer?

12 A    I do have an opinion and that would have been part

13 of the --

14          MR. MOORE:  (Stands)

15          THE COURT:  I'm sorry, I think we've got an

16 objection.

17          MR. MOORE:  I'll wait for the next question,

18 Your Honor.

19          THE COURT:  All right.  Then you can answer

20 that one, Doctor.

21          THE WITNESS:  Thank you, Your Honor.  As I was

22 saying, I do have an opinion and my opinion would be

23 that that exposure --

24          THE COURT:  Wait.

25          MR. MOORE:  Now I have an objection.  I was

                    ARTHUR FRANK - DIRECT

1   waiting for the next question, but it wasn't asked what

2   the opinion is.  I do have an objection based on

3   foundation, Your Honor; that the fact that the --

4           THE COURT:  Based on the specification of the

5   product?

6           MR. MOORE:  That --

7           THE COURT:  Let's go side bar real quick.

8           MR. MOORE:  Yes, Your honor.

9           THE COURT:  Hold that thought, Doctor.

10          THE WITNESS:  I will.  Thank you.

11      (Discussion at side bar at 10:12 a.m.)

12          THE COURT:  The objection is?

13          MR. MOORE:  That there hasn't been established

14  a requisite predicate for this question; that there's no

15  evidence in the record to support the basis for the

16  hypothetical.

17          THE COURT:  But break it out for me more in the

18  sense that's it's Philip Carey or there was snow --

19          MR. MOORE:  Exactly.  There's no evidence that

20  was asbestos-containing.  There's no evidence of any

21  snow.  It's not disclosed in any deposition transcript.

22  I mean there's -- I don't even -- there's no facts in

23  the record to that effect.

24          THE COURT:  Well, I think I can predict the

25  response.  I'll let you make it and then I'll give you

                    ARTHUR FRANK - DIRECT

61

1   the Court's thoughts.

2          MR. MCCOY:  All right.  Our response is that

3   the evidence will be presented as foundation.  And

4   again, we have to prove up these things, otherwise these

5   hypotheticals will be ultimately left to the jury.  But

6   these specific facts will be proved to the extent they

7   haven't already been proved.  We haven't had

8   Mr. Bushmaker testify, but he will be testifying about

9   the specific matters.

10         THE COURT:  Okay.  Well, and for --

11         MR. MCCOY:  And these --

12         THE COURT:  Stop.  For that reason, I'm going

13  to deny the objection because as the instructions have

14  already told the jury, this is one of the preliminary

15  instructions and certainly we'll be able to get those

16  again and you can argue this, an expert's opinion based

17  on a hypothetical has no value unless the underlying

18  facts have been proved.  So if he wants to proffer to

19  the Court that he can prove this up, then I will let him

20  ask the question and get the answer.

21         MR. MOORE:  Sure.  Absolutely.  And in lieu of

22  doing this exercise on any other hypotheticals, I'd like

23  to have a continuing objection to the basis and to

24  the --

25         THE COURT:  Certainly you're entitled to
                    ARTHUR FRANK - DIRECT

1  continue objecting to the end of the case if you think

2  the hypotheticals have not been properly supported and

3  you want a court instruction to that effect, you can

4  certainly ask for it.  Mr. McCoy of course thinks you

5  won't get there from here, but let's see how the

6  evidence plays out.  Okay?

7          MR. MOORE:  Yes, sir.  Thank you.

8       (End of side bar discussion at 10:13 a.m.)

9          MR. MCCOY:  Should we just have the last

10  question and answer read back?

11         THE COURT:  If we can get there from here.

12         MR. MCCOY:  If not, I'll start it again.

13         THE COURT:  That might be better.  And Doctor,

14  he gets to ask if he wants to, so let's see what

15  Mr. McCoy wants to do.

16         THE WITNESS:  You did ask me to hold the

17  thought and I did try to do so.

18         MR. MCCOY:  I'm going to go back to just

19  restating the assumptions I asked the doctor to make

20  very quickly here.

21  BY MR. MCCOY:

22  Q    So assume, Doctor, that the removal of Philip Carey

23  asbestos cement and block insulation was done by

24  Mr. Bushmaker on a high temperature water system and

25  created so much dust that it looked like snow.
              ARTHUR FRANK - DIRECT

1        Do you have an opinion to a reasonable degree of

2   scientific and medical certainty about whether such

3   exposures caused Mr. Bushmaker's lung cancer?

4            MR. MOORE:  Object to the form of the question

5   again.  Caused or a cause.

6            MR. MCCOY:  I'll rephrase it, Judge, to state

7   were a cause of Mr. Bushmaker's lung cancer.

8            THE WITNESS:  Yes, I do have an opinion, and my

9   opinion would be that that exposure, as you outlined,

10  would have been part of his cumulative overall exposure

11  that would have led to his developing his lung cancer

12  and to his asbestosis.

13  BY MR. MCCOY:

14  Q    What is your basis for saying that?

15  A    The basis is what we just discussed with the jury

16  that the cumulative exposure is what ends up giving you

17  your disease.  It is all of the exposures that one has

18  and whatever makes up that exposure is contributory to

19  the development of those diseases.

20  Q    I'd like you also to assume some other facts.

21  Assume Mr. Bushmaker had about six months of exposure

22  during the years of about 1947 to 1952 as a bystander

23  working in the same or adjacent rooms to persons who

24  were cutting and sawing asbestos-containing Philip Carey

25  millboard in home construction work and that that
                ARTHUR FRANK - DIRECT

1    cutting and sawing released asbestos fibers into the

2    air.

3         Do you have an opinion to a reasonable degree of

4    scientific and medical certainty about whether such

5    exposures caused Mr. Bushmaker's lung cancer?

6    A    I do have an opinion and that also would have been

7    a contributing cause as part of his overall cumulative

8    exposures.

9    Q    What about his asbestosis?

10   A    Both for his lung cancer and for his asbestosis.

11   Q    Have you read publications about different kinds of

12   asbestos products in terms of disease causation

13   assessment?

14   A    I have read about them.  I've written about them.

15   Q    Does that include cement and block materials?

16   A    Yes, sir.

17   Q    And board, millboard-type materials?

18   A    Yes, sir.

19   Q    Another set of assumptions here.  Assume

20   Mr. Bushmaker had ten months of exposure one or two

21   hours per day during the years 1955 to 1956 as a

22   bystander in the same areas as insulation crews that

23   were cutting and sawing Philip Carey asbestos block and

24   also mixing Philip Carey asbestos cement to be fitted

25   onto a high temperature water system.
                    ARTHUR FRANK - DIRECT

1    Do you have an opinion to a reasonable degree of

2 scientific medical certainty about whether such

3 exposures also caused -- were a cause of Mr. Bushmaker's

4 lung cancer and asbestosis?

5 A    Yes, I do have an opinion.  And again, those

6 exposures as you've just outlined would have been part

7 of his cumulative exposure giving rise both to his

8 asbestosis and to his lung cancer.

9 Q    And I have a couple other assumptions here.  The

10 next one is assume Mr. Bushmaker had ten months of

11 exposure, one or two hours per day, during the years

12 1955 to '56 as a bystander in the same areas as

13 insulation crews that were only mixing Philip Carey

14 cements and applying them to a high temp water system.

15    Do you have an opinion to a reasonable degree of

16 scientific and medical certainty about whether such

17 exposures to the asbestos cements only were a cause of

18 Mr. Bushmaker's lung cancer?

19 A    I do have an opinion and my opinion would be to the

20 extent that he had such exposures, they too would have

21 added to his cumulative exposures giving rise both to

22 his asbestosis and to his lung cancer.

23 Q    Okay.  Last set of assumptions here.  Assume Mr.

24 Bushmaker had 25 years of repair and maintenance work

25 which involved about 25 -- 25 percent of his time

ARTHUR FRANK - DIRECT

1  working on a high temperature water system and that the

2  work, repair and maintenance on that required removing

3  and reinstalling asbestos containing Philip Carey cement

4  and block insulation and this took place during the

5  years 1956 to about 1980.

6       Do you have an opinion to a reasonable degree of

7  scientific and medical certainty about whether such

8  exposures caused Mr. Bushmaker's lung cancer and --

9            MR. MOORE:  (Stands)

10           THE COURT:  Wait, I think we've got an

11  objection to that.

12           MR. MOORE:  I do have an objection.  I need to

13  be heard at side bar on this one.

14           THE COURT:  All right.  Let's go side bar.

15      (Discussion at side bar at 10:18 a.m.)

16           THE COURT:  Okay.  And the objection is?

17           MR. MOORE:  Yeah, this time now we're past even

18  the period of exposure.  My ability here --

19           THE COURT:  Right.  You went out to 1980 with

20  that hypothetical.

21           MR. MCCOY:  Yeah, but the causation question is

22  different than the issue of knowing -- the causation

23  question has to be established, of continuing ongoing

24  exposure that's relevant to causation independently of

25  anything else.
                        ARTHUR FRANK - DIRECT

1          THE COURT:  Okay.  So I may be not tracking the

2    time line properly, but is Mr. Bushmaker going to

3    testify that he was exposed to Philip Carey products up

4    to 1980?

5          MR. MCCOY:  He's going to testify that he was

6    exposed during the removal and repair work.  About 25

7    percent of his work total was on this high temperature

8    system, and he did, like Mr. Ferriter said, remember,

9    the removal --

10         THE COURT:  No, no, I'm more focusing on the

11   time line.  I didn't realize it was all going out to

12   1980 at some point.

13         MR. MCCOY:  Right.

14         MR. MOORE:  I'm objecting.  This is a total

15   surprise.

16         MR. MCCOY:  This is not --

17         THE COURT:  Wait.  It's his time.

18         MR. MOORE:  Liability cuts off in 1967 under

19   any circumstance.

20         THE COURT:  Right.  You can't go past '67 on

21   this.

22         MR. MCCOY:  Judge, this is part of the

23   causation.

24         THE COURT:  No.  No.  '67.  You can frame it as

25   a '67 hypothetical.  That's it.
                    ARTHUR FRANK - DIRECT

```
1              MR. MCCOY:  Okay.

2              THE COURT:  Do you understand?

3              MR. MCCOY:  Okay.

4         (End of side bar discussion at 10:22 a.m.)

5    BY MR. MCCOY:

6    Q    Okay.  I'm going to withdraw and change that last

7    set of assumptions.  I want you to assume that

8    Mr. Bushmaker had -- did repair and maintenance work

9    starting in 1956 and continuing through 1967 and that

10   about 25 percent of his time in that period was working

11   on a high temperature water system and that the work

12   required removing and reinstalling asbestos-containing

13   Philip Carey block and insulation.

14        Do you have an opinion to a reasonable degree of

15   scientific and medical certainty about whether such

16   exposures contributed or I should say were a cause of

17   Mr. Bushmaker's lung cancer and asbestosis?

18   A    I do have such an opinion and my opinion would be

19   that those exposures also would have been part of his

20   overall cumulative exposure that gave rise to both his

21   asbestosis and to his lung cancer.

22   Q    And Dr. Frank, if a person -- specifically we'll

23   just use Mr. Bushmaker -- if Mr. Bushmaker had inhaled

24   asbestos fibers from other sources than the Philip Carey

25   products, would those exposures also have been a cause
```

ARTHUR FRANK - DIRECT

1  of his lung cancer and asbestosis?

2  A    Yes, they would have been.  There's no way the body

3  knows that it's a Philip Carey product or somebody

4  else's product.  It responds to the exposures to

5  asbestos.  So again, the cumulative exposures, both from

6  Philip Carey products as well as other products, would

7  have been contributory.

8            MR. MCCOY:  I have a few more questions on this

9  line, Judge, and then probably if you want, then after

10 that I probably have another half hour or so or 45

11 minutes I think.

12           THE COURT:  Okay.  Well, let's --

13           MR. MCCOY:  Tell me when to stop.

14           THE COURT:  No, thank you for that.  Let's

15 finish this line of questioning, then we'll see if the

16 jury is ready for a break and I'm thinking the answer is

17 probably yes.  But let's get there from here.

18 BY MR. MCCOY:

19 Q    All right.  We've talked in these hypotheticals,

20 I've asked you to assume a couple different scenarios;

21 one involves the installation of these products, pipe

22 covering block.  I also asked you to assume another

23 scenario about the removal and reinstallation of those

24 products.  Have you studied articles that involve both

25 these types of situations?
                    ARTHUR FRANK - DIRECT

1   A    Yes, and I've spoken to people who have done both

2   kinds of work.

3   Q    Can you just tell us in terms of assessing

4   causation what differences there are, if there are any,

5   in terms of the original application of these materials

6   versus the removal and reinstall?

7   A    As far as the body knows, there's no difference.

8   The fiber is one that is being put in place and escapes

9   and gets inhaled by somebody or comes from removal

10   activities.  Again, the body doesn't know or care about

11   what brand it is; if it was going in; if it was coming

12   out; what product it came from.  The body will respond

13   to asbestos, no matter what the source, name of the

14   company or activity that released the fibers.

15   Q    When you're talking -- when you talk about

16   bystander exposures and causation, if a person is within

17   20 feet of this type of activity application of block

18   and pipe -- of block and cement insulations, has that

19   been studied in terms of the causation issue?

20   A    Yes.

21   Q    And what's been determined in the scientific

22   literature in that type of scenario?

23   A    Well, it's been shown, depending upon the setting,

24   depending on how the asbestos is handled, it can travel

25   feet, it can travel hundreds of feet, it can travel

ARTHUR FRANK - DIRECT

1  hundreds of miles.  There's a band application process

2  we use to spray asbestos in this country onto buildings

3  and there was a study that was shown that when -- it was

4  actually the World Trade Center was being built in

5  New York and they were spraying asbestos, they detected

6  it in the air over Boston.  So that was 300 miles as the

7  crow flies.  The material certainly can spread and it

8  certainly can spread 20 feet.

9  Q    When the asbestos spreads, is it always going to be

10  visible?

11  A    No.  Most of the time, most of the time asbestos

12  fibers are not visible.  They're not visible to the

13  naked eye.  It's only under extraordinary circumstances

14  that you'll see dust from an asbestos-containing product

15  or anything.  You have to have very high amounts before

16  you'll actually see them.  Most dusts, be it coal dust,

17  silica particles, asbestos fibers, anything, you won't

18  see.  But they can be in the air and they can be there

19  in a significant amount.

20  Q    And I think the question I have on that then is if

21  you see visible dust from asbestos materials being used

22  like block and cement insulations, is that all the

23  asbestos fibers that are in the air or what you can see?

24  A    No.  There will be materials you can't see and

25  those materials could be used when you don't see it and

ARTHUR FRANK - DIRECT

1  you still could be exposed to a significant amount of

2  material.  When you see it, it just tells you that

3  there's generally an extraordinarily large amount of

4  dust.  Depending on the concentration of the asbestos in

5  the product, some percentage of it will be asbestos.

6          MR. MCCOY:  That concludes this line of

7  questioning, Judge.

8          THE COURT:  Okay.  We've been going about 90

9  minutes.  Why don't we take our usual 15-minute break.

10 We'll start somewhere between, oh, 20 to and quarter to.

11 All right.

12      (Jury excused from courtroom at 10:27 a.m.)

13         THE COURT:  Everyone please be seated.  Doctor,

14 you're still on the stand.  Actually you're not.  So

15 you're free to take a break as well, but because you're

16 technically on the stand, please do not talk to the

17 lawyers or the lawyer's team about your testimony while

18 on break.  Understood?

19         THE WITNESS:  Yes, sir.  Thank you.

20         THE COURT:  All right.  I don't have anything.

21 Mr. McCoy, anything before the break?

22         MR. MCCOY:  Not right now, but I do want to

23 make a further record on that one ruling we got.  I

24 heard Your Honor, but I would -- I do want to make a

25 further record on that.
                    ARTHUR FRANK - DIRECT

1            THE COURT:  As you wish.  Do you want to do it

2    now?

3            MR. MCCOY:  I don't -- I need to think about

4    that point just to present something to Your Honor, so

5    it doesn't need to be right now.

6            THE COURT:  Fine.  But if you want me to

7    reconsider the ruling, it's got to be before Dr. Frank

8    is done because otherwise the damage is done from your

9    perspective.

10           MR. MCCOY:  I understand.

11           THE COURT:  Mr. Moore, anything else then

12   before the break?

13           MR. MOORE:  No, sir.

14           THE COURT:  All right.  You guys get 15 as

15   well.

16       (Recess       10:28-10:44 a.m.)

17           THE COURT:  Let's bring in the jury here,

18   please.

19       (Jury brought in courtroom at 10:46 a.m.)

20           THE COURT:  All right.  Everyone please be

21   seated.  Ladies and Gentlemen, welcome back.  The doctor

22   is ready.  Mr. McCoy, why don't we continue, please.

23           MR. MCCOY:  Thank you, Judge.

24   BY MR. MCCOY:

25   Q    Dr. Frank, you've already explained about what
                      ARTHUR FRANK - DIRECT

1  asbestosis is.  Can that disease be cured?

2  A    No.  It is an incurable disease.  Once the scar

3  tissue forms, it's there forever.

4  Q    What are the long-term effects that can be caused

5  by asbestosis as the disease progresses?

6        MR. MOORE:  Objection, Your Honor.  Lack of

7  foundation.  Calls for speculation in the case of

8  Mr. Bushmaker.

9        THE COURT:  Do we need to go side bar on this,

10  Mr. McCoy?

11        MR. MCCOY:  I'd like to go ahead and ask that

12  question if we need to, Judge.

13        THE COURT:  Yeah.  I guess I just need a little

14  more background, so let's go side bar.

15      (Discussion at side bar at 10:47 a.m.)

16        THE COURT:  Okay.  So why don't you give me a

17  little bit more detail on lack of foundation here.

18        MR. MOORE:  Sure.  I mean he's asking -- it's a

19  prejudicial question because he's asking what can be the

20  long-term side effects of asbestosis was the question as

21  I understood it.  Now he's going to try to use that to

22  say that that's the situation with Mr. Bushmaker and

23  that's not within the report and it's not a claim that

24  I've seen in this case and -- nor evidence of.  You

25  can't see that he -- you can't draw the inference in

                    ARTHUR FRANK - DIRECT

1  front of the jury that that's going to be the situation

2  here.  That's unfair to us.

3          THE COURT:  Okay.  Mr. McCoy.

4          MR. MCCOY:  That wasn't how I was planning to

5  use it, Judge, because what I'm directing this at is in

6  opening statement Mr. Moore said that Mr. Bushmaker did

7  not have asbestosis anymore because there was something

8  on the 2012 CT scan.  That's what I'm directing it at.

9          THE COURT:  I know that you did mention during

10 opening that he's now cleared.  But again, I thought

11 this case was about cancer, not about asbestosis.  I'll

12 let you ask it and get an answer as one question, but

13 then let's move on.  Okay?

14     (End of side bar discussion at 10:49 a.m.)

15 BY MR. MCCOY:

16 Q   Dr. Frank, what are the longer term effects that

17 can be caused by asbestosis as that disease progresses?

18 And I'm talking about within the lung.

19 A   When someone has asbestosis, basically two things

20 can happen.  It need not progress.  Not every case

21 progresses.  And then somebody will be left with

22 whatever their pulmonary condition is at that time.  On

23 the other hand, if it progresses, someone will end up

24 being more and more short of breath, limitations of

25 their activities will occur, and ultimately if it gets

                    ARTHUR FRANK – DIRECT

1  bad enough, it can cause death.

2  Q    If the jury was told in opening statement by

3  counsel for Rapid-American that Mr. Bushmaker did not

4  have asbestosis based on a 2012 CT scan, would you agree

5  based on your review of the medical records and

6  knowledge of the disease?

7  A    No.  I've seen two 2012 CT scans and both of them

8  speak to the extensive calcified pleural plaques; make

9  no mention one way or the other of parenchymal changes.

10 There's no way that his asbestosis, pleural asbestosis

11 or whatever didn't exist anymore in 2012.  It's a

12 disease that doesn't go away once you have it.

13 Q    Just in reference to this one medical record which

14 was June 12, 2012, and it makes -- this is from the

15 Marshfield Clinic in Marshfield -- this makes a

16 statement under here of findings and it says "Additional

17 linear areas of scarring are noted at the lung bases."

18 A    That is entirely consistent with his diagnosis of

19 asbestosis and certainly it speaks just before that of

20 his calcified pleural plaques.  It certainly was evident

21 and present in 2012.

22 Q    Thank you.  Have you published papers, Doctor, on

23 the combination of tobacco and asbestos exposures?

24 A    I have.

25 Q    Okay.  Can you tell us when you first did that or

                    ARTHUR FRANK - DIRECT

1  an example of one that's significant in connection with

2  the circumstances of this case?

3  A    I think the first time I published on that would

4  have been 1979.  It was a paper in the Annals of the

5  New York Academy of Sciences.

6  Q    What did you conclude in that research that was

7  published back then?

8  A    I was looking at the data that existed at the time

9  and basically it had to do with the interaction and the

10 synergism of tobacco and asbestos.  It showed that

11 asbestos by itself could cause lung cancer; smoking

12 certainly by itself can cause lung cancer, and that the

13 two together could cause even more lung cancer, many

14 times more.

15     There's also data in there or discussions in there,

16 because there was information from the insulators that

17 Dr. Selikoff worked with and had us work with him on

18 that if you could get somebody to give up cigarette

19 smoking, that greatly increased risk of the combination

20 materials would go down over time and that actually over

21 time you were left with the risk of just the asbestos

22 without the cigarettes.

23     So there certainly is this synergistic effect, but

24 as we've already discussed specifically in the case of

25 Mr. Bushmaker, his tobacco use stopped many years ago.

ARTHUR FRANK – DIRECT

Q    You had mentioned something earlier about cigarette

smoke and the removal or clearance of the carcinogens

from the lung over time.

A    Yes.

Q    Okay.  Can you explain what you mean by that?

A    There are literally hundreds of compounds in

cigarette smoke; about -- it varies whose data you look

at, but somewhere around 40 of them are cancer-causing

agents.  They're so-called carcinogens.  Most of them

are what we call *polycyclic aromatic hydrocarbons*.  It's

a fancy term for carbon rings with hydrogens sticking

off them, sometimes multiples of these rings.  These are

relatively easily metabolized in the body and it's

actually the metabolite in some cases that is the

cancer-causing agent, not the original compound.

     For someone who gives up cigarette smoking, once

they've smoked their last cigarette and the body has

metabolized these compounds into other related

compounds, they've now perhaps stuck a sulfur group on

or some other ways the body deals with this, they get

excreted from the body and they're not there anymore.

     Another example of a carcinogen that doesn't stay

around is radiation.  If someone gets a big dose of

radiation, it goes through their lungs, comes out the

other side.  It may have done damage while it was there,

ARTHUR FRANK - DIRECT

1 but the body also has mechanisms whereby it can repair

2 certain amounts of cell damage.

3      So the carcinogen doesn't need to hang around, but

4 the longer you go without exposure to that carcinogen

5 that doesn't hang around, the less and less likely that

6 it has any effect.  On the other hand, as we've already

7 spoken, asbestos will hang around for the rest of your

8 life.

9 Q    Doctor, what is COPD?

10 A    COPD is sort of a catch-all phrase and it refers to

11 *chronic obstructive pulmonary disease*.  What it means is

12 someone is having some difficulty in exhaling air.

13 That's what it means by obstructive.  We take air in

14 relatively easily.  Blowing it out is sometimes

15 difficult.

16      There are two diseases that generally fall under

17 the category of COPD.  One is chronic bronchitis.  Some

18 people will develop that disease and that will constrict

19 the airways.  And then the other disease that will do

20 that is emphysema.  Both of those have many causes.

21 Q    Have you seen medical records after Mr. Bushmaker's

22 lung surgery which show emphysematis changes?  Did I say

23 that right?

24 A    Emphysematis.  Yes, I did see such records in his

25 medical files.
                    ARTHUR FRANK - DIRECT

```
 1   Q    And what is an emphysematis --

 2   A    Emphysematis change?

 3   Q    Emphysematis change, yes.

 4   A    What happens, I described earlier today that the

 5   lung is basically this collection of these literally

 6   billions and billions of air sacs and they're all held

 7   together with tissue.  What happens in the case of

 8   emphysema, these connections can break down and the air

 9   sacs enlarge.  So instead of having in the same space

10   maybe ten air sacs, some of them break down, you might

11   only be left with five.  Over time if you lose enough of

12   them, you end up being short of breath because you don't

13   have enough ability to transfer the oxygen back and

14   forth.  That's what goes on in these air sacs.

15        There are a number of causes of emphysematis

16   changes and I gave some consideration to that with

17   regard to Mr. Bushmaker.

18   Q    That was my next question was to what do you

19   attribute the emphysematis changes --

20             MR. MOORE:  Objection, Your Honor.

21   Q    -- of Mr. Bushmaker?

22             MR. MOORE:  Outside the scope.

23             THE COURT:  If it's in the report, it's fair

24   game.  If not, you've got to move on.

25             MR. MCCOY:  I think it's in the report.
                    ARTHUR FRANK - DIRECT
```

81

1          THE COURT:  Can you point to a page for

2  Mr. Moore?  Doctor, you get a break now while they

3  exchange notes.  Do we need to go side bar?

4          MR. MOORE:  Yeah, I think so.

5          THE COURT:  Let's do it.

6      (Discussion at side bar at 10:58 a.m.)

7          THE COURT:  Okay.  Wait, wait.  Okay.  So let's

8  clarify.  The objection is?

9          MR. MOORE:  That there's no statement in the

10 record that the COPD and emphysema that's been

11 referenced in the --

12         THE COURT:  Post-surgery medical record.

13         MR. MOORE:  Or in his report, in Dr. Frank's

14 report, makes no mention that the fact that those

15 emphysematis --

16         THE COURT:  Emphysematis.

17         MR. MOORE:  Yes -- changes are due to anything

18 other than -- well, he doesn't even make mention of it.

19         THE COURT:  Where are you going with this?

20 What's he going to tell you, Mr. McCoy?

21         MR. MCCOY:  He's going to describe what he

22 thinks would be the causes of the changes.

23         THE COURT:  Okay.  And is that in his report?

24         MR. MCCOY:  It's not specific to those --

25         THE COURT:  Then it's not coming in.
                    ARTHUR FRANK - DIRECT

1          MR. MCCOY:  Judge, it's in --

2          THE COURT:  Okay?  Point to the page in the

3    report.  Show me his report.

4          MR. MCCOY:  It was raised in his opening

5    statement.

6          THE COURT:  No.  Show me in the report.  If he

7    made a statement -- let's be clear.

8          MR. MCCOY:  He's got this statement here --

9          THE COURT:  Is this his report?

10         MR. MCCOY:  -- about smoking.  They want to say

11   it's related to smoking, the emphysematis changes.  He

12   has said it's not.  It's in his report.

13         MR. MOORE:  No.  He says it's unclear.

14         MR. MCCOY:  But that's --

15         THE COURT:  Okay.  Wait, let me just read it.

16   You're pointing to the sentence that begins "Given the

17   long hiatus..."  Okay.  But that's got nothing to do

18   with emphysematis conditions.

19         MR. MCCOY:  Well, it is in the sense that it

20   directly has to do with this case because we've been

21   told in opening statement that these emphysematis

22   changes are something caused by cigarette smoking.  His

23   report says --

24         THE COURT:  Okay.  Wait.  You can ask him, and

25   I want you to lead him, do you think these changes were

                  ARTHUR FRANK - DIRECT

1  caused by his cigarette smoking.

2          MR. MCCOY:  Okay.

3          THE COURT:  And I think his answer is it's

4  unclear that they were, so he does not think so, if I'm

5  reading that correctly.  You can ask him that.  In fact,

6  if you just want to read his report statement to him --

7          MR. MCCOY:  I'll ask him the question and he

8  can cross.

9          MR. MOORE:  I object to that question.  I think

10 it's --

11         THE COURT:  No, let's do this.  Let's do this.

12 The report says what it says.  Why don't you just show

13 him the report and read the sentence and say is that

14 your statement in the report.  Okay?

15         MR. MCCOY:  I need to relate it to the

16 emphysematis changes.

17         THE COURT:  No, you don't.  You read the

18 report.  Period.  Got it?  His report says what it says.

19 You're trying to extrapolate beyond that.  You can't do

20 that.  You can read what he says in the report because

21 that's his testimony.  If you want to argue from that

22 later, you can.  But you can't ask him a new opinion

23 that isn't in the report.  Okay?

24         MR. MOORE:  We've gone way beyond.  This on

25 several topics, but I'm allowing some leeway here.
                ARTHUR FRANK - DIRECT

1          THE COURT:  I understand.  And I haven't read

2    the reports, but the fairest thing to do is simply have

3    him read the report.

4          MR. MCCOY:  There's no medical doctor for

5    Rapid-American to testify about any of these matters.

6          THE COURT:  I've ruled.

7          MR. MCCOY:  If that's true --

8          THE COURT:  Stop.  I've ruled.

9        (End of side bar discussion at 11:01 a.m.)

10   BY MR. MCCOY:

11   Q    Doctor, I'm just going to go ahead and show you a

12   copy of your report in this case.  You may have it

13   already.

14   A    I do.

15   Q    Okay.  If you can find that.

16   A    Maybe just --

17          THE COURT:  If you want to share a copy, that's

18   fine.  Mr. McCoy, if you just want to point him to the

19   sentence that we're talking about, that would be fine.

20   Q    Right.  Okay.  I'd like to direct your attention to

21   this one sentence right here.

22   A    Yes.  Okay.

23   Q    Okay.  And I'd like you to just read that sentence,

24   if you would, to the jury from your report.

25   A    Sure.  I wrote in my report, "Given the long hiatus

                      ARTHUR FRANK - DIRECT

1  from smoking and the fact that he had not smoked

2  cigarettes since the 1940s, it is unclear what role, if

3  any, his prior tobacco use played in developing his lung

4  cancer."

5  Q    And that's still your opinion today?

6  A    Yes, sir.

7  Q    Dr. Frank, have you studied the historical

8  scientific literature about the health risks of

9  asbestos?

10  A    Yes.

11  Q    Have you personally contributed to this literature?

12  A    Yes, I have.

13  Q    Give us an example of your contributions to that

14  literature.

15  A    That's the book chapter that I referred to earlier

16  on the *History of Uses of Asbestos*, and it goes back

17  actually probably several thousand years because the

18  Romans knew of the hazards of asbestos.  But that's not

19  the modern story of what asbestos could do to people.

20  Q    Based on your review and understanding of the

21  history of the literature, when were the dangers of

22  asbestos first reported in the medical literature?

23  A    The first significant report that is usually cited

24  was a government publication in Great Britain.  It was

25  1898.  Her Majesty's Inspectorate of Factories spoke

ARTHUR FRANK - DIRECT

1 with the hazards of asbestos, and shortly thereafter,

2 Dr. Montague Murray wrote that -- because the hazards of

3 asbestos that were now better appreciated, they didn't

4 expect to see so much disease as they had seen

5 previously.  Unfortunately he wasn't correct.

6 Q    All right.  And you've selected some references

7 today that you were going to talk to the jury about and

8 gave me a list of what they were.

9 A    Yes, sir.

10 Q    Okay.  I'm just going to go through these

11 one-by-one.  I'll give you the name and you can tell me

12 what the significance of that particular piece of

13 literature is --

14 A    Yes.

15 Q    -- to the historical knowledge of the dangers of

16 asbestos in the literature.  The next -- you talked

17 about Montague Murray, and that was published in 19 --

18 A    That was 1907, the quote, the famous quote of his

19 now that -- I'm paraphrasing, of course, that the

20 disease was understood and wouldn't occur, as he put it,

21 so often as heretofore.

22 Q    Okay.  The next publication that you mentioned to

23 me was by Collis.  C-o-l-l-i-s.

24 A    Right.  He was --

25 Q    1915?

                    ARTHUR FRANK - DIRECT

1   A    Right.  He wrote some papers in 1915 on what had

2   been called by then *pneumoconiosis* or *dust diseases of*

3   *the lung*.  That had been a phrase coined by a German

4   pathologist in 1867.  And he wrote a paper in 1915 about

5   the hazards both of silica and about asbestos and the

6   changes that it could cause in the lung.

7   Q    And the next publication that you mentioned to me

8   is by Cooke in 1924?

9   A    The fact that asbestos could cause disease was

10  appreciated prior to Cooke, but he gave the term to the

11  disease asbestosis.  He's the first one in a paper in

12  1924 that spoke to and used the term asbestosis.  He was

13  a British physician and wrote using that term in 1924.

14  Q    And the next publication that you mention in my

15  list is by Meriwether.  1930.

16  A    Meriwether and Price.  Dr. Meriwether was a

17  physician.  Mr. Price was an industrial hygienist.  That

18  was about a 70 or 80-page document that they wrote.  It

19  was also in Great Britain.  And there were a number of

20  important points in that particular article.  I'll just

21  sort of tick them off for you.

22      Basically what Meriwether and Price wrote was men

23  can get asbestos disease; women can get asbestos

24  disease.  You can get it from different products.  They

25  talked about different materials that people were

ARTHUR FRANK - DIRECT

1  exposed to that contained asbestos.

2      They made a very telling comment in there.  They

3  said workers who are exposed to hazardous materials

4  should be educated about the hazards of the materials

5  that they're working with so they can participate in

6  helping to protect themselves.  They talked about, when

7  dealing with asbestos, that you needed good ventilation

8  to reduce the amount of dust that workers would be

9  exposed to.  And they even carried it one step further.

10  They said if you can't provide good ventilation, you

11  need to give workers respirators.  This was all written

12  about in 1930.

13      So Meriwether and Price wrote what I personally

14  consider sort of the fairly seminal paper about the

15  hazards of asbestos and how to prevent them.

16  Q    The next authors that you mentioned in the list to

17  me were Lynch and Smith.  1935.

18  A    Doctors Lynch and Smith were two physicians in

19  South Carolina.  They saw workers who came to them from

20  an asbestos textile plant.  They didn't definitely write

21  this, but they said we're seeing -- one has to remember

22  that in 1935, lung cancer was a very uncommon disease.

23  Very rare.

24      MR. MOORE:  Objection, Your Honor.  I don't

25  think he can put his gloss on this.  I think he can say

ARTHUR FRANK – DIRECT

1    what was written.

2            THE COURT:  We'll give him some leeway.  I'm

3    not going to stop him.

4            MR. MOORE:  Okay.

5            THE WITNESS:  They were looking after workers

6    who worked at the asbestos textile plant.  They were

7    seeing cases of asbestos-related lung disease and they

8    suggested that they were seeing excess cases of lung

9    cancer and that they thought it might be related to the

10   exposures to asbestos that these workers were having.

11   BY MR. MCCOY:

12   Q    The next author that you had asked me to put on the

13   list is Hueper.  H-u-e-p-e-r.  In 1942.

14   A    Wilhelm Hueper was head of Occupational Cancer

15   Studies at the National Cancer Institute, the same place

16   I went to work at decades later.  He wrote a textbook.

17   It was published in 1942 called *Occupational Tumors and*

18   *Allied Diseases* and in there he specifically wrote that

19   he considered asbestos to be a cancer-causing agent of

20   lung cancer.  That was in his role as head of

21   Occupational Cancer Studies.

22   Q    And the next publication that I've noted here is

23   one from the Journal of the American Medical Association

24   in 1949.

25   A    The Journal of the American Medical Association was

ARTHUR FRANK - DIRECT

1  and probably still is the most widely read medical

2  journal in the United States and they wrote about the

3  hazards of asbestos in 1949, including the fact that it

4  caused lung cancer.

5  Q    What else was covered in that article in 1949?  Was

6  it a study of cases or --

7  A    It was a review of some cases and the fact that

8  cases had been collecting during the 1940s with regard

9  to lung cancer, showing up in individuals who had been

10  exposed to asbestos.

11  Q    And another article that you had put on the list

12  then was by Doll in 1955?

13  A    Richard Doll was a medical physician, medical

14  epidemiologist in Great Britain, and in 1955 he did and

15  reported on the first epidemiological study of lung

16  cancer being caused by asbestos.  Prior to that, there

17  had been these reports.  There was enough information

18  for Hueper to call it a carcinogen.  But in 1955, he

19  reported that in an asbestos textile factory that he

20  looked at, he looked at something over 100 deaths.  He

21  expected that there would have been 4 percent of the

22  deaths from lung cancer.  All of these patients or

23  individuals had had autopsies.  What he found was that

24  instead of 4 percent, there was 17 percent of the people

25  had died of lung cancer, and so he again, added to the

ARTHUR FRANK - DIRECT

1 literature with his epidemiological study that asbestos

2 was a cause of lung cancer.

3 Q    And after Mr. Doll or after Sir Richard Doll's

4 publication in 1955, was there other articles published?

5 A    There have been at this point following that, there

6 were hundreds of articles about lung cancers and all the

7 other diseases we talked about; I mean literally

8 thousands of papers published about the hazards of

9 asbestos following that time frame.

10 Q    Okay.  I'm going to stop with Sir Richard Doll.

11 We've covered enough so far.  If a company making

12 asbestos products has claims by employees who worked in

13 production areas for asbestos diseases, is this

14 important from an occupational medicine perspective to

15 protecting persons working in the field with the same

16 products?

17          MR. MOORE:  (Stands)

18          THE COURT:  Wait, wait.  I think we've got an

19 objection.

20          MR. MOORE:  Yes.  Same objection as I

21 previously stated at side bar.  The four corners issue.

22          THE COURT:  Okay.  Is this part of the report?

23          MR. MCCOY:  No, Judge.  It's not specifically

24 stated.

25          THE COURT:  Okay.  Like we discussed, you may

                    ARTHUR FRANK – DIRECT

1    ask Dr. Frank about those things that he put in his

2    report, but otherwise we've got to move on.  Okay?

3              MR. MCCOY:  All right.

4    BY MR. MCCOY:

5    Q    Dr. Frank, again addressing the history of the

6    knowledge of the hazards of asbestos, did some of the

7    government agencies in Wisconsin take steps to regulate

8    asbestos before 1960?

9    A    Yes, they did.

10   Q    Can you describe for us what actions were done?

11   A    Well, there are reports from the Industrial

12   Commission of Wisconsin.  There's a report from 1932 on

13   the effects of dust upon the respiratory system.  In

14   that document they speak to cases of asbestosis in 1932,

15   and then went ahead and started regulating these either

16   in the 30s or early 40s.

17   Q    Were regulations actually enacted by Wisconsin?

18   A    Yes.  The Industrial Commission did put in place

19   regulations for asbestos.

20   Q    What about in Ohio where Philip Carey was based?

21   A    Similarly they too had studied this as a problem

22   and put in place regulations.  I think that would have

23   been in the early 1940s to regulate exposures to

24   asbestos at workplaces.

25   Q    Are you familiar with something called the *standard*
                         ARTHUR FRANK - DIRECT

1   *of five million particles per cubic foot* for asbestos

2   exposure?

3   A    I am.

4   Q    Is that what was adopted early on in the

5   regulations?

6   A    Yes.  Early on the regulations called for, as it

7   says, five million particles per cubic foot.  A cubic

8   foot is a block of air that's a foot on each side.

9   Q    Where did that standard come from?

10  A    That came from the limited amount of information

11  that was available at the time.  There were a number of

12  studies that were carried out looking at how much

13  exposure could be thought to be documented and did it or

14  did it not give rise to disease.

15  Q    Was this standard intended for protection against

16  persons getting lung cancer from asbestos?

17  A    No, it was not.  It was a standard used to protect

18  against asbestosis.

19  Q    What's your basis for saying that?

20  A    Because that's what the standard was designed for,

21  and others recognized that.  There was the writings of

22  Dr. Stokinger.  Herbert Stokinger worked at -- well,

23  NIOSH didn't exist.  Then the predecessor to NIOSH, the

24  government agency in Cincinnati.  I actually met him.

25       But in 1956 before I got started in this, he

                    ARTHUR FRANK - DIRECT

1  actually wrote that when dealing with workplace levels,

2  if you're dealing with a cancer-causing agent, you

3  should have a level that was 100 or even 500 times less

4  than what you allowed for the diseases that were being

5  controlled that were not cancer.  So he was looking --

6  and he recognized that the standard that was in place

7  was to prevent asbestosis, even though it turned out

8  that that was not a sufficient standard.

9  Q    Turned out later?

10  A    Yes.

11  Q    Can persons with exposures less than five million

12  particle per cubic foot still get asbestos disease?

13  A    Yes.

14  Q    Can you explain that?

15  A    Well, again, it varies -- first of all, five

16  million particles per cubic foot, which is not the

17  measurements we use today.  Now we use something called

18  *fibers per cc* and a cc is the size of a sugar cube

19  roughly instead of a cubic foot.  Now we're down to a

20  tenth of a fiber per cc as a legally allowable standard,

21  but it still is not considered safe.  When the

22  government set that standard, they didn't call it safe,

23  they said it's legally allowable.

24       But if you look back, people with far less than --

25  well, with less than five million particles per cubic

ARTHUR FRANK - DIRECT

1  foot got the disease, and there's even discussions in

2  the scientific literature at the time saying that some

3  people didn't think that this was protective.

4  Q    At the time meaning back in?

5  A    In the 40s.  50s.

6  Q    When it was adopted or written by the governments?

7  A    Yes.

8  Q    Does the term *individual susceptibility* have a

9  meaning to you, Doctor?

10  A    It does.

11  Q    In the context of asbestos disease?

12  A    It does.

13  Q    What does that mean?

14  A    Well, with any exposure, not everybody who gets

15  exposed is going to get disease.  Even among asbestos

16  insulators who have the highest exposure of any group

17  that we know, I will tell you that after, let's say, 30

18  years of working in the trade, *only* 94 percent of them

19  end up with asbestosis.  I'm being a little facetious of

20  course, but there's 6 percent of people with the same

21  exposures day in and day out don't get the disease.  We

22  really don't know why.  We'd like to know because if

23  there's some factor or something that we could do to

24  protect other people, we'd like to make use of it.

25        We certainly know that not everybody gets lung

                    ARTHUR FRANK – DIRECT

1    cancer.  Some people get lung cancer.  Some people get

2    mesothelioma.  Some get the other cancers.  We don't

3    know ahead of time and cannot predict which individual

4    is going to get which disease.  And that is why, of

5    course, you end up protecting everybody so that nobody

6    gets disease or very few people.

7         The reason some people do or don't get disease, we

8    don't understand all of it, but some of it appears to

9    have to do with immunologic status.  It may have to do

10   with diet a little bit.  It may have to do with your

11   basic genetics.  We know there are certain genes that

12   dispose you to cancer.  That doesn't mean you're going

13   to get cancer if you have the genes, it just means that

14   if you're exposed to the cancer-causing agent, you're

15   going to be more likely to get it.  So you still have to

16   be exposed.  Just having the gene isn't enough.

17        So there are all of these factors, but we never

18   know ahead of time.  The state of medical knowledge is

19   not such that we can predict who will and who won't get

20   disease.

21   Q    Those persons who get it are the susceptible ones?

22   A    Yes.

23   Q    Is that the goal of occupational medicine, to

24   protect the susceptible persons?

25   A    To protect everybody.  The ones that are
                    ARTHUR FRANK - DIRECT

1   susceptible; the ones that are less susceptible.  You

2   don't know that ahead of time.  The whole goal is to

3   protect as many people as you can.

4   Q    The goal of occupational medicine would be to

5   protect Mr. Bushmaker from having gotten that condition?

6           MR. MOORE:  Objection, Your Honor.

7   Argumentive.  Outside the scope.

8           MR. MCCOY:  Judge, I don't have any further

9   questions.

10          THE COURT:  That one is stricken.  So with

11  that, let's turn the witness over.

12          MR. MCCOY:  I do want to offer some proffers,

13  but that's fine for now.

14          THE COURT:  As you wish.

15          MR. MCCOY:  Okay.  Thank you.

16          MR. MOORE:  May I, Your Honor?

17          THE COURT:  You may.

18          MR. MOORE:  Again.  May I sit here at counsel

19  table?

20          THE COURT:  You may choose your spot.

21          MR. MOORE:  And everyone can hear me okay?

22  Okay.  Thank you.  (11:20 a.m.)

23                  CROSS-EXAMINATION

24  BY MR. MOORE:

25  Q    Dr. Frank, you've never been the treating physician
                      ARTHUR FRANK - CROSS

1   for Mr. Bushmaker; correct?

2   A    Correct, Mr. Moore, I have not.

3   Q    Had you met Mr. Bushmaker before yesterday?

4   A    No, sir.

5   Q    You were hired by Mr. McCoy to look at this case;

6   correct?

7   A    Yes.  By his firm.

8   Q    And you've done a lot of cases for Mr. McCoy and

9   his law firm; correct?

10  A    I don't know what you mean by *a lot of cases*.  I've

11  worked with his firm probably about ten years or so.

12  I've done a number of cases.  There's other firms I've

13  done fewer and some I've done more with.

14  Q    You talked about, I believe in your direct

15  testimony speaking with Mr. McCoy, about the number of

16  depositions and trial testimony you've given.  Isn't it

17  true that your testimony has been 99 percent for

18  plaintiffs?

19  A    That's probably accurate, yes.

20  Q    Okay.  And in this case --

21  A    In asbestos litigation.  In other areas it's been

22  more balanced.

23  Q    Okay.  And as part of your report in this case, you

24  submitted a list of your testimony that you've given in

25  prior litigation; correct?
                    ARTHUR FRANK - CROSS

1  A    Yes, sir.

2  Q    And I mean this is -- for the record this is

3  Exhibit 2752 -- and this would be legal cases with

4  deposition or trial appearance by Arthur L. Frank, M.D.

5  That's you obviously?

6  A    Yes, sir.

7  Q    And this is your list of trial testimony and

8  deposition testimony?

9  A    Since 1994, yes, sir.

10  Q    Okay.  And we can go through this.  I'm skipping

11  lots of pages.  But up to here, I mean they're full page

12  lines of cases.  And it ends on page -- hold on.  It

13  ends on page 42?

14  A    Yes, sir.

15  Q    And that -- this is actually not complete because

16  the last date on here is 8-25-11; correct?

17  A    Correct.  And I did some work obviously the rest of

18  that year and last year as well.

19  Q    Yeah.

20  A    It's an older version.

21  Q    So the newer version would be another seven or

22  eight pages maybe?

23  A    I don't know, two or three pages.  I don't keep

24  track of it.

25  Q    Okay.  So more than a thousand times.
                 ARTHUR FRANK - CROSS

1  A    Yes.

2  Q    And you've been retained by plaintiffs' attorneys

3  like Mr. McCoy for more than 2,000 times.

4  A    I've looked at more than 2,000 cases over 35 years,

5  yes, sir.

6  Q    In fact, in one year alone, you wrote over 500

7  reports for plaintiff's counsel, didn't you?

8  A    In some years, yes.

9  Q    And you've testified for more than 45 different

10 plaintiffs' law firms in this litigation; correct?

11 A    I've never added them up, but it's a considerable

12 number.

13 Q    Would you disagree with me if I said it was 45?

14 A    No.

15 Q    And you've testified in more than half of the

16 states in the United States for plaintiffs' counsel?

17 A    At this point, yes.

18 Q    And last I saw, you were charging $400 an hour for

19 your time; now it's $425, right?

20 A    Yes.

21 Q    In the last three years, you've charged between

22 $350,000 and $450,000 per year for your testimony on

23 asbestos litigation.

24 A    That's the money that has come to the University

25 for doing all that work, yes, sir.
                        ARTHUR FRANK - CROSS

1  Q    And collectively it's upwards of four million

2  dollars; correct?

3  A    Over 35 years, yes, I'm sure it is.

4  Q    And I know you've been asked these questions in the

5  past, Dr. Frank, but you're not a pulmonologist;

6  correct?

7  A    Correct.

8  Q    And you're not a radiologist?

9  A    Correct.

10  Q    You didn't see any films in this case at all, did

11  you?

12  A    I read the reports.  I did not see the original

13  films.

14  Q    And again, you're not an industrial hygienist

15  either?

16  A    Correct.

17  Q    And you're not an expert in warnings, are you?

18  A    I'm only an expert in those things the Court

19  designates me as an expert in.  I have no special

20  knowledge or experience with warnings.

21  Q    Okay.  Thank you.  And in addition to your reports,

22  you get your materials from the plaintiffs' counsel;

23  right?

24  A    Yes.

25  Q    And in this case, you haven't read Mr. Bushmaker's
                    ARTHUR FRANK - CROSS

1  deposition, sworn deposition testimony, have you?

2  A    I did not.

3  Q    You relied on the summary provided you by

4  Mr. McCoy; correct?

5  A    Correct.

6  Q    One thing you did -- you talked about the stuff you

7  have written in the past.  You also were involved in a

8  publication for lawyers in litigation; correct?

9  A    When I was a medical resident, one of my fellow

10  residents had a wife who worked for a medical legal

11  publishing house.  Knowing that I was interested in an

12  academic career and that I did work going back to my

13  high school days on cancer, I was asked if I would write

14  a book for lawyers so they could understand something

15  about cancer.  I figured lawyers are just as entitled to

16  learn about that as other people, so I agreed to write

17  such a book.

18      The book was initially about 600 pages.  There are

19  some legal materials in there that I had nothing to do

20  with.  I'm not a lawyer.  I don't know about legal

21  materials.  Those were added by the publishing firm.  I

22  wrote about 600 pages of material and did that back in

23  1976.

24  Q    And you had already worked for Mount Sinai or

25  excuse me, been in school at Mount Sinai from '68 to
                    ARTHUR FRANK - CROSS

1  what?  '72?

2  A    I was a medical student through '72.  I was a

3  graduate student at the Mount Sinai campus of City

4  University where I got my Ph.D. until '77.  When I wrote

5  that book, I had not yet done any work for any lawyers.

6  Q    You were an M.D. at that time.

7  A    I was.

8  Q    Yeah.  Right.  And it was published by Matthew

9  Bender; right?

10 A    Yes.

11 Q    And that book also discussed how to present a case

12 for trial.

13 A    That's legal material that were added by the

14 lawyers at the publishing firm.  I had nothing to do

15 with that.

16 Q    There was even a section in that book on how to

17 present Dr. Selikoff, your mentor, for trial; right?

18 A    Which I didn't know existed until the book came

19 out, yes.

20 Q    I've got to clear something up here because I'll be

21 honest with you, I don't know where you got some of the

22 information for your testimony today.  In opening

23 statement, Mr. McCoy said that Mr. Bushmaker smoked

24 cigars up until around 1986.  Okay?

25      Now did you get your information about
                    ARTHUR FRANK - CROSS

1   Mr. Bushmaker's smoking history from Mr. McCoy?

2   A    Initially I did.  That's how I wrote my report,

3   which speaks to his smoking until about 1970.  Then I

4   verified that with Mr. Bushmaker last night.

5   Q    Okay.

6   A    So Mr. McCoy may have misspoken or had

7   misinformation when he said '86.  Mr. Bushmaker and his

8   family members do not recall his smoking past 1970.

9   Q    Okay.  Well, I mean we have some medical records

10  from Mr. Bushmaker's treating physicians and -- let me

11  just highlight this.  This was the Marshfield Clinic and

12  he -- Doctor, or excuse me, Mr. Bushmaker apparently was

13  going in for surgery for his carotid artery disease.  Do

14  you see that?

15  A    I do.

16  Q    And this date of service was 2000.

17         MR. MOORE:  I'm sorry, folks.  I'll get it a

18  little closer.  Once I figure out how to use this, it'll

19  be great.

20  Q    It was October of 2000 and he was in for an

21  endartarectomy?

22  A    Endartarectomy.

23  Q    That's to clear the carotid artery in your neck;

24  right?

25  A    Yes, sir.

                    ARTHUR FRANK - CROSS

1   Q    As part of this, I mean don't you think these

2   doctors who are going to do -- this is a serious

3   surgery; correct?

4   A    Any surgery is serious.

5   Q    Absolutely.  And this is one that's cutting on your

6   carotid artery; correct?

7   A    Yes.

8   Q    And this is from 2000 and you would expect

9   Mr. Bushmaker to give truthful answers to his treating

10  doctors about his health history, wouldn't you?

11  A    Yes, depending on what the question was and where

12  the doctors got the information.

13  Q    Sure.  Well, do you have any reason to think that

14  they didn't get his history of tobacco use from

15  Mr. McCoy or anyone else?

16  A    They wouldn't have gotten it from Mr. McCoy.  They

17  might have gotten it from old medical records which may

18  or may not be accurate.

19  Q    And this one, it says in No. 6, it says "History of

20  tobacco use.  Patient is a former smoker of two cigars

21  per day for 25 years.  Off tobacco for 12 to 15 years."

22  And then it says he's asystematic from a pulmonary

23  standpoint; correct?

24  A    It says that.  There are other parts of the

25  records.  You know, you've pulled out one sheet that

                    ARTHUR FRANK - CROSS

1  says he's been off of tobacco for 30 years.  You know, I

2  think Mr. Bushmaker, it's my understanding, will be on

3  the witness stand in this very place under oath.

4  Q    Well --

5  A    Let him testify as to what his smoking history is.

6         MR. MOORE:  Your Honor, I'm just asking answers

7  to my questions.  That's all.

8         THE COURT:  Sure.  And Doctor, you know the

9  drill.  Answer the question asked.

10         THE WITNESS:  Yes, sir.

11  BY MR. MOORE:

12  Q    So if we do the math here, which is pretty easy, if

13  you deduct 12 years ago or 12 to 15, you're talking 1985

14  to 1988; correct?

15  A    If it's correct.

16  Q    But that would be the correct math though; right?

17  A    The math would be correct.

18  Q    Okay.  There is certainly no reason that you know

19  of that Mr. Bushmaker would not give the same or the

20  truthful answers to his physicians; correct?

21  A    I wasn't there.  I don't know if they asked him

22  that or if they took it from previous records.  I have

23  every reason to believe that Mr. Bushmaker, as is the

24  case for most patients, will give honest answers to

25  their doctors.
                    ARTHUR FRANK - CROSS

1    Q    Sure.  I would hope so.  Because that's for their

2    care and treatment; right?

3    A    Yes.

4    Q    Right.  Okay, here's an office note from December

5    18, 2006, and this is when he went in for his lung

6    cancer surgery; correct?

7    A    Yes.

8    Q    And there at the bottom this -- and I apologize.

9    For the court reporter, the exhibit we just looked at

10   was 2722A.  Would you confirm that for me, Dr. Frank?

11   A    Yes.

12   Q    Okay.  Now I'm showing you what's been marked as

13   Exhibit 2722B.  Okay?  Which is the pre-op report for

14   the lung surgery; right?

15   A    Yes.

16   Q    And it's dated December 18, 2006.  And there under

17   past medical history No. 4 it lists "History of severe

18   COPD"; right?

19   A    Well, at the same time he was going in for his lung

20   surgery, his --

21   Q    I'm sorry.  Is that what it says, Doctor?

22   A    That's what it says.  But it doesn't fit with the

23   rest of the data from that time.

24   Q    It says "History of severe COPD."

25   A    That's what it says.
                    ARTHUR FRANK - CROSS

1    Q    And on the next page of that same exhibit, No. 6,

2    it says "History of tobacco abuse"; right?  No. 6 at the

3    top there, sir.

4    A    Yes.

5    Q    Sorry.  And then under Social History, we have

6    another discussion here:  "The patient is a retired

7    pipefitter.  He denies any history of alcohol abuse.  He

8    only drinks socially.  Former smoker.  Quit smoking 20

9    years ago.  He smoked for about 20 years."

10        Did I read that correctly?

11   A    You did.

12   Q    And 20 years before 2006 would be 1986; right?

13   A    Yes.

14   Q    Just like Mr. McCoy told this jury.

15   A    Right.  If that is correct.  The math is correct.

16   Q    The math is correct.

17   A    Yes.

18   Q    Is centrilobular emphysema the one that's

19   associated with cigarette or tobacco smoking?

20   A    It can be, and there are other factors that cause

21   it as well and factors in his past exposure history that

22   are causative of that as well.

23   Q    In his -- this is a record from October 16, 2012.

24   Just about four months ago.  This is what I was

25   referring to in front of the jury.  No. 4, it lists --
                    ARTHUR FRANK - CROSS

1   No. 4, centrilobular emphysema in Mr. Bushmaker;

2   correct?

3   A    Correct.  And based on the smoking history that I

4   have from Mr. Bushmaker, I would not think his smoking

5   history was the cause of that.

6   Q    Please, Doctor, confine your answers to my

7   questions.  And this is Exhibit 2723A; correct?

8        THE COURT:  You're not showing it.

9   Q    Oh, I'm sorry.  Gosh.  Okay.  2723A; correct?

10  A    That's what it says.

11  Q    And you can see there, yes -- there's no dispute in

12  this case that Mr. Bushmaker has asbestos-related

13  pleural disease.  But it does say there, the treating

14  physician says "without evidence of

15  asbestosis/fibrosis"; correct?

16  A    And the previous one you showed said a history of

17  asbestosis, so the internal records are inconsistent

18  with each other.

19  Q    We just don't know from these records, do we?

20  A    Well, that's if you go by the records.  But I know

21  what I think he has.

22  Q    You haven't seen any films though.  You're looking

23  at the same records here; right?

24  A    I'm looking at those records, I'm looking at the

25  radiology reports, I'm looking at the B-reader reports,

                    ARTHUR FRANK - CROSS

1    and I'm making my own judgment.

2    Q    But you haven't seen -- you have not seen one CT

3    scan or x-ray; correct?

4    A    Correct.

5    Q    So you're looking at the same records the jury is

6    looking at.

7    A    Yes.  Well, I probably got to see more records than

8    they're likely to see if you only show them selected

9    pages.

10    Q    I suspect we don't want to have them see all of

11    those.  You know, we can talk about this a lot.  This is

12    Exhibit 2185A; correct?

13    A    That's what it says.

14    Q    And this is for service that was performed on

15    February 10, 2003.  This is for his knee replacement

16    surgery.  Do you see that?

17    A    I do.

18    Q    Okay.  So again, he's going in for a knee

19    replacement surgery.  Have you had a knee replacement

20    surgery, Doctor?

21    A    No.  I have a torn meniscus, but I haven't had it

22    repaired yet.

23    Q    Okay.  Suffice to say, it can be not a fun surgery

24    to go through; correct?

25    A    No surgery is fun to go through.
                     ARTHUR FRANK - CROSS

1  Q    Exactly.  So it's important again that we have the

2  correct social history before the surgery.  And again --

3  and this is another medical provider.  We have the

4  doctor who did the endarterectomy; we had the guy -- the

5  gentleman who's going to testify here who did the

6  lobectomy that Mr. Bushmaker had.  Now this is a doctor

7  who did the knee surgery; right?

8  A    He has a different history than the others.  He

9  said 30 years of smoking; the others said 20 years of

10 smoking.  And then there's a history you'll get from

11 Mr. Bushmaker.

12 Q    Well, I'm -- come and circle around on that a

13 little bit, Dr. Frank.  But I'm focusing more on when he

14 quit, because that's really the gist of this.  I mean

15 you talked about there being a risk associated with lung

16 cancer from smoking that goes back 35 years to the date

17 of quitting.  Remember that testimony on direct

18 examination?

19 A    Yes, and they're talking about smoking cigars which

20 don't carry the same risk as cigarettes.

21 Q    Please don't tell this jury that there's -- that

22 cigars are a safe form of tobacco.

23 A    Oh, I wouldn't say they're safe and they certainly

24 could give you mouth cancer.  But the increase in lung

25 cancer from cigars is far, far less than the risk from

ARTHUR FRANK - CROSS

1   smoking cigarettes, especially if you don't inhale.

2   Q    This document here says he quit smoking 17 years

3   ago.  So that would have been 1986 again; right?  If

4   this -- if this surgery was done in 2003.

5   A    That's what the math would tell us.

6   Q    Right.  And 30 years of cigar smoking, you would

7   agree that's a significant smoking history of cigars,

8   even of cigars.

9   A    Doesn't say how many; doesn't say if he inhaled;

10  doesn't say how much of the cigar he smoked.

11  Q    Okay.  Let's assume he smoked two cigars a day for

12  30 years.  Is that a significant --

13  A    Before it was 20 years, now it's 30 years.  What

14  one do you want me to assume?

15  Q    I want you to assume two cigars for 30 years.

16  A    Okay.

17  Q    That's a significant smoking history.

18  A    Of cigars, yes.

19  Q    Thank you.  Now there are any number of carcinogens

20  in the environment; correct?

21  A    Yes, there are.

22  Q    Sunlight is a carcinogen?

23  A    Yes, as a skin cancer.

24  Q    I'm from Kansas City.  I eat barbecue.

25  A    That has carcinogenetic materials on it, yes.
                    ARTHUR FRANK - CROSS

1    Q    Right.  So when you talk about no safe level, that

2    applies to any carcinogen, whether it's sunlight or my

3    burnt ends that I like.

4    A    Right.  And you know about it and you're willing to

5    take the risk.

6    Q    But it's all about dose; correct?

7    A    Yes.

8    Q    The higher the dose, the higher the risk.  You have

9    a chart over there; right?

10   A    Yes.

11   Q    Now some fact checking that I did with Dr. Brody.

12   I apologize.  I asked him some fact check questions that

13   I said in opening statement; confirm this with you, and

14   I think you already said it on direct examination.  I

15   said in my opening statement that there were between 3-

16   and 4,000 different products that contain asbestos.  I

17   was right; right?

18   A    That's what I testified to.  I guess we're both

19   right or we're both wrong.

20   Q    Okay.  You talked about a reference to the B-reader

21   report.  You -- that's an examination that's given to

22   people by NIOSH; correct?

23   A    Correct.  And I took the exam once in 1983.  I

24   didn't pass it.  I've never taken it since.  All of my

25   publications on readings of x-rays have been published
                    ARTHUR FRANK - CROSS

1   in the scientific literature, but I'm not a B-reader.

2   Q    That's correct.  Because you didn't pass the test.

3   A    Correct.  Fifty percent of the doctors like myself

4   don't pass it the first time they take it and I decided

5   I knew how to read x-rays, I didn't have to take it

6   again.

7   Q    You talked about some of the uses, 3- to 4,000

8   different uses of asbestos.  Back in the 50s and 60s,

9   physicians who did heart surgery back then put asbestos

10  in the chest cavity; correct?

11  A    And they occasionally caused mesotheliomas to occur

12  from that, yes.

13  Q    So the doctors back then doing that surgery didn't

14  appreciate the harmful effects of asbestos that they

15  might have on humans; correct?

16  A    Some doctors today still don't appreciate it.  That

17  doesn't mean it's not known about or that they couldn't

18  know about it.

19  Q    But these are sophisticated surgeons back in the

20  1950s and 60s doing heart surgery, packing asbestos in

21  the heart -- in the chest cavity of their patients;

22  correct?

23  A    I have no idea how sophisticated they were.  I have

24  no idea what they knew about asbestos.

25  Q    Okay.  But that's what they chose to do; right?
                    ARTHUR FRANK - CROSS

1    A    That's what they chose to do and they gave people

2    disease because of it.

3    Q    Now from the 30s -- and certainly that wasn't their

4    intent at that time, was it?

5    A    I would hope not.

6    Q    Okay.  From the 30s until the 70s, asbestos was put

7    into products because of its safety qualities; correct?

8    A    Sometimes it was used because of safety qualities.

9    Sometimes it was used because it was useful for certain

10   things like filtering or making cement lighter.  There

11   were lots of reasons people ended up using asbestos.

12   Q    One of the main ones was to provide protection from

13   fire; correct?

14   A    That was a use of asbestos materials.

15   Q    And by the way, the first product warnings didn't

16   come out -- that were on products didn't even come out

17   until the 1960s; correct?

18   A    I don't recall when the products --

19   Q    Okay.

20   A    -- came out.

21   Q    You don't dispute that?

22   A    I don't know about it.  I don't know when the

23   warnings were first put on there.  To this day some

24   companies don't warn about it.

25   Q    In that Matthew Bender book that you talked about,
                      ARTHUR FRANK - CROSS

1  the one you did for the lawyers, you wrote the

2  following -- this was in 1976?

3  A    Depends what I --

4  Q    It was before --

5  A    I wrote the first book in 1976.  I then wrote

6  additional chapters.  So depending on what you're

7  quoting, I'll tell you if I remember when I wrote it.

8  Q    You wrote the following:  "In many ways, modern

9  technology depends on this material."  You're referring

10 to asbestos; correct?

11 A    Yes.

12 Q    "It is useful for insulation of both hot and cold

13 pipes.  It is an excellent fireproofing material and

14 modern automobile brakes use millions of pounds of this

15 material."  Did you write that?

16 A    If it's in the book, I wrote it.

17 Q    Okay.  You don't deny you wrote that, do you?

18 A    No.  I don't recall writing it, but 600 pages, I

19 don't remember everything I wrote.  But if it's in

20 there, I wrote it.

21 Q    You weren't here for my opening statement

22 unfortunately because it was just a masterful piece of

23 litigation.

24 A    And you probably would have asked me to step out

25 anyway.

                    ARTHUR FRANK - CROSS

1   Q    But I talked about the forest and the trees, and I

2   want to talk about that a little bit with you,

3   Dr. Frank.  You talked about these initial reports about

4   asbestos and the harmful effects that were being

5   discovered like in the factories in England, and in

6   particular the Meriwether report.  Do you remember your

7   testimony in that report?

8   A    My short-term memory still works.

9   Q    Very well.  The fact is is that in the Meriwether

10  and Price case, they were studying an asbestos textile

11  mill in England; right?

12  A    Among other things.  A lot of the paper has to do

13  with the textile mill.  They were also talking about

14  making brakes.

15  Q    But it was still in the production of these

16  asbestos materials; correct?

17  A    Yes.

18  Q    And invariably they were using raw asbestos fiber

19  to make these products; correct?

20  A    Yes.

21  Q    So the -- we have an understanding of this tree

22  here, the tree in 1930 with Meriwether and Price, that

23  was raw asbestos fiber in the manufacturing environment;

24  correct?

25  A    Yes.

                    ARTHUR FRANK - CROSS

1  Q    And you talked about Mr. or Dr. Hueper's book

2  *Occupational Tumors and Allied Diseases* from 1942;

3  right?

4  A    I did.

5  Q    Okay.  And in that publication -- did I get it all

6  on there?  This is -- I'm sorry, Doctor.  This is the

7  book you're talking about; right?

8  A    Yes.

9          MR. MOORE:  It's *Occupational Tumors and Allied*

10  *Diseases* by C.W. Hueper for the record.  This is, I

11  don't even see a page number -- it's page 400.

12  Q    And Dr. Hueper wrote "The chief health hazard

13  consists in the inhalation of asbestos dust which is

14  produced abundantly during the preparation of the

15  mineral for the spinning process (purification and

16  removal of stony impurities) and during other phases of

17  the production and manufacturing processes of asbestos

18  and asbestos-containing goods."  Right?

19  A    That's what it says.

20  Q    And so we're talking about asbestos in the

21  manufacturing process, the Meriwether and Price

22  scenario; right?

23  A    That is most of whom was studied in those days, but

24  again, they understood about the hazards of that

25  material.
                    ARTHUR FRANK - CROSS

1   Q    In the manufacturing process.  Now one document or

2   one study that you didn't mention when Mr. McCoy was

3   asking you questions was, in fact, a study of pipe

4   covering done by the U.S. Public Health Service in 1946.

5   You did --

6   A    The Fleisher-Drinker report.

7   Q    The Fleisher-Drinker report.  You're familiar with

8   it.  Very famous in the history of the state of the art

9   of asbestos knowledge.  Fleisher-Drinker is a well-known

10  report; correct?

11  A    Well-known and very flawed.

12  Q    Unfortunately flawed.

13  A    Yes.

14  Q    Yeah.  And let's take a look at this.  This was

15  January of 1946 is when this was published.  Is this the

16  journal in which it was published?  Do you remember

17  that?

18  A    I don't recall.  I'm sure it is.

19  Q    We'll just go over here.

20  A    Yes.

21  Q    "The health survey pipe covering operations in

22  constructing naval vessels."  And we call it

23  Fleisher-Drinker, but the first author is Walter

24  Fleisher, the second one is Frederick Viles, Robert

25  Gade, and then Phillip Drinker.  Who's Phillip Drinker?

                    ARTHUR FRANK - CROSS

1    A    He was a professor at Harvard at that time.

2    Q    What was his specialty?

3    A    I think it was industrial hygiene.

4    Q    Similar to your --

5    A    Pardon me?

6    Q    You worked with industrial hygienists; right?

7    A    I do.

8    Q    Now, you've been shown this article I'm sure in

9    other cases.  You're well familiar with it; right?

10   A    Not for many years, but I have been shown it.  I've

11   read it.

12   Q    So these are -- now this is -- what's interesting

13   about this, Dr. Frank, is yesterday we got to see a

14   videotape done by the United States Government in 1945

15   or 1946, about the same time this article was written.

16   And it was showing -- have you seen that video before?

17   A    No.

18   Q    Okay.  There's no discussion about any harmful

19   effects of asbestos in that video.  Would that surprise

20   you?

21   A    I don't know anything about it.  I'm not sure if I

22   should be surprised or not --

23   Q    Okay.

24   A    -- or who made it or --

25   Q    Okay.  Let's just say it was done by the U.S.
                        ARTHUR FRANK - CROSS

1   Government to show pipe coverers how to do their jobs in

2   Navy ships.  Okay?

3   A    Okay.

4   Q    It's an instructional video.

5   A    Okay.

6   Q    Okay?  No masks.  No nothing.  Okay?  So this paper

7   talks about the health effects of doing that exact same

8   work; right?  This is what this Fleisher-Drinker report

9   does; right?

10  A    Yes.

11  Q    So --

12  A    On ships.

13  Q    On ships.  Just like the video showed us yesterday.

14  That was one of the highest exposures of end-use

15  products that there has ever existed, right, on ships?

16  Insulators on ships.

17  A    Insulators.  Insulators in general.  Pipe coverers

18  are up there as well.

19  Q    And insulators on ships.  Because -- it's so high

20  because there's very little ventilation in the hulls of

21  these ships; right?

22  A    Right.  Going against exactly what Meriwether and

23  Price said, you need good ventilation.

24  Q    Apparently the American experience was not the same

25  as the one in Britain; correct?

                    ARTHUR FRANK - CROSS

1   A    Well, no.  It was -- unfortunately it was very much

2   the same.

3   Q    The first conclusion of this article is "The

4   character of the asbestos pipe covering industry on

5   board Naval vessels is such that conclusions drawn from

6   other asbestos industries such as textiles cannot be

7   applied." Did I read that correctly?

8   A    You did.

9   Q    And textiles, they're talking about the Meriwether

10  or Price or the Driessen article that you talked about;

11  correct?  Did you talk about Driessen?

12  A    No.

13  Q    Okay.  Same conclusion in Driessen.

14  A    Yes.  Back in '38.

15  Q    Right.  And in fact, 1938 is when they came up with

16  the five million particles per cubic foot TLV that was

17  eventually adopted by the American Conference of

18  Industrial Hygienists; correct?

19  A    American Conference of Governmental Industrial

20  Hygienists.

21  Q    I left the "G" out.

22  A    You did.

23  Q    Okay.  The American Conference of Governmental

24  Industrial Hygienists.  The ACGIH.

25  A    Right.
                    ARTHUR FRANK - CROSS

1    Q    And the ACGIH was a group of state, federal, local

2    health professionals who were interested in promoting

3    the health in the workplace; correct?

4    A    Even though it had the term governmental, not

5    everybody was a governmental employee.  But they were

6    basically industrial hygienists who then and even today

7    still put out recommended levels.

8    Q    Right.

9    A    That was their recommended level then.

10    Q    And five million particles per cubic foot, the same

11    limit that was adopted here in Wisconsin, the same one

12    that was adopted in Ohio, and that remained the

13    threshold limit value up until the late 1960s; correct?

14    A    I don't keep up with all the regulations.  I don't

15    know when they changed over.

16    Q    Is that fair though?  At least into the 60s; right?

17    A    Presumably.

18    Q    Yeah.  And then the last conclusion, back to the

19    Fleisher-Drinker report, it says, "Since each of the

20    three cases of asbestosis had worked at asbestos pipe

21    covering and shipyards for more than 20 years, it may be

22    concluded that such pipe covering is not a dangerous

23    occupation."  That's what was said in 1946; right?

24    A    That's what they said and I certainly wouldn't have

25    written the same statement.  And the fact that they let

ARTHUR FRANK - CROSS

1  go just before the study most of the people who had

2  worked for 20 years and missed most of the disease is

3  part of the problem with that paper.

4  Q    But it is what was out there in the knowledge for

5  folks to learn about if they were interested about the

6  potential hazards of asbestos in use products.

7  A    And there was lots of other material about asbestos

8  out there as well, including --

9  Q    I'm talking right now about the pipe covering

10  insulation trade.

11  A    Well, there was information about plumbers as well

12  that was out there that were end-users who got disease.

13  Q    Now one of the most important things that

14  Dr. Selikoff did was, in 1964, was find out that that

15  conclusion, their No. 4, was not correct; right?

16  A    He wasn't the first one to find that out, but he

17  certainly publicized that and in 1964 wrote that

18  asbestos is no respecter of trade.

19  Q    And the fact of the matter is that Dr. Selikoff in

20  1964, 18 years later, that was the first large-scale

21  study of asbestos exposure from end-use products to

22  identify any sort of health risk; right?

23  A    It was probably the first large study of end-users,

24  not miners or manufacturing workers.

25  Q    Correct.  Thank you.  By the way, back to the

ARTHUR FRANK - CROSS

1  Industrial Commission of the State of Wisconsin, if

2  Mr. Bushmaker's employer, Consolidated Papers, allowed

3  him to work in a circumstance where snow was falling off

4  these pipes, that would have been a violation of the TLV

5  adopted by the State of Wisconsin, wouldn't it?

6  A    I'm not a lawyer.  I'm not an inspector.

7  Q    Oh.

8  A    I don't know what the violations of the rules would

9  be.  It certainly was inappropriate.

10 Q    It would -- okay.  Very well.  And you would find

11 fault with Mr. Bushmaker's employer to put him in a

12 position where he was exposed to asbestos in those

13 quantities in that fashion, correct, as a health

14 professional?

15 A    As a health professional, yes.  Finding fault in a

16 legal sense is a whole different issue.

17 Q    Okay.  I just want to know what your opinion is,

18 Doctor.

19 A    Right.

20 Q    Okay.  I'm going back to the forest now, and the

21 forest I want to talk about relates to this issue of

22 cumulative exposures.  As I understand your testimony,

23 it's your opinion that each and every exposure to

24 asbestos that Mr. Bushmaker may have had would have

25 contributed to the risk of him developing his lung

                    ARTHUR FRANK - CROSS

1  cancer; correct?

2  A    Well, I don't know what the statute is in this

3  state.  There are some states in which my opinion of

4  each and every is not an allowable opinion because

5  judges have ruled that.  I don't know what the rules are

6  here.  What I will simply say, as I said to Mr. McCoy,

7  I'll be happy to say to you, Mr. Moore, is that the

8  cumulative exposure, the cumulative exposure is what

9  caused the disease and the exposure was accumulated from

10  all of the exposures they had.  Some would have -- some

11  exposures would have contributed more and some exposures

12  would have contributed less.

13  Q    And as you said, some courts have not even allowed

14  that testimony to come in; correct?

15          MR. MCCOY:  Objection, Your Honor.

16          THE COURT:  Right.  Let's not go there.

17          MR. MOORE:  Okay.  Fair enough.

18  BY MR. MOORE:

19  Q    Okay.  Now Mr. McCoy asked you some hypothetical

20  questions and I want to ask you a couple as well.  You

21  understand that Mr. Bushmaker was a pipefitter; correct?

22  A    Yes.  Is that a hypothetical or --

23  Q    You understand that.  Yes, it's -- assume with me

24  that Mr. Bushmaker was a pipefitter at Consoweld Papers

25  for 30 plus years.  Okay?

                    ARTHUR FRANK - CROSS

1    A    Okay.

2    Q    And assume with me that Mr. Bushmaker, as a

3    pipefitter, worked with asbestos sheet gaskets and

4    asbestos packing.  Can you assume that with me?

5    A    Yes.

6    Q    And I want you to assume that Mr. Bushmaker

7    testified and will testify in my belief that the

8    facility where he worked had 600 valves.  Okay?

9    A    I'll take your assumptions as a hypothetical.

10   Q    Thank you.  And further assume that Mr. Bushmaker

11   had to replace the asbestos rope packing in those 600

12   valves once each year.

13   A    Okay.

14   Q    And further assume that in order to do this work,

15   he used about two-and-a-half feet of braided asbestos

16   packing made by the A.W. Chesterton Company.  Okay?

17   A    Yes.

18   Q    Now based on what your general opinion is, would it

19   be your opinion -- oh, excuse me.  And also further

20   assume, Dr. Frank, that he did this for a period of 30

21   years.

22   A    Okay.

23   Q    It would be your opinion, I assume then, that

24   assuming those facts to be true, that this work would

25   have resulted in an asbestos exposure to Mr. Bushmaker;

                    ARTHUR FRANK - CROSS

1  correct?

2  A    Your assumption is correct.  Would have contributed

3  to his overall exposure.  Of course.

4  Q    And would have been a cause of his lung cancer;

5  correct?

6  A    Yes.

7  Q    Assume with me that Mr. Bushmaker also used Garlock

8  asbestos --

9  A    In gaskets.

10  Q    -- gaskets.

11  A    They too would have contributed to his disease.

12  Q    I haven't asked that question.  Okay.  Any product

13  I ask you about --

14  A    You'll get the same answer.

15  Q    Fair enough.

16  A    If it contained asbestos and he was exposed, it

17  contributed to his disease.  Some more, some less.

18  Q    And you would agree if you don't know if a product

19  contained asbestos or not, you can't attribute fault to

20  that; correct?

21  A    If I don't know or --

22  Q    I'm sorry.  If we don't -- if the jury doesn't

23  know.

24         THE COURT:  No, no, no.  Fault is the word I'm

25  troubled about.  Cause.  Okay?
                ARTHUR FRANK - CROSS

1          MR. MOORE:  Fair enough, Your Honor.  I will

2     rephrase.

3          THE COURT:  Please rephrase the question.

4          MR. MOORE:  I will.  Thank you, Judge.  I

5     appreciate that.

6     BY MR. MOORE:

7     Q    If it's -- if it's unable to be determined if a

8     product contained asbestos or not, you cannot provide

9     expert testimony that it was a cause of Mr. Bushmaker's

10    lung cancer; correct?

11    A    Without knowing or without there being proof to the

12    jury that a specific product contained asbestos, I can't

13    say it contributed to his disease.

14    Q    Now as I understand your testimony, and I'll say it

15    again, that every asbestos exposure that Mr. Bushmaker

16    encountered contributed to the risk of his developing

17    disease; correct?

18    A    All of his exposures contributed to his overall

19    exposure.

20    Q    Okay.

21    A    Cumulative exposure.

22    Q    But you, you, Dr. Frank, cannot tell us what

23    particular exposure actually caused his disease;

24    correct?

25    A    Well, I can tell you with the asbestosis, all of

                         ARTHUR FRANK - CROSS

1 them caused the disease because all of them contributed

2 to his lung cancer.  I can't tell you which fiber from

3 which product did it.  If he had a left-sided lung

4 cancer and one of the fibers went to the right lung, it

5 certainly didn't cause a cancer in his left lung.  So of

6 all of his exposures to whatever company's products,

7 it's impossible to say which product did it.  You have

8 to say they all had the potential to do so and they all

9 contributed to the total exposure.  Some would have

10 gotten into his lung, but obviously not every fiber from

11 every day no more than every cigarette over a smoking

12 lifetime or every molecule of benzene from filling up

13 gas tanks giving people leukemia is the one that caused

14 it.  You don't know which one did it.

15 Q    Okay.  Thank you, Doctor.  Circling back around,

16 showing you what's been marked as Exhibit 2705.  Okay?

17 A    Yes.

18 Q    And this is plaintiff Gerald Bushmaker's response

19 to bankruptcy trust discovery served by Georgia-Pacific

20 on 11-15-11.  Do you see that?  Can you read that?

21 A    I can.

22 Q    Can the folks of the jury see that?  Okay.  I'll

23 represent to you that this is a document that the

24 plaintiff provided to the defendants during the course

25 of discovery in this case.
                    ARTHUR FRANK - CROSS

1   A    Which means he may have had some other exposures,

2   all of which would have been contributory.

3   Q    Okay.  Well, that's the question I was going to ask

4   you.  Here at the back of this document is a list of all

5   the companies.

6          MR. MCCOY:  Your Honor, can I be heard on this

7   for a moment?

8          THE COURT:  Sure.  Do you want to go side bar?

9          MR. MCCOY:  Yes.

10         THE COURT:  We can do that.

11      (Discussion at side bar at 12:00 p.m.)

12         MR. MOORE:  We just --

13         THE COURT:  Wait.  We've got to get him here

14  too.

15         MR. MCCOY:  Yes, Judge.

16         THE COURT:  Okay.  Your objection is?

17         MR. MCCOY:  My objection is to this part of the

18  chart.

19         THE COURT:  Oh.

20         MR. MCCOY:  I think it's fine --

21         THE COURT:  Can you fold it?  It's fair.  Just

22  fold it in half.

23         MR. MOORE:  Sure.

24         THE COURT:  Is that your concern?

25         MR. MOORE:  Thanks, Judge.
                      ARTHUR FRANK - CROSS

1          MR. MCCOY:  Yeah.  The other question I had was

2     he just brings up the word bankruptcy trust with no

3     explanation of this process.  I --

4          MR. MOORE:  Well, it is what it is.  I'll lay

5     the foundation.

6          THE COURT:  Well, I'm not sure how this is

7     going to come in with Mr. Bushmaker's testimony, but I

8     sort of predicted that it will be asked of him as well.

9          MR. MCCOY:  As long as we go with that.

10         MR. MOORE:  Okay.  That's not a problem.

11         THE COURT:  Okay.  Fair enough.

12      (End of side bar discussion at 12:01 p.m.)

13   BY MR. MOORE:

14   Q    I think the jury saw most of this list in opening

15   statement.  It was probably even on smaller type than

16   this.  So I'll just go down the list.  But I want you to

17   assume, Dr. Frank, that Mr. Bushmaker testified that in

18   his belief that he was exposed to asbestos from all of

19   these companies.  Okay?

20   A    Yes.  And to the extent that he was exposed, they

21   would have been contributory, just like any other

22   exposure he had.

23   Q    Okay.

24         MR. MOORE:  Your Honor, I am loathe to run up

25   against the lunch hour to the jurors.
                    ARTHUR FRANK - CROSS

1          THE COURT:  Sure.  Let's go side bar just to

2     talk about calendaring because I know we've got a full

3     afternoon with some other stuff, but also want to make

4     sure we get Dr. Frank out of here in a timely fashion.

5     So let's just talk about how much is left.  You know, I

6     don't even need to turn on the white noise for that.  So

7     if you guys want to stand up and stretch, but it sounds

8     like we might be breaking soon.  Let's find out.  And

9     this does not have to be on the record.

10         (Discussion off the record     12:03-12:04 p.m.)

11         THE COURT:  Actually Ladies and Gentlemen,

12    you're still on break because they're consulting about

13    whether they want to ask any more questions or not.  But

14    you don't get to vote on that.

15         (Pause)

16         MR. MOORE:  Your Honor, I'm just going to check

17    my notes right now.

18         THE COURT:  That's fine.  You're entitled.  And

19    just give me the thumbs up or thumbs down and then we'll

20    go to Mr. McCoy.

21         MR. MOORE:  Do I need to offer the exhibits

22    that were identified?

23         THE COURT:  No.  You've made your record.  We

24    can clean that up later while the jury is not waiting.

25         MR. MOORE:  Thank you.  Just a couple of
                    ARTHUR FRANK - CROSS

1  questions.

2  BY MR. MOORE:

3  Q    I think we asked this about the Chesterton product,

4  but I didn't ask --

5           THE COURT:  Fold it.

6           MR. MOORE:  I'm sorry, Your Honor.

7  Q    -- about these companies here.  Assume with me,

8  Dr. Frank, that all these products were present and used

9  in the Consoweld facility owend by Consolidated Papers

10  where Mr. Bushmaker worked.  Would you agree that

11  Consoweld should have taken steps to prevent

12  Mr. Bushmaker from being exposed to all of these

13  products --

14           MR. MCCOY:  Objection, Your Honor.

15  Q    -- as a safety -- as an occupational and safety

16  doctor?

17           MR. MCCOY:  Outside the scope of the testimony

18  and expertise.

19           THE COURT:  Let's go side bar real quick, and I

20  apologize, Ladies and Gentlemen, but let's clean this

21  up.

22      (Discussion at side bar at 12:05 p.m.)

23           THE COURT:  Okay.  I'm going to sustain the

24  objection as cumulative.  You've already asked him if

25  they had an obligation.  Now you're just taking him
                    ARTHUR FRANK - CROSS

1  through the whole list.  So we don't need that.

2         MR. MOORE:  Okay.

3         THE COURT:  If that's all you've got, you're

4  done.  If you've got anything else, let's get there.

5         MR. MOORE:  Okay.  It was my last question,

6  so...

7         THE COURT:  Are you done?

8         MR. MOORE:  I'm done.

9         THE COURT:  Okay.  Then we'll turn it over for

10  redirect.

11      (End of side bar discussion at 12:05 p.m.)

12         MR. MOORE:  That concludes my

13  cross-examination.

14         THE COURT:  It doesn't count until the white

15  noise is off.  All right.

16         MR. MOORE:  That concludes my cross-examination

17  of Dr. Frank.

18         THE COURT:  All right.  Mr. McCoy, any

19  redirect, please.

20         MR. MCCOY:  Yes, Judge.

21                REDIRECT EXAMINATION

22  BY MR. MCCOY:

23  Q    Dr. Frank, does it make any difference in terms of

24  your opinions about what caused Mr. Bushmaker's lung

25  cancer, meaning asbestos exposure versus smoking, if you

                    ARTHUR FRANK - REDIRECT

1  believe what's in the medical records of the treaters

2  versus what Mr. Bushmaker had told you?

3  A    If you mean do I still believe that asbestos had a

4  role in his lung cancer?

5  Q    Yes.

6  A    Of course it does.  Even if the smoking would have

7  had a role, that doesn't diminish the fact that asbestos

8  contributed as well.

9  Q    And is it still your testimony as far as the role

10  that smoking would have played, does that change?

11  A    No.  I mean that's -- my understanding is my

12  understanding.  But it's not my understanding that will

13  count.  There's no question in my mind that the asbestos

14  did it.  You know, as my report said, you know, it's

15  unclear what role, if any, the tobacco had, but there's

16  no question that the asbestos had a clear and

17  significant role in his developing his lung cancer, and

18  certainly his asbestosis, which doesn't get caused by

19  smoking.

20  Q    The -- you were shown some medical records that

21  talked about emphysematous changes --

22  A    Yes, sir.

23  Q    -- in Mr. Bushmaker.  What is your opinion as to

24  the cause of those changes?

25            MR. MOORE:  Objection.  Outside the scope.
                ARTHUR FRANK - REDIRECT

1    Outside the scope of his report.

2              MR. MCCOY:  The door was opened on that, Judge.

3              THE COURT:  We've got to go back to side bar.

4         (Discussion at side bar at 12:08 p.m.)

5              THE COURT:  Now refresh my recollection.  Let's

6    back up a little bit.  We were at side bar during the

7    direct exam and I said that if it wasn't in the report,

8    you couldn't go there.  And then what I directed you to

9    do over your objection was have him read aloud the

10   report, which really did not talk about that.

11        Now what on the cross-exam reopened that door?

12             MR. MCCOY:  They showed him the documents about

13   the emphysematous changes and asked him about it.  They

14   opened the door.

15             MR. MOORE:  No --

16             THE COURT:  No, wait.

17             MR. MOORE:  -- I didn't say that word.

18             THE COURT:  No, I'm not recalling that.

19             MR. MCCOY:  Judge, once again they have not

20   designated a medical expert on these changes.  If

21   they're going to put it in front of Dr. Frank and imply

22   to Dr. Frank that he should --

23             MR. MOORE:  I said --

24             THE COURT:  No.  Wait, wait, wait.  We can't

25   both talk at once and I get to talk over you.  Again,
                    ARTHUR FRANK - REDIRECT

1   you keep talking about emphysematic changes, but I don't

2   recall that coming up during the cross-exam.

3          MR. MOORE:  Intentionally so.

4          MR. MCCOY:  It was shown to --

5          THE COURT:  When you say "it" was shown, what

6   was "it"?  Find me the document that was shown.  And if

7   you're right, I'll give it to you.  But --

8          MR. MCCOY:  Here are my notes.  2723A.

9          THE COURT:  Let's get it.  Let's get it.

10      (Pause)

11         THE COURT:  Okay.  Well, no.  Show me what

12  you're thinking.

13         MR. MCCOY:  Right here.

14         THE COURT:  Okay.  Well, you did highlight it.

15         MR. MOORE:  I did highlight it.  I never said

16  the word.  But that's fine.

17         THE COURT:  Well, no.  That's what I was

18  looking for.  Yes, you may go there.

19         MR. MCCOY:  And the other one, Judge, the other

20  one, the same thing, was the COPD.  That was also --

21         THE COURT:  That definitely came up.  He

22  asked --

23         MR. MCCOY:  Right.

24         THE COURT:  You're clean.  Okay.

25         MR. MOORE:  Absolutely.  Yeah, I agree.
                    ARTHUR FRANK - REDIRECT

1        (End of side bar discussion at 12:10 p.m.)

2            THE COURT:  Believe it or not these are very

3    productive for the lawyers.  So Mr. McCoy, you may

4    continue.

5    BY MR. MCCOY:

6    Q    Yes.  Dr. Frank, you were shown some documents that

7    had highlighted a finding of centrilobular emphysematous

8    changes in Mr. Bushmaker.

9    A    Yes, sir.

10   Q    Do you recall that?

11   A    I do.

12   Q    And what is your opinion as far as Mr. Bushmaker's

13   concerned about the cause of that finding?

14            MR. MOORE:  Objection.  Lack of foundation.

15   There's been no study that he actually looked at any of

16   the films to form a basis for this opinion.

17            THE COURT:  I'll allow the question, the

18   answer, and if you want to recross on the foundation,

19   you may do so.  But the question is fair.

20            THE WITNESS:  I saw in the records where it

21   said that they thought Mr. Bushmaker had emphysematous

22   changes.  There are at least three possibilities of what

23   could have caused those emphysematous changes.

24   Depending on the smoking history, the smoking history I

25   have, I don't think there was enough smoking to cause

                ARTHUR FRANK - REDIRECT

1   those changes.

2        Secondly, emphysematous changes can occurred in the

3   lung following removal of part of the lung because the

4   other parts of the lung expand to compensate.

5        Thirdly, part of the work of a pipefitter is to do

6   welding.  Welding fumes and the act of welding can also

7   cause emphysematous changes.  So we have three

8   possibilities.  We know that he was doing welding as a

9   pipefitter.  We know that he had lung surgery.  It is

10  unclear what the smoking history is.  That may or may

11  not have been a contributing factor.

12  BY MR. MCCOY:

13  Q    You also were shown a document that showed a

14  finding of COPD --

15  A    Yes.

16  Q    -- in Mr. Bushmaker and I think you described

17  before what COPD is.  But can you briefly remind us what

18  that means?

19  A    It's a generic term meaning Chronic Obstructive

20  Pulmonary Disease.  The centrilobular emphysema we

21  just -- which could be equated with COPD, could have

22  come from the three causes we just mentioned.  The other

23  data that we have about his COPD, which was not terribly

24  severe if you look at his pulmonary function testing, he

25  had a test of 74 percent prior to his lung surgery.  80
                    ARTHUR FRANK - REDIRECT

1  percent is considered normal.  74 in a gentleman of his

2  age is a modest decrease.  Certainly nothing that would

3  go under the heading severe.  And if it would have been

4  thought to be severe with a part of his lung out, you

5  would expect, for example, that he might require

6  supplemental oxygen, which he doesn't.  So I don't

7  think -- and that's why I disagreed with Mr. Moore that

8  I didn't think the COPD was severe and that's my

9  assessment of the data that's in the medical records.

10 Q    What about the cause of the COPD?  Do you have any

11 assessment on that?

12 A    We just discussed -- you know, COPD, he doesn't

13 have evidence of chronic bronchitis.  He had episodes of

14 acute bronchitis, which anybody can get if they get

15 inflammation of the respiratory tract.  So we have to

16 assume that somebody thought his emphysematous changes

17 was, to their mind, equivalent of COPD.  There's no

18 other plausible explanation.  And the cause of his

19 emphysema could be cigarettes; undoubtedly was

20 contributed to by his welding fumes, and then there was

21 the role of having part of his lung removed.

22 Q    What kind of role would having part of his lung

23 removed --

24 A    As we said, when you take -- there are certain

25 tissues in the body, when you take them out or you take

                    ARTHUR FRANK - REDIRECT

1    part of them out, the rest of it tries to compensate for

2    it.  For example, if you take out one kidney, the other

3    kidney gets larger to compensate for it.  Some organs

4    like the liver, if you take a part of the liver out, it

5    can regenerate the rest of the liver.  If you take out a

6    piece of lung, the remaining lung on that side will show

7    certain changes.

8         The other thing that was of interest is if you look

9    at the pathology report when they have --

10        MR. MOORE:  Objection, Your Honor.  There's no

11   question pending.  It's outside the scope of the --

12        THE COURT:  Well, actually I think he's giving

13   a narrative answer to a question, so it's fair.

14        THE WITNESS:  When you look at the pathology

15   report when he had his lung cancer surgery when they had

16   a whole lobe of his lung, nowhere in the pathologic

17   assessment, when they actually had the lung tissue to

18   look at, did anybody in that pathology report ever

19   mention emphysematous changes.  So there's a real

20   question if it was there or not.

21   BY MR. MCCOY:

22   Q    You talked about -- you were asked some questions

23   about exposure, and I think one of the points you said

24   was that there has to be proof that the product

25   contained asbestos --

                    ARTHUR FRANK - REDIRECT

1    A    Yes.

2    Q    -- for you to have an exposure.

3    A    For me to say that it contributed to his disease,

4    he had to have worked with a product that contained

5    asbestos that he was exposed to; fibers that were

6    released from it.

7    Q    Does it also require that the fibers from that

8    product be released into the air?

9    A    Yes.

10   Q    And that they get into the area where they can be

11   inhaled?

12   A    Yes.

13   Q    So without those actual -- without that actual

14   evidence of asbestos content, fibers released in the

15   air, in the breathing zone to be inhaled, there would

16   not be an exposure from --

17   A    Correct.

18   Q    -- a causation standpoint.

19   A    Correct.  You could come visit my office, I have a

20   piece of asbestos-containing rock.  It's taped up in a

21   plexiglass box.  The physical presence of it in my

22   office doesn't put me -- and I sit in my office pretty

23   much every day -- or anybody visiting me at risk.  So

24   the mere presence of it, if somebody now opened that box

25   and released those fibers into the room, that puts us at
                    ARTHUR FRANK - REDIRECT

1   risk.

2        So to say that it was a contributor to his disease,

3   there been to be knowledge he was actually exposed to

4   it.

5   Q    Okay.  And exposure includes all those elements.

6   A    All of those things.  It had to be there; it had to

7   be in the air; it had to be in his breathing zone; it

8   had to get into his lungs.

9   Q    So if somebody comes in to you as an occupational

10  physician and says I was exposed to a toxin, do you take

11  -- would you take them at their word in terms of

12  assessing what they said, exposure?  Or would you ask

13  them these questions about does that mean, you know,

14  that it had the toxin in it or determine that; that it

15  had the toxin in it and that they actually inhaled it?

16          MR. MOORE:  Objection, Your Honor.  Outside the

17  scope.  Calls for speculation.

18          THE COURT:  No, I'm going to sustain that one

19  for a different reason.  It's a 403 confusion issue.

20          MR. MCCOY:  Yeah.  Right.

21  BY MR. MCCOY:

22  Q    All right.  I'm going to move on to this last

23  question I've got.  You were shown a copy I think of

24  this article by Fleisher.

25  A    Yes.

                    ARTHUR FRANK - REDIRECT

145

1  Q     Okay.  You saw parts of it on the video system.

2  A     Yes.

3  Q     But I just gave you a copy of the whole article.

4  You made some comment about that article that the people

5  were fired who had had 20 -- less than -- or as they

6  neared the 20-years exposure.  What do you mean by that?

7  A     Well, they were going to go to the shipyard -- it

8  was up in Boston -- to study the problem of asbestos in

9  shipyards, specifically in pipe coverers.  Nobody is

10 quite clear how or why this happened, but most of the

11 people who had had the 20 years of exposure were let go

12 and were not there to be part of the study.  Of the few

13 that were left, three of them did, in fact, have

14 disease.  You know, this is a conclusion that not

15 everybody would reach.

16      If three people working 20 years or more had

17 asbestosis, I think it's a legitimate question to ask.

18 Does that mean that that's safe?

19      We also know that it takes relatively many years.

20 We talked about latency.  So people with lesser

21 exposures wouldn't yet have had enough of the latency

22 period to demonstrate disease.  So there were some

23 serious flaws with this.  But even so, the finding that

24 they got, you know, could have been looked at many

25 different ways in saying that it is -- appears to be

                    ARTHUR FRANK - REDIRECT

1  safe based upon three people developing asbestosis out

2  of very few that were 20 years or more seems

3  inappropriate.

4      And even though this was their conclusion, anybody

5  else reading this could have thought about it and said

6  you know, maybe this isn't exactly what I would think

7  about this problem because there's other information out

8  in the world of science that tells us it's dangerous.

9  Q   And that article was published in what year?

10  A    1946.

11  Q   And you mentioned something about an article in the

12  Journal of the American Medical Association in 1949?

13  A    Right.  In fact, it went on to talk about lung

14  cancer.

15  Q   And how does the article in 1949 add to or differ

16  from the perspective of the 46 conclusions?

17  A    It looks at the problem of asbestos differently.

18  It reaches different conclusions that the material is,

19  in fact, hazardous.  And in '56, Stokinger says whatever

20  we do to protect people from asbestosis, there should be

21  -- and he -- you know, it's there -- 100 or 500 times

22  better control to prevent cancer.  And that was

23  certainly known by 1956 with regard to asbestos.

24          MR. MCCOY:  That's all the questions I have.

25          THE COURT:  Did you want to redirect just on
                    ARTHUR FRANK - REDIRECT

1  the foundation?

2          MR. MOORE:  One question.  Couple down this

3  path.   (12:22 p.m.)

4          THE COURT:  I'll give you three to four minutes

5  total.

6                    RECROSS-EXAMINATION

7  BY MR. MOORE:

8  Q    Dr. Frank, did you watch the Green Bay Packers play

9  the Washington -- excuse me, the San Francisco Giants --

10 49ers rather?

11 A    This year?

12 Q    Yeah.  Did you see the playoff game?

13 A    No.

14 Q    What could -- do you know what Green Bay could have

15 done to have won that game?

16 A    Played better.  Scored more touchdowns.

17 Q    That's right.  It's Monday morning after the game.

18 We can talk about what things happened in the past, but

19 that's -- in Fleisher-Drinker, that's what happened in

20 1946.  That's what the U.S. Government found; right?

21 A    And others on other articles earlier and later

22 found different conclusions.

23 Q    Fair enough.

24          MR. MOORE:  Briefly, Your Honor, we're going to

25 see a lot of these later on.  But this is one of the

                    ARTHUR FRANK - RECROSS

1    affidavits that Mr. Bushmaker submitted.

2          MR. MCCOY:  Your Honor, I think this is outside

3    the scope.

4          THE COURT:  I think I know where Mr. McCoy is

5    going, but I think he needs to tell me at side bar.  But

6    this counts as part of your three minutes.

7          MR. MOORE:  Okay.

8       (Discussion at side bar at 12:22 p.m.)

9          THE COURT:  I think I can predict, but you tell

10   me.

11         MR. MOORE:  He's trying to undermine the

12   foundation for the admissibility of these exhibits

13   through him saying, you know, Mr. Bushmaker has to have

14   asbestos; it has to be all these things that he laid out

15   in his --

16         THE COURT:  Right.  So this is to --

17         MR. MOORE:  Rebut that.

18         THE COURT:  -- rebut the implication that a lot

19   of these products on the list Mr. Bushmaker never

20   actually was exposed to.

21         MR. MOORE:  Precisely.  And that's through the

22   document.

23         THE COURT:  Okay.  So I'll let you do it with

24   one document.  I assume it's all going to come back in

25   with Mr. Bushmaker from both of you.
                    ARTHUR FRANK - RECROSS

1       MR. MOORE:  Yes, absolutely.

2       THE COURT:  Okay.  Let's make it quick.

3       (End of side bar discussion at 12:24 p.m.)

4  BY MR. MOORE:

5  Q    Real fast.  Okay.  This is -- sorry.  This is an

6  affidavit marked Exhibit 2729A from Mr. Bushmaker.  Do

7  you see the signature there?

8       THE COURT:  Well, now you've got to turn it

9  sideways.

10 A    Yes.

11 Q    And it's sworn under oath.  Do you see that?  It

12 says "Upon first being duly sworn on oath, I depose and

13 state as follows..."

14 A    I see that.

15 Q    And it says "I regularly engaged in activities

16 and/or worked in close proximity to others engaged in

17 activities that caused the release of asbestos fibers in

18 the air.  I breathed in this asbestos dust for the time

19 period I worked at the job sites listed below.  And I

20 was exposed to Armstrong asbestos-containing products

21 for a period of at least six months.  To my

22 recollection, I worked with or in close proximity to the

23 following Armstrong asbestos-containing products as

24 circled..." and there are several circled there.  Do you

25 see that?

                    ARTHUR FRANK - RECROSS

1    A    I do.

2    Q    And I read this correctly for you; right?

3    A    Yes.

4    Q    And then on the second page -- I'm sorry, folks, if

5    you can -- I hope you can see this.  "I altered,

6    repaired or otherwise worked with asbestos-containing

7    products such that I was exposed on a regular basis to

8    raw asbestos fibers."  Did I read that correctly?

9    A    You did.

10   Q    And this is the type of proof that you need to

11   attribute -- to say that it was a contributing cause to

12   Mr. Bushmaker's lung cancer; correct?

13   A    To the Armstrong products, yes.

14   Q    Absolutely.

15   A    Yes.  Just as it would be for any other product,

16   including the Philip Carey products.

17          MR. MOORE:  Fair enough.

18          THE COURT:  Did you want to re-redirect on

19   that?

20          MR. MCCOY:  Judge, I lost track of the re-re's,

21   so --

22          THE COURT:  That's why I'm here.  Are you done?

23          MR. MCCOY:  I'm finished.

24          THE COURT:  All right.  Well, Doctor, so are

25   you.  Thank you for your testimony.  You're free to go

                    ARTHUR FRANK - RECROSS

1  about your business.  Have a safe trip home.

2       THE WITNESS:  Thank you, Your Honor.

3       (Witness excused at 12:25 p.m.)

4       THE COURT:  You're free to go to lunch as well.

5  We'll -- I'll tell what.  I'm feeling generous.  65

6  minutes.  Come back at 1:30.

7       (Jury excused from courtroom at 12:25 p.m.)

8       THE COURT:  Okay.  Everyone be seated, please.

9  Doctor, you're free to go.

10      MR. MCCOY:  Judge, before he goes, that's why I

11  got up here.  If we're going to make a proffer on this

12  future medical, I can do it with him or I can just do it

13  by summarizing.  Whichever way Your Honor wants.

14      THE COURT:  Well, no, no.  Wait.  Wait.  Wait.

15  Wait.  We're on the record now.  Wait.  I need you guys

16  to focus.  Mr. McCoy, I have no idea what you're talking

17  about.  Future medicals had nothing to do with

18  Dr. Frank's testimony.

19      MR. MCCOY:  Well, that's because Your Honor

20  made the ruling that we couldn't talk about it.  That

21  was discussed at the beginning because -- that was the

22  beginning of this morning.

23      THE COURT:  No.  What I said was that -- what

24  my understanding of the dispute that was put in front of

25  the Court was that you guys were $5,000 apart on

1  medicals.  I don't recall anything about future

2  medicals.

3          MR. MCCOY:  We discussed that this morning;

4  that Mr. Moore made the objection that his testimony

5  didn't refer to future medical care.  And --

6          THE COURT:  I'm not tracking at all.  I don't

7  recall that.

8          MR. MOORE:  No, no, no, Your Honor.  Maybe I

9  can clarify.  My objection -- Doctor, unless --

10          THE COURT:  Well, I don't know, I think

11  Mr. McCoy paid his freight, so I think he better wait

12  until Mr. McCoy says it's okay.  But as far as I'm

13  concerned, he's done.  But Mr. McCoy, we're on your

14  dime.  Clarify, please.

15          MR. MOORE:  I --

16          THE COURT:  No, I want him to clarify.

17          MR. MCCOY:  What I was told this morning was

18  that future medical, because it wasn't specifically

19  mentioned in his report as that term future medical,

20  couldn't be allowed in Dr. Frank's testimony.  I adhered

21  to that.  That's why I mentioned when I stopped my

22  testimony that I would be making a proffer.

23          THE COURT:  Okay.  Well, I'm going to have to

24  go back and look at the transcript.  Maybe I'm older and

25  more senile than even my wife gives me credit for, but I

1  do not recall at all the topic of future medicals coming

2  up.

3      Mr. Moore, your recollection on this?

4      MR. MOORE:  My recollection was that I was

5  going to cut it off at saying that there was no

6  information in the report that indicated an increased

7  risk of cancer or anything that's going to happen to him

8  in the future as a result of this current condition.

9  That had nothing to do with medical expenses.

10     I just didn't want speculation about future, the

11 future -- what holds the future for Mr. Bushmaker, you

12 know, and the scare, possible scare that he might get of

13 cancer again.  That's where I was trying to cut the line

14 off.

15     MR. MCCOY:  That's what I was referring to

16 exactly; what he just talked to when I said future

17 medical meaning --

18     MR. MOORE:  They're apples and oranges

19 obviously.

20     THE COURT:  Okay.  I'm sorry. I misunderstood.

21 I thought you were talking about future medical

22 expenses.  You're just talking about the probability of

23 future recurrence?

24     MR. MCCOY:  Yes, right.

25     THE COURT:  I don't recall that coming up, and

1   I apologize if we brought it up this morning.  I thought

2   we were talking about --

3          MR. MOORE:  Maybe I --

4          THE COURT:  Go ahead.

5          MR. MCCOY:  It was brought up.

6          THE COURT:  On the record?

7          MR. MOORE:  It might have been between

8   Mr. McCoy and myself and I just said Bob, I'm going to

9   keep you to the four corners.

10         MR. MCCOY:  It was with Your Honor, because

11  there's where I heard Your Honor say where is it in his

12  report and I said I could --

13         MR. MOORE:  You said that a lot.

14         THE COURT:  Yeah.  I'm sorry.  That doesn't

15  help much today.

16         MR. MCCOY:  I mean if they can come in --

17         THE COURT:  Don't you have the surgeon coming

18  in?  I mean why -- again, it's fair game for somebody to

19  offer to a reasonable degree of medical certainty that

20  something is likely to happen in the future if it's part

21  of the report.  But again, this goes back to something

22  that we've talked about with all of our experts and it's

23  not new to this case.  If it's in the report, it's fair

24  game.  If it's something new and substantive, it's not.

25      You know, to the extent that you don't have in

1  Dr. Frank's report any prediction to a reasonable degree

2  of medical certainty that the cancer will recur or that

3  something else will recur, yeah, I would stand by that

4  ruling, although I don't remember making it.  If you

5  wanted to proffer something in that regard, I'll let you

6  do it.

7          MR. MCCOY:  Okay.

8          THE COURT:  But the report speaks for itself.

9  I certainly don't want to prevent you from making your

10 record in that regard.  But I'm not sure we need

11 Dr. Frank to do that.

12         MR. MCCOY:  Okay.  If I can just do a proffer,

13 then I will without him.  I will do that.

14         THE COURT:  That's fine.  And frankly, I don't

15 know that Mr. Moore objects to anything that's actually

16 in the report.

17         MR. MOORE:  No.  No.  It's his report.  I mean

18 the report is what it is.  I'm just saying I don't want

19 the four -- you know, it's the four corners.

20         THE COURT:  Tell me what's in the report that

21 you want the jury to hear.  Just read it to me.  Tell me

22 what page so Mr. Moore can read along.

23         MR. MCCOY:  What I'm saying is that specific --

24 let me find the report again.

25         THE COURT:  If you want to have a seat,

1   Dr. Frank.

2         THE WITNESS:  If you don't mind, I'll stand.

3   I've been sitting.

4         MR. MCCOY:  Okay.  Dr. Frank's report talks

5   about him having developed two asbestos-related

6   conditions.  It doesn't go on to say anything about that

7   it's his opinion that there will be a recurrence or

8   anything of these conditions.

9         THE COURT:  Well --

10        MR. MCCOY:  What I wanted to do was to

11  introduce though, based on these two conditions, the

12  medical knowledge of what happens with these two

13  conditions; to describe it.  I wasn't going to ask him

14  to give any opinion on this, I was just going to ask him

15  to describe what happens that it does reoccur.  It's not

16  cured.

17        THE COURT:  No.  Okay.  Well, I wouldn't have

18  allowed that anyway.

19        MR. MCCOY:  Okay.  Then I'll do a proffer.  Do

20  I need Dr. --

21        THE COURT:  That's fair.  Because again, if you

22  were to read to me now something that was in his report,

23  I would have allowed that.  But what you're telling me

24  now is that you were going to ask Dr. Frank to talk

25  generally about what can happen when people have these

1  conditions.  If that was not in his report, then it

2  would not be fair game under 26(b)(2) or 26(e).

3      But again, I'm not entirely clear as to which it

4  is.  And Mr. Moore, maybe you can help me.  Is this news

5  to you?  Is this something that --

6          MR. MOORE:  My mind is coming back to me a

7  little bit.  I had the same affliction.  I believe they

8  were going down this path during direct testimony.  We

9  came to side bar.  It was the subject of an objection.

10 The Court ruled just as you are ruling right now.  That

11 was my recollection.

12         THE COURT:  If it's in the report, it's in.

13         MR. MOORE:  Precisely.  And we got to the issue

14 of progression.  What's in the future for Mr. Bushmaker.

15 That was the gist of it.

16         THE COURT:  Okay.  So it was at side bar.  I

17 thought, Mr. McCoy, you were talking about before we

18 even started this morning.

19         MR. MCCOY:  Right.  I am.

20         THE COURT:  So this morning when we talked

21 about the medicals, that was about the financials.  But

22 now I understand.  Okay.

23         MR. MOORE:  Yes.

24         MR. MCCOY:  I am talking about what happened

25 early this morning because Dr. Frank can tell you --

1          THE COURT:  Well, no, now I'm tracking.

2          MR. MCCOY:  But I told Dr. Frank he can't talk

3    about that part of it before he even started testifying.

4          MR. MOORE:  I --

5          THE COURT:  Now you've lost me again.  I've got

6    back off the rails.  The ruling stands.  Okay?  If you

7    want to make a proffer, you can.  But I don't want

8    Dr. Frank to have to wait for that.

9          MR. MOORE:  I'm satisfied with the proffer made

10   by counsel to Lynette.  That's fine.

11         THE COURT:  If he wants to perfect his record,

12   I won't prevent Mr. McCoy from doing that.

13         MR. MCCOY:  I'll do that without Dr. Frank.

14         THE COURT:  Well, he's not getting back on the

15   stand anyway.  I mean that's the ruling.  I'm saying

16   Dr. Frank is free to go.  But after lunch, you're free

17   to make your proffer to the Court to perfect your

18   record.  Okay?  Does that make sense?

19       All right.  Doctor, now you're really free to go.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  Thank you.  And you can still have

22   a safe trip home, please.

23         THE WITNESS:  Thank you.

24         MR. MOORE:  Safe travel, Dr. Frank.

25         THE COURT:  All right, Counsel.  This doesn't

1   have to be on the record, but let's talk about this

2   afternoon.

3           (Discussion off the record at 12:33-12:36 p.m.)

4           (Noon recess        12:36-1:30 p.m.)

5                   (End of requested excerpt)

6

7                       *  *  *  *  *

8

9           I, LYNETTE SWENSON, Certified Realtime and Merit
    Reporter in and for the State of Wisconsin, certify that
10  the foregoing is a true and accurate record of the
    proceedings held on the 7th day of March 2013 before the
11  Honorable Stephen L. Crocker, Magistrate Judge for the
    Western District of Wisconsin, in my presence and
12  reduced to writing in accordance with my stenographic
    notes made at said time and place.
13  Dated this 27th day of March 2013.

14

15

16                      /s/_____

17                      Lynette Swenson, CRR, RMR, CBC
                            Federal Court Reporter

18

19

20

21

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means
24  unless under the direct control and/or direction of the
    certifying reporter.

25